UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2004 JUL -7 P 12:54

CIVIL ACTION: 04-CV-11069-JLT

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| ABRAHAM PHILIP, MD | ) |
| Plaintiff, | ) |
| vs. | ) |
| JOHN CRONIN, in his personal capacity. | ) |
| Defendant. | ) |

FIRST, AMENDED
COMPLAINT AND DEMAND FOR JURY TRIAL

The plaintiff appears through his counsel and states the following First, Amended Complaint.

JURISDICTION

1. This action is brought pursuant to 42 USC Sections 1983, 1988 and the First and Fourteenth Amendments. Jurisdiction is based upon 28 USC Section 1331 and 1343(1), (3), (4) and the aforementioned statutory and constitutional provisions.

2. The plaintiff invokes the supplemental jurisdiction of this court under 28 USC Section 1367 to consider claims arising under state law.

PARTIES

3. Plaintiff Abraham Philip, MD is a resident of the Town of Beverly, Essex County, Massachusetts.

1

4. Defendant-John Cronin was, at all times pertinent, the Chief Administrative Officer of the Officer of the Chief Medical Examiner ("OCME"), with a business address within Suffolk County, Massachusetts.

5. Defendant-Cronin is sued in his personal capacity, only.

## GENERAL ALLEGATIONS

6. On or about September 2, 2003, Dr. Philip entered into a contract for employment with the Office of the Chief Medical Examiner ("OCME").

7. The above-mentioned contract was the fourth time the OCME had hired Dr. Philip or extended his employment contract.

8. During, and also before, the period of December 30, 2003 to March 3, 2004, Dr. Philip made, to Defendant-Cronin, numerous suggestions for improving the operations of the OCME.

9. During, and also before, the period of December 30, 2003 to March 3, 2004, Dr. Philip also pointed out, to Defendant-Cronin, numerous ways in which the operations of the OCME violated state regulations, violated state law, or created dangers to public health and safety.

10. Among the ways in which Dr. Philip reasonably believed the operations of the OCME violated state regulations, or created dangers to public health and safety was the failure of OCME to do adequate investigation of newly-deceased hospital

patients who were on "do not resuscitate" (DNR) orders who had abnormally high levels of morphine in their blood.

11. Among the ways in which Dr. Philip reasonably believed the operations of the OCME violated state regulations, or created dangers to public health and safety was the failure of OCME to do adequate investigation of the deaths of nursing home patients.

12. Among the ways in which Dr. Philip reasonably believed the operations of the OCME violated state regulations, or created dangers to public health and safety was the failure of OCME to conduct adequate toxicological studies of deceased persons for illicit drugs such as Ecstasy, PCP, Fentanyl, Ketamine, or abuse of prescription drugs.

13. Among the ways in which Dr. Philip reasonably believed the operations of the OCME violated state regulations, or created dangers to public health and safety was the failure of OCME to conduct timely microbiological studies of deceased persons for infectious diseases including but not limited to Hepatitis, Influenza, Severe Acute Respiratory Syndrome (SARS), and West Nile Virus.

14. Among the ways in which Dr. Philip reasonably believed the operations of the OCME violated state regulations, violated criminal law, or created dangers to public health and safety was in permitting the removal of organs from a hospital patient who was not brain-dead, in whom cardiac arrest was

induced in order to pronounce him dead, after which organs from the body, including but not limited to the heart, were removed.

15. Among the ways in which Dr. Philip reasonably believed the operations of the OCME created dangers to public health and safety was OCME's equipping its personnel with inadequate protective equipment, such as aprons that were not blood-proof and which were highly likely to expose OCME personnel to infectious diseases.

16. Defendant-Cronin never implemented any of the various suggestions for improvement submitted by Dr. Philip, even though he had time to do so between (A) the time the plaintiff informed him of the violations and the improvements that needed to be made and (B) the time the plaintiff reported these matters to other individuals within and outside the OCME.

17. Defendant-Cronin never, before the plaintiff's contract was terminated, eliminated or addressed any of the ways in which the operations of the OCME violated state regulations, violated criminal law, or created dangers to public health and safety as pointed out to him by Plaintiff-Dr. Philip.

18. The relationship between Cronin and Dr. Philip deteriorated over time.

19. On February 13, 2004, Dr. Philip was performing an autopsy on the body of a female rape and homicide victim.

20. During the course of the autopsy mentioned above, a funeral home representative came to the OCME, without an

appointment or prior notification, to seek a signature for a death certificate.

   21. Defendant-Cronin sent an OCME employee to secure Dr. Philip's signature.

   22. Dr. Philip informed the employee that he was in the middle of a homicide autopsy and the individual who wanted the death certificate would have to wait until the autopsy was completed, which would have been approximately 60 minutes.

   23. Shortly thereafter, the employee's supervisor again appeared in the autopsy room, and told Dr. Philip that Defendant-Cronin demanded that he interrupt the homicide autopsy and immediately sign the death certificate.

   24. Dr. Philip did interrupt the autopsy as the defendant had demanded, and signed the death certificate.

   25. Blood went upon the death certificate.

   26. Dr. Philip disputes that he played a role in getting blood on the death certificate.

### COUNT I:
### VIOLATION OF THE FIRST AMENDMENT

   27. The plaintiff incorporates the preceding paragraphs of the Complaint and states further as follows.

   28. In retaliation for Dr. Philip's speech as outlined in paragraphs 7 through 13, Defendant-Cronin suspended Dr. Philip from work for one day as a penalty for getting blood on the death certificate that Cronin had ordered Dr. Philip to sign during the middle of an autopsy.

29. The suspension for getting blood on a death certificate under the circumstances described above was a pretext for retaliation.

30. On March 1, 2004, Dr. Philip wrote a letter to the Governor of the Commonwealth of Massachusetts in which Dr. Philip expressed his opinions about problems in the OCME and outlined some ideas for improvements, including but not limited to the issues outlined above in this Complaint.

31. A copy of Dr. Philip's letter to the Governor was provided to Defendant-Cronin.

32. On March 2, 2004, Dr. Philip wrote a memo to other medical examiners at the OCME pertaining to a case in which body parts had been harvested from an auto accident victim before the victim was brain dead, as described in paragraph 13 of this Complaint.

33. Dr. Philip had been requested to approve the harvesting procedure described in paragraph 13 on or about January 30, 2004, but had declined to do so due to medical and ethical concerns.

34. When Dr. Philip declined to authorize the removal of body parts from a person who was not yet brain-dead, the persons who wanted to harvest the body parts obtained the approval of the Chief Medical Examiner, Dr. Richard Evans, to do so.

35. Dr. Philip's March 2, 2004 memo suggested that the

removal of the body parts described above was not a good or appropriate procedure, and suggested a conference among appropriate personnel to discuss how such cases might be handled in the future.

36. On March 3, 2004, Defendant-Cronin told the Defendant that he would no longer be permitted to conduct "cremation certification duty," a duty to which all other medical examiners were still assigned.

37. The singling out of Dr. Philip as a medical examiner who would not be permitted to conduct cremation certification duty was a retaliatory act that stigmatized Dr. Philip without good cause or justification.

38. On March 3, 2004, Dr. Philip wrote a second letter to the Governor. This letter concerned the harvesting of body parts referred to above in paragraph 12 of this Complaint.

39. A copy of the March 3, 2004 letter to the Governor was provided to Defendant-Cronin.

40. On March 4, 2004, Defendant-Cronin fired the plaintiff by terminating his employment contract with the Office of Chief Medical Examiner. The letter terminating Dr. Philip expressly referred to the plaintiff's communications with members of the OCME and the governor as a reason for the Plaintiff's termination.

41. The termination of Dr. Philip's employment with the OCME was an intentional act taken by Defendant-Cronin in

retaliation for Dr. Philip's exercise of his First Amendment right to petition the Governor and other state officials.

42. The speech in which Dr. Philip was engaged involved matters of public concern.

43. The speech in which Dr. Philip was engaged did not disrupt the activities of the OCME nor did it interfere with the OCME's efficiency or operations.

44. Dr. Philip's speech was a substantial and motivating factor in the adverse employment decision Defendant-Cronin made against Dr. Philip.

45. As a direct and proximate cause of Defendant-Cronin's actions, the plaintiff has suffered a loss of income.

46. As a direct and proximate cause of Defendant-Cronin's actions, the plaintiff has suffered humiliation, anxiety, sleeplessness, physical discomfort, and extreme emotional distress.

## COUNT II: INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS UNDER STATE LAW

47. The plaintiff incorporates the preceding allegations of this Complaint by reference and states further as follows.

48. Plaintiff-Dr. Philip had a binding contract with the Commonwealth of Massachusetts.

49. Plaintiff-Dr. Philip did not have a contract of any sort with Defendant-Cronin.

50. Defendant-Cronin was aware of the plaintiff's contract with the Commonwealth of Massachusetts.

51. Defendant-Cronin knowingly induced the Commonwealth to break that contract with Dr. Philip.

52. Defendant-Cronin's interference, in addition to being intentional, was improper in motive or means.

53. Dr. Philip was harmed by the defendant's actions.

54. As a direct and proximate cause of Defendant-Cronin's actions, the plaintiff has suffered a loss of income.

55. As a direct and proximate cause of Defendant-Cronin's actions, the plaintiff has suffered humiliation, anxiety, sleeplessness, physical discomfort, and extreme emotional distress.

### COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

56. The plaintiff incorporates the preceding allegations of this Complaint by reference and states further as follows.

57. In firing Dr. Philip in retaliation for speech, Defendant-Cronin intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct.

58. The defendant's actions were extreme and outrageous and were beyond all possible bounds of decency.

59. The defendant's actions were utterly intolerable

in a civilized community.

60. The emotional distress sustained by the plaintiff was severe and of a nature that no reasonable person could be expected to endure.

61. The actions of Defendant-Cronin were the proximate cause of the plaintiff's distress.

62. As a direct and proximate cause of Defendant-Cronin's actions, the plaintiff has suffered a loss of income.

63. As a direct and proximate cause of Defendant-Cronin's actions, the plaintiff has suffered humiliation, anxiety, sleeplessness, physical discomfort, and extreme emotional distress.

## DEMAND FOR TRIAL BY JURY

64. The plaintiff demands that all claims triable to a jury be so tried.

## RELIEF REQUESTED

WHEREFORE, the plaintiff requests that the trier of fact award:

(1) Against Defendant-Cronin, compensatory and emotional distress damages for the injuries described above;

(2) Punitive damages;

(3) Pre-judgment interest;

(4) Costs and attorney's fees pursuant to 42 USC Sections 1983 and 1988; and

(5) Such other relief as is just and equitable under the circumstances.

Dated: 7/5/4

Respectfully Submitted,

*/s/ Daniel S. Sharp*
WHITFIELD SHARP & SHARP
Elaine Whitfield Sharp
(BBO 565524)
Daniel S. Sharp (BBO 565524)
Attorney for Plaintiff
196 Atlantic Avenue
Marblehead, MA  01945
781-639-1862

### CERTIFICATE OF SERVICE

Daniel S. Sharp certifies that a true copy of the document above was served upon the attorney of record for each other party by first-class, U.S. Mail, plainly addressed and pre-paid on July 5, 2004.