UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION: 04-CV-11069-JLT

ABRAHAM PHILIP, MD       )
                         )
    Plaintiff,           )
                         )
vs.                      )
                         )
JOHN CRONIN, in his personal )
capacity.                )
                         )
    Defendant.           )

### AFFIDAVIT OF ABRAHAM PHILIP, MD

I, Abraham Philip, MD, state the following facts on the basis of personal knowledge. If called as a witness, I would testify as follows.

1. On or about September 2, 2003, I entered into a contract for employment with the Office of the Chief Medical Examiner ("OCME"). This was the fourth time I had been hired by the OCME.

2. During and before the period of October 2, 2003 to March 3, 2004, I made to Mr. John Cronin numerous suggestions for what I believed would be improvements in the operations of the OCME.

3. On or about January 30, 2004, I was approached to approve the harvesting of organs from a young man who was not yet brain-dead. I declined to do so for medical and ethical reasons.

4. After I declined to authorize the removal of body parts from a person who was not

1
1

PLAINTIFF'S EXHIBIT

yet dead, my understanding is that the persons who wanted to harvest the body parts obtained the authorization of the Chief Medical Examiner, Dr. Richard Evans, to do so.

5. On March 3, 2004, John Cronin told me that I would no longer be permitted to conduct "cremation certification duty", a duty to which all other medical examiners were still assigned.

6. This concludes my affidavit.

SIGNED UNDER PAINS AND PENALTIES OF PERJURY

6/4/2005

*Abraham Philip, MD*

Abraham T. Philip, M.D.
Assistant Medical Examiner
Office of the Chief Medical Examiner
720 Albany Street
Boston, MA 02118

March 1, 2004

The Honorable Mitt Romney  
State House  
Office of the Governor  
Room 360  
Boston, MA 02133

Via Certified Mail RRR
7003 1680 0001 4309 9933

Re. **Problems at the Office of Chief Medical Examiner**

Dear Governor Romney:

I write to alert you to serious deficiencies in the Office of Chief Medical Examiner (OCME) where I am currently employed. I am compelled to share this information with you because it relates to matters of serious public health and concern. I have headlined these issues of important political and public concern.

**Getting Away with Murder?**

Because of the deficiencies in the OCME, people may be getting away with murder in this state. For example, toxicology is frequently not performed on elderly people who die suddenly in nursing homes. For all we know we could have one or more "Dr. Shipmans" in our midst.

As I am sure you are aware, with the advent of an increasing aging population, those who work in the criminal justice system have an increased sensitivity and concern about issues of elder abuse. Yet, there is an extreme reluctance in dealing with cases of nursing home deaths, deaths of the elderly and the infirm. Indeed, the approach taken in these cases by the agency is to search for reasons to decline jurisdiction rather than to actively investigate to rule out neglect or abuse.

With an aging population, and the turmoil in the elder care industry, it is a gross dereliction of duty to remain unmindful by lack of investigation into nursing home deaths. We owe our elders more respect than this, and we owe it to the public to



PLAINTIFF'S EXHIBIT 2

ensure that those who are alleged to have unlawfully taken the life of an elder shall be subject to prosecution. If we do not investigate, how will there be any accountability?

**Risk of DNA Contamination**

Due to sloppy practices and a complete lack of proper protocols controlling the entry of non-essential staff into autopsy rooms during autopsies, the collection of DNA in cases where the victims may have been raped is subject to the risk of cross-contamination. This sort of situation does not serve the criminal justice system well and, indeed, could result in a guilty person going free, perhaps to rape and murder other victims.

**The OCME's Lack of Independence**

The agency has lost its ability to independently-investigate the cases it is supposed to investigate and hands over important decision making authority to the police, district attorneys and the politicians that it serves. Countless are the times that at morning conferences decisions on whether to do or not do an autopsy are deferred to what the police want. Decisions about cause and manner of death are deferred to what the district attorney wants.

**Hospital "Therapy" Deaths Not Investigated**

The agency will not delve into the cases of therapy-related deaths, denying the people of Massachusetts the right to an independent autopsy in cases dying in hospitals. This leads to the tragic situation of the hospitals left to police themselves, cover up on their own vested interests and widespread client dissatisfaction. The fact that the newspaper stories about investigations into the obesity surgery-related deaths has completely bypassed the medical examiner's office is a shameful chronicle of the irrelevance and powerlessness of the agency in deaths occurring in hospitals.

**Misreporting of Deaths Creates Faulty Public Health Statistics**

The agency is taking too cavalier an attitude to the cases where the deceased is above the age of 50 years, relying on opinions of superficial presumptive diagnosis and not scientific investigations. This results in extremely erroneous classification of the cause and manner of death, with downstream effects of faulty health statistics, improper allocation of health care funds, and gross discrepancy in insurance settlements.

**Sloppy Crime Scene Investigation Due to Lack of Specialized CSI Personnel**

2

The agency still persists with and outdated model of death investigation left to police personnel, who operate with the imperative of closing cases, leading to botched investigations. There is an urgent need to replace the current death investigation procedures with a specially trained, and sub-specialty trained cadre of crime scene investigators, as is the model followed in the rest of the country. Modern medical examiner offices have specialized death investigators who visit the scene of the incident, and in collaboration with the police, do a comprehensive investigation. In addition, they are backed up by specialized teams who, for example, evaluate child abuse cases, SIDS cases and what are becoming increasingly-important bio-terrorism cases.

### Lack of Photo Documentation and Retention: Acquittals and/or Civil Suits

The procedures for photo documentation of autopsy work as done now are extremely inefficient. Autopsy photos constitute evidence for the State and the criminal defense, and for personal injury counsel for the plaintiff and defense in civil cases.

Despite the fact the autopsy photos are evidence for use in court, there is no cadre of photographers fully documenting autopsies and staying in the autopsy rooms as long as the doctors need them to be present. Further, there is no control of the photos with unified command structures, and photographers requested from different agencies are sometimes present. Police photographers remain poorly motivated to remain for the entire duration of the autopsy, are unavailable when cases are re-evaluated the next day and/or when specialized examinations, such as those of the heart or brain, are conducted.

Frequently, it is left to the individual assistant medical examiners to retain pictures. This situation, coupled with poor record-keeping procedures, ensures ready unavailability, lost and, sometimes, missing photographs when cases come to trial. In other words, due to lack of photography personnel and sloppy procedures, the chain of custody for what is often critical evidence is compromised. This may result in the suppression of evidence for the defense, which may result in the guilty going free.

### Division of Labor and Assignment of Administrative Tasks

The current division of labor does not work. The OCME needs cadres for body transportation, evidence transport and autopsy assistance. Similarly, the office staff should have separate transcriptionists, secretaries and records clerks. Leaving multiple tasks to be carried out by the same clerical assistants leads to loss of productivity. The dire need of a records clerk leaves the filling of charts, x-rays slides and other evidence in total shambles that, in turn, leads to the extraordinary expenditure of man-hours searching for the records or material.

**Inadequate Toxicology Panels Create Missed Homicide Cases**

The current quality of toxicological testing is abysmal. It takes extraordinarily long to do and is very limited in scope. The OCME needs adequate financing and manpower to ensure that there is both a widened array of toxicological analyses that will enable us to search for a larger 'panel' of substances in more tissues and organs, including routine vitreous chemistry. In effect, by performing toxicology tests for only a limited number of substances, we may be blind to dangerous contraband drugs of abuse that are circulating "on the street" and, in such cases, we will be unable to issue warnings to the public about these hazards. This may result in the loss of life, particularly among our young people who have succumbed to using contraband drugs. We owe it the parents of this state – many of whom are your constituents -- to do a better job on forensic toxicology.

**The OCME Cannot Continue and Evolve and Improve Without Quality Control**

It is a popular idea today to make government agencies as efficient and responsive to the 'consumers' public as are private corporations. Despite years of berating the senior administrators, the agency is still to develop a comprehensive and continuous quality improvement initiative monitoring not just areas of complaints, but also the turn around times, standardization of reports, development of protocols and procedures, with index criteria and strategies for improving services. It is imperative to have a senior manager, a statistician and a computer programmer be dedicated to the task of monitoring and outlining strategies for quality improvement.

**Bad Morale Creates Bad Service**

Morale at the OCME is abysmal at all levels. The agency has failed to adequately establish a core of educational programs for visiting residents, adequate training of forensic pathology fellows, inter-agency and other medical-specialty interactions, continuing medical education programs for the staff pathologists, has failed to encourage or allocate time for its professional staff to work on publications and board certification. Further, there is no video conferencing with outside hospitals. These are just a few examples of the failure of the spirit, initiative and drive within the agency.

**No More Money Means No More Change**

Nothing of course can be achieved without the eradication of budget constraints, recruitment of additional staff and pathologists, a reorganized hierarchy and workload distribution. Or put another way, barring the possibility of outsourcing the autopsies and the shipping of bodies and the investigating police officers to some third world country for autopsy, there is no way that a modern medical

4

examiners system can be put in place for Massachusetts without raising the budget of the agency by five to eight times the current levels.

**Some Closing Thoughts**

I am willing to share many specific examples of these and many other problems. I believe that, with some hard work in planning and management, appropriate funding, team spirit and diligence by OCME employees, and with the assistance of your administration, we can build a modern medical examiner system which will serve well the criminal justice system and, ultimately the people to whom we are responsible.

In sum, the OCME has completely lost sight of its primary goal as an agency with a charter to investigate sudden and unexpected deaths so that threats to public safety and public health can be identified and appropriately handled. As interpreted by many in the office, the charter necessitates that the office be informed about all sudden and expected deaths, but says nothing about the investigation of such deaths. Moreover, almost all have lost sight of the latter goal of identifying threats to the public's safety and health. We need specific policies and procedures to ensure high quality public service.

I stand ready to be at your service in helping to make the OCME a top-flight agency for the public and to do whatever is my part in helping improve the current situation. Thank you for hearing my views on these extremely important political issues.

Yours Sincerely,

s// Abraham T. Philip, M.D.

Abraham T. Philip, M.D.

cc. John Cronin
Chief Administrative Officer
Office of the Chief Medical Examiner
720 Albany Street
Boston, MA 02118
via Certified Mail RR   7003 1680 0001 4309 9902

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                                  SUPERIOR COURT
                                                              DOCKET No. SUCV2004-02264

ABRAHAM PHILIP, M.D.                )
    Plaintiff,                      )
                                    )
v.                                  )
                                    )
DR. RICHARD EVANS M.D., in his official and )
personal capacity, EDWARD FLYNN, in his     )
personal and official capacity, and THE     )
COMMONWEALTH OF MASSACHUSETTS               )
    Defendants.                     )
                                    )

## FURTHER ANSWERS OF DEFENDANT DR. RICHARD EVANS MD TO PLAINTIFF'S INTERROGATORIES

**INTERROGATORY #9**
Please state the date and the time when your first learned, read, heard, or were otherwise informed that Dr. Philip wrote to the Governor of the Commonwealth on March 1, 2004 regarding any matter pertaining to the OCME, stating the manner in which you first learned, read, or heard that such communication had taken place and the name of the person from whom you first received such information.

    **ANSWER #9**
On March 1, 2004 Attorney Elaine Whitfield Sharp sent a copy of a letter addressed to Governor Mitt Romney to John Cronin via facsimile. Mr. Cronin informed me of the existence of this letter shortly after he received it.

    **FURTHER ANSWER #9**
On March 1, 2004 Attorney Elaine Whitfield Sharp sent a copy of a letter addressed to Governor Mitt Romney to John Cronin via facsimile. The letter to the Governor was dated March 1 and referred to "Problems at the Office of the Chief Medical Examiner." Mr. Cronin informed me of the existence of this letter shortly after he received it.

PLAINTIFF'S EXHIBIT 3

On March 3, 2004 Attorney Elaine Whitfield Sharp sent a copy of a second letter addressed to Governor Mitt Romney to John Cronin via facsimile. The letter to the Governor was dated March 1 and referred to "Organ Procurement: Procedures of Concern." Mr. Cronin informed me of the existence of this letter shortly after he received it.

**INTERROGATORY #10**
Please state the date and the time when you first learned, read, heard, or were otherwise informed that Dr. Philip wrote to the Governor of the Commonwealth on March 2, 2004 regarding any matter pertaining to the OCME, stating the manner in which you first learned, read, or heard that such communication had taken place and the name of the person from whom you first received such information.

    **ANSWER #10**
    Please see Answer #9.

    **FURTHER ANSWER #10**
    To the best of my present knowledge, I did not learn of such a letter.

**INTERROGATORY #11**
Please state the date and the time when you first learned, read, heard, or were otherwise informed that Dr. Philip wrote to the Governor of the Commonwealth on March 3, 2004 regarding any matter pertaining to the OCME, stating the manner in which you first learned, read, or heard that such communication had taken place and the name of the person from whom you first received such information.

    **ANSWER #11**
    Please see my Answer #9.

    **FURTHER ANSWER #11**
    To the best of my present knowledge, I did not learn of such a letter.

**INTERROGATORY #14**
Please describe, to the best of your ability, each and every written or oral grievance, complaint, or negative comment you received about the Plaintiff from any person from calendar year 200 through the end of his employment at the OCME, stating (a) the substance of the complaint or comment, (b) who made the complaint or comment, (c) the date on which such comment was made, and (d) whether you memorialized or recorded the comment in any way, whether through writing, tape recording, or any other means.

**ANSWER # 14**
The Defendant objects to this interrogatory as it is overly broad.

**FURTHER ANSWER #14**
As indicated previously, the Defendant objects to the Interrogatory as overly broad, and states that to respond would be unduly burdensome to the Defendant. The OCME employs approximately 50 people, and at any given time, approximately 40 contractors. In addition, there are usually about ten new hires in a given year; and it would be extremely difficult to determine every complaint made against Dr. Philip over the cited period.

Notwithstanding nor waiving his objection, Dr. Evans states as follows: I am aware of an incident on March 3, 2004 in which Dr. Frank Evangelista made a written complaint to Jackie Faherty, counsel for the OCME, pursuant to the Workplace Violence Policy of the OCME. Dr. Evangelista expressed his concern, and that of others in the department, that Dr. Philip could be a danger. Specifically, he noted that others in the department were making comments such as, "He's the kind of guy that would bring a gun to work, and start firing." At or around the same time, Dr. Faryl Sanders also expressed concerns verbally with regard to Dr. Philip's behavior.

Please also see my Answers to Interrogatories No. 6 and 8.

Signed under the penalties of perjury this 18 day of May, 2005.

_____
Dr. Richard Evans

AS TO OBJECTIONS:

_____
Jean M. Kelley, BBO #265540
Assistant Attorney General
Government Bureau/Trial Division
One Ashburton Place, Rm. 1813
Boston, Massachusetts 02108
Tel. (617) 727-2200 Ext. 3327

## CERTIFICATE OF SERVICE

I, Jean M. Kelley, hereby certify that I have this date, May 19 2005, served the foregoing **Further Answers of Dr. Richard Evans MD to Plaintiff's Interrogatories** and **Certificate Of Service** upon counsel of record by mailing first class, postage prepaid, to :

Elaine Whitfield Sharp, Esquire
Daniel S. Sharp, Esquire
WHITFIELD, SHARP & SHARP
196 Atlantic Avenue
Marblehead, MA 01945

                                                Jean M. Kelley, Assistant Attorney General
                                                Government Bureau/Trial Division

Abraham T. Philip, M.D.
Assistant Medical Examiner
Office of the Chief Medical Examiner
720 Albany Street
Boston, MA 02118

March 1, 2004

The Honorable Mitt Romney
State House
Office of the Governor
Room 360
Boston, MA 02133

**Re. Organ Procurement: Procedures of Concern**

Dear Governor Romney:

I write to alert you to serious issue regarding organ procurement in the Commonwealth of Massachusetts. Please see the attached memorandum that I circulated within the OCME and that I also sent to the New England Organ Bank (NEOB). The situation described in the memorandum needs to be investigated. I have redacted the name of the victim in the interests of maintaining his family's privacy, but you may obtain it as an elected official directly from the OCME.

The procedures for organ procurement must be scrupulously followed in order to avoid situations where, for example, organs are procured causing unjustified loss of life by the prospective donor.

Thank you for hearing my views on this important political matter.

Yours Sincerely,

//s// Abraham T. Philip, M.D.

Abraham T. Philip, M.D.

cc. John Cronin
Chief Administrative Officer
Office of the Chief Medical Examiner
720 Albany Street
Boston, MA 02118

PLAINTIFF'S EXHIBIT 4

# MEMORANDUM

### THE STRANGE DEATH OF ████████████ (04 – 324)

It was the night of January the 30th, when around 8 p.m. I received a call from Traci (front desk) regarding the possibility of organ donation on the victim of a vehicular accident. My response was the usual clear it with DA regarding charges, get consent from family etc., when Traci gave me a heads up that person was not dead and would not be brain dead (following usual protocol), but would be pronounced dead by asystole, and then would be put back on life support and organ harvest was to proceed.

Spoke a little later with Larry from NEOB, who repeated essentially the same criteria of asystole for brain death. I explained the procedure was highly irregular as I had not heard the criteria of asystole for pronouncement of death. I asked why the routine protocol of brain death could not be applied. Larry's reply was that the body would be in permanent vegetative state and delay in harvest would cause deterioration of organs and so this procedure was being followed. I still expressed my discomfort with the procedure, to which Larry replied it had been cleared with Jackie Faherty and Richard Evans knows all about. I explained that Jackie was on maternity leave and I had no way to confirm that the process had been cleared by her. I emphatically mentioned it to Larry that I was not approving organ harvest, and he was welcome to talk to Richard Evans for consent. Later that night, Chris from NEOB called Traci to inform Richard Evans had approved organ donation. There were no charges and a view and tox was done on the case on first October. See case records for additional information if required.

A review of the medical records (pruned for storage purposes – but relevant portions retained,) indicate that the deceased was involved in a head on collision on 1/.27/04 and after prolonged extrication was med flighted to a Boston area hospital. He suffered closed blunt head trauma and left femur fracture. CT scan of head revealed frontal, parietal, occipital and midbrain hemorrhage besides subdural hemorrhage. Raised intracranial pressures were periodically maintained by Manitol infusions. The deceased was put on DNR/DNI on 1/29/04 at 858.

1

On 1/29/04 during a family conference the topic of withdrawal of care (read stoppage of Manitol and extubation) was broached. The family was uncomfortable initially with this. On 1/30/04, neurological evaluation revealed no improvement and limited brainstem function. At 1530 on 1/30/04 the family consented to withdrawal of life support. Later ventilation was removed, patient became asystolic, after remaining asystolic for 5 minutes, was pronounced dead at 12.58, later a morphine drip started, and organ procurement initiated.

## MEDICAL EXAMINER COMMENTS

I was and remain very uncomfortable with the way this case was handled. The criteria for brain death are well documented in standard textbooks, have stood the test of legal challenges and have been around for nearly two decades now, for everybody to be comfortable with the protocols, criteria and safeguards against abuse. However, the status of pronouncement of death in Permanent Vegetative state is still an area with murky laws and inadequate interpretations. The Florida case where withdrawal of care was obtained by the husband of a woman and fought tooth and nail by her parents is a case in point. Things may have changed in the last few years since I kept up legal briefs and case laws in these cases, but my understanding still is that the picture is still not clear. And pressing a medical examiner at 8.30 p.m. for a decision is not appropriate. If the matter was brewing since the 29th, a call during morning hours of the 30th, could have helped obtaining clarification from appropriate legal authorities.

If as it appears, there should be no objection to harvest, then threatening tone used by Larry of the NEOB was highly inappropriate. If again as the NEOB claims, the procedures were claimed by Jackie Faherty, then an educational session should have been scheduled with legal, ethical and medical experts from the NEOB, briefing the doctors, answering concerns and allaying doubts. In the absence of this proactive step, to go over the top to the Chief and calling back that he approves again smacks of despotism which is intolerable. The medical examiners office has no information of the safeguards in place, no documentation of the families consent, only instructions from high almighty the NEOB.

2

I wish to remind all of you that Burke and Hare did not happen so far back in the past that no one remember, I most certainly do, though I frequently blank out on the name of the physician (McPherson) who was vilified during the trial. In the case of ███████████, there were no charges, however, my concern is that the situation could be repeated in a homicide case in permanent vegetative state. I hope this Memo prompts a wider discussion between the NEOB, Medical Examiners, District Attorneys, etc., so that everybody is comfortable with the decisions taken.

Respectfully submitted,

Abraham Philip M.D.

*Commonwealth of Massachusetts*
## OFFICE OF THE CHIEF MEDICAL EXAMINER
### HEADQUARTERS

Mitt Romney
*Governor*

Kerry Healey
*Lieutenant Governor*

Edward A. Flynn
*Secretary of Public Safety*

Richard J. Evans MD
*Chief Medical Examiner*

720 Albany Street
Boston, MA 02118

Tel: (617) 267-6767
Tel: (800) 962-7877
Fax: (617) 266-6763
TTY: (617) 266-1472

March 3, 2004

**BY CERTIFIED MAIL and OVERNIGHT MAIL DELIVERY**

Abraham Philip, MD
118 Hull Street
Beverly, MA 01915

RE:   Termination of Contract

Dear Dr. Philip:

February 25, 2004, you were notified that any occurrence of unprofessional or unacceptable behavior would result in the immediate termination of your contracted services pursuant to the Terms and Conditions of the contract you endorsed with the Office of the Chief Medical Examiner. Due to continued instances of misconduct, your contract is hereby terminated for cause, effective immediately.

As you are aware, your contract required you to demonstrate high standards of conduct. Explicit in your duties was a requirement that you adhere to the highest ethical standards and serve as a role model for all other OCME employees. Your conduct on or about March 1st and 2nd, 2004, which included unprofessional and inappropriate communications with members of the OCME and a district attorney's office do not comport with this requirement and constitute a breach of your contract.

You are required to return all Office of the Chief Medical Examiner property that you may have including keys to the building, cell phones, and any computer equipment. Please arrange to return these items and retrieve your personal belongings with Denise Sarro, Human Resources Director. Ms. Sarro can be reached at (978) 835-0403.

Sincerely,

John Cronin
Chief Administrative Officer

Richard Evans, MD, Chief Medical Examiner
Elaine Whitfield Sharp, Esq. via facsimile


PLAINTIFF'S EXHIBIT 5