FILED
CLERKS OFFICE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

2005 AUG 12 P 1: 27

CIVIL ACTION 04-CV-11069-JLT
DISTRICT OF MASS.

| | |
|---|---|
| ABRAHAM PHILIP, M.D.<br>    Plaintiff, | )<br>)<br>) |
| v. | )<br>) |
| JOHN CRONIN,<br>    Defendant. | )<br>)<br>) |

**SUPPLEMENTAL OPPOSITION OF DEFENDANT JOHN CRONIN TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Now comes the Defendant John Cronin and hereby files this Supplemental Opposition to Plaintiff's Motion for Partial Summary Judgment, filed with this Court on June 9, 2005.

In support of this Supplemental Opposition, Defendant states as follows:

1. As discussed in Defendant's original Opposition, any determination as to "matters of public concern" must also take into account the factual context in which the words were utilized. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-148 (1983). The determination of whether speech is a matter of public concern may also require an inquiry into the employee's motivation for the speech. Mullin v. Town of Fairhaven, 284 F.3d 31, 38 (1st Cir. 2002), citing Alinovi v. Worcester Sch. Comm., 777 F.2d 776, 787 (1st Cir. 1985.) In the present case, before he wrote the two March

1, 2004 letters to Governor Romney, Plaintiff already believed that he was about to be fired. His motivation had nothing to do with bringing matters of public concern to the attention of the Governor; but, rather, was in preparation for the present lawsuit.

2. On July 21, 2005, Counsel for the Defendant deposed the Plaintiff Dr. Philip. The transcript of that Deposition, together with selected Exhibits, is annexed to this Memorandum as Defendant's Exhibit 3.

3. During the course of the Deposition, Plaintiff was asked about an incident which had occurred on February 13, 2004, concerning Dr. Philip and a bloody Death Certificate. (Pl. Depo., p. 167-168.) A technician had requested that Dr. Philip sign a Death Certificate because a funeral home was waiting for it (p. 168-169). Dr. Philip advised that she would have to ask the funeral home to wait about an hour, at which point he would stop the autopsy he was conducting and come upstairs to sign it. (pp. 171-172). The technician's supervisor then came to the autopsy room (p. 172), at which time Dr. Philip took the Death Certificate (p. 175). He signed it (p. 176), but as he walked toward the body being autopsied, according to Plaintiff's testimony, "a splash of blood fell on the certificate." (pp. 176-177). He laid the bloody certificate on the side counter and continued with the autopsy. (p. 177) At some point staff person Kathleen Taylor entered the autopsy room; and, out of the corner of his eye, Dr. Philip saw her pick up the bloody certificate. He said nothing to her. (p. 178).

4. Dr. Philip heard nothing further about the bloody certificate until he was called into John Cronin's office on February 25, 2004. (pp. 185-186). Mr. Cronin advised that there had

been an incident in which a Death Certificate was returned from the autopsy room stained with blood, and that he was going to issue a one-day suspension to Dr. Philip. (p. 187). Mr. Cronin then provided the February 25, 2004 suspension letter to Dr. Philip. (p. 192; letter marked as Ex. 24 to Dr. Philip's Deposition.)

5.  As a result of his meeting with John Cronin and the receipt of the February 25 Letter of Suspension, Dr. Philip considered that he was going to be fired:

> Q. As of March 3rd, did you consider that basically you were going to be fired?
>
> A. I considered I was going to be fired on March – February 25.
>
> Q. As soon as you got that letter with the one-day suspension?
>
> A. Yes. The letter, to me, appeared as a setup.
>
> Q. So as of February 25, you felt you were already on pretty shaky ground at the Medical Examiner's Office; is that fair to say?
>
> A. Yes.
>
> Q. And that you might well be fired within the next week or two.
>
> A. Yes.
>
> (Pl. Depo., pp. 234-235.)

6.  Plaintiff's own testimony clearly shows that before writing his March 1 letters, Plaintiff believed that he was going to be fired. He then wrote two letters to the Governor on March 1; and his attorneys faxed those letters to John Cronin on March 1 and March 3. (See Plaintiff Depo., Defendant's Exhibit 3, and Exhibits 26 and 27 to that Deposition.) The Court may infer from the circumstances that Plaintiff never intended to raise matters of public concern, but only

intended that he lay a foundation for the institution of the lawsuits currently pending in this court and in Suffolk Superior Court.

7.      As also discussed in Defendant's original Opposition, in attempting to determine whether a constitutional violation has occurred, courts also examine the extent to which a Plaintiff has intended that his speech contributes to the public discourse. O'Connor, 994 F.2d at 914. Plaintiff contends he sought to generate public debate. However, his deposition testimony supports the inference that Plaintiff's purpose in sending the March 1 letters was not for the purpose of contributing to public discourse. This is especially evidenced by the fact that Plaintiff's letter referencing "problems at the OCME" was essentially a regurgitation of issues which Plaintiff himself knew had previously been called to the attention of the Governor's office.

8.      At the time of his Deposition, Dr. Philip conceded that during the period April-June, 2002, he and the other medical examiners at the OCME were provided with a copy of a document entitled, "Needs Assessment of Forensic Services in the Commonwealth of Massachusetts" (attached to Plaintiff Depo. Transcript as Ex. 12). (Pl. Depo., p. 118-119) He understood that the reason the Report was prepared was that, "the Governor's office was going to fix the problems and needed an assessment of what and how it needed to be done." (Pl. Depo., p.121) In fact, Plaintiff had met with the Report's preparers on at least two occasions, in meetings lasting 20-30 minutes, to discuss his perception of problems at the OCME. (Pl. Depo., pp. 121-123)

9.      The Needs Assessment Report, dated April 4, 2002, and addressed to the Governor of Massachusetts to raise issues with respect to the OCME, is amazingly similar to Plaintiff's letter

marked as Exhibit 2 to Plaintiff's Motion (and as Ex. 26 to Pl. Depo.)

10.     Taken one at a time, it is clear that Dr. Philip's expressed concerns as raised in his March 1, 2004 letter are matters that were previously reported to the Governor in the April, 2002 Needs Assessment Report, and, moreover, which Plaintiff knew had already been reported to the Governor. Dr. Philip's letter cites as problems:

   A. Deficiencies in the OCME which result in fewer toxicological screenings and/or declinations of jurisdiction over cases, resulting in possible missed criminal acts, particularly with respect to the elderly (Letter, p.1).– Compare Report at 2.1.8.2: inadequate support results in medical examiners handling large volume of cases, resulting in fewer full autopsies and more external examinations ("views"); cap on resources leads to a restriction on toxicology testing; agency can't get enough information to make fully informed decisions on whether to take cases, and some cases which should be investigated are not.

   B. Sloppy practices and lack of proper protocols, resulting in possible contamination of evidence and possibility of guilty person going free (Letter, p. 2) – Compare Report at 2.1.8.5: little effort on quality management; 2.1.8.3: High risk to the Commonwealth of injustice occurring; high rate of autopsies required of CME leaves little time to establish policies and procedures.

   C. OCME's Lack of Independence (Letter, p. 2) and Sloppy Crime Scene Investigation (Letter, pp.2-3) – Compare Report at 2.1.8.2: police frequently conduct

investigation in the field because OCME lacks investigators to perform these duties; appearance of a "conflict of interest" where individuals hired by a tissue procurement agency determine whether a case should be accepted by the OCME.

  D. Hospital Deaths Not Investigated and Misreporting of Deaths (Letter, p. 2) – <u>Compare</u> Report, Section A, above.

  E. Lack of Photo Documentation and Retention, due to lack of personnel and poor record-keeping procedures (Letter, p. 3) – <u>Compare</u> Report, Section A, above.

  F. Inefficient Division of Labor and Assignment of Administrative Tasks, resulting in lost productivity (Letter, p.3) – <u>Compare</u> Report at 2.1.8.2: inadequate technical and clerical support, resulting in medical staff spending significant time chasing down information and performing tasks better left to others.

  G. Inadequate Toxicology Panels (Letter, p. 4) – <u>Compare</u> Report, Section A, above.

  H. OCME Cannot Continue and Evolve and Improve Without Quality Control (letter, p. 4) – <u>Compare</u> Report, Section B, above.

  I. Bad Morale Creates Bad Service (Letter, p. 4) – <u>Compare</u> Report at 2.1.8.2: "The forensic pathologists are poorly paid and minimally trained. The pay for professional staff

is near the lowest in the country. ... If wages do not significantly improve, there are indications that retention of staff will become a worsening problem."

J. No More Money Means No More Change (Letter, p.4) – <u>Compare</u> Report at 2.1.8.3: "The office appears to operate on a budget of approximately $0.56 per capita, a rate that is essentially unchanged for the office since 1983. This budget would have been on the very low end of the national scale in 1983 and is totally inadequate to sustain a viable and safe death investigation system in 2002. The current national scale is approximately $2.00 (+/-) per capita."

11.     Contrary to Plaintiff's assertions in this case, it is clear that the subjects raised in his March 1, 2004 Letter (attached to Plaintiff's Motion as Exhibit 2 and to Pl. Depo. As Ex. 26) were not in any way intended to advise the Governor of issues in the OCME. All of the issues raised in Plaintiff's letter were already known by him to have been raised to the Governor's Office in the Needs Assessment Report; and, in fact, Plaintiff knew that the Governor's Office had requested the investigation resulting in that Report. Plaintiff cannot claim that the letter in question was a valid attempt to raise matters of public concern.

12.     Where Plaintiff was not motivated by a desire to publicize issues of common concern, as evidenced by the falsity of information disclosed and by his knowledge of his imminent firing; and where Plaintiff has not demonstrated any intent to contribute to the public discourse; this Court should find that the matters at issue in this case were not "matters of public concern" which could serve as a foundation for Plaintiff's claim under the First Amendment.

WHEREFORE Defendant respectfully requests that this Court deny the motion styled as Plaintiff's Motion for Partial Summary Judgment, filed with this Court on June 9, 2005.

> Respectfully Submitted,
> COMMONWEALTH OF MASSACHUSETTS
>
> By its Attorneys,
>
> THOMAS F. REILLY
> ATTORNEY GENERAL
>
> Jean M. Kelley, BBO #265540
> Assistant Attorney General
> Government Bureau/Trial Division
> One Ashburton Place, Room 1813
> Boston, MA 02108-1598
> (617) 727-2200 ext. 3327
> jean.kelley@ago.state.ma.us

August 12, 2005

## CERTIFICATE OF SERVICE

I, Jean M. Kelley, hereby certify that I have this date, August 12, 2005, served the foregoing **Supplemental Opposition of Defendant to Plaintiff's Motion for Partial Summary Judgment;** and **Certificate Of Service** upon counsel of record by mailing a copy first class, postage prepaid, to:

Daniel S. Sharp, Esquire
WHITFIELD, SHARP & SHARP
196 Atlantic Avenue
Marblehead, MA 01945

Jean M. Kelley, Assistant Attorney General
Government Bureau/Trial Division