**ABRAHAM PHILIP, M.D.  07/21/05**

1 (Pages 1 to 4)

## Page 1

1   COMMONWEALTH OF MASSACHUSETTS
       SUFFOLK, SS.
2       SUPERIOR COURT
    CIVIL ACTION NUMBER: SUCV-2004-02264
3
    ABRAHAM PHILIP, M.D.,
4       Plaintiff,
    VS
5   DR. RICHARD EVANS, M.D., IN HIS OFFICIAL CAPACITY AND
    PERSONAL CAPACITY, ET AL.
6       Defendants.
    ~~~~~~~~~~~~~~~~
7
       UNITED STATES DISTRICT COURT
8       COMMONWEALTH OF MASSACHUSETTS
    CIVIL ACTION NUMBER:  04-CV-11069-JLT
9
    ABRAHAM PHILIP, M.D.,
10      Plaintiff,
    VS
11  JOHN CRONIN, IN HIS PERSONAL CAPACITY,
       Defendant.
12  ~~~~~~~~~~~~~~~~
13
14      DEPOSITION OF ABRAHAM PHILIP, M.D.,
15  taken on behalf of the Defendants pursuant to
16  the applicable provisions of the Massachusetts
17  Rules of Civil Procedure and Federal Rules of
18  Civil Procedure, before Susan A. Romano, Notary
19  Public, Registered Merit Reporter and Certified
20  Realtime Reporter within and for the
21  Commonwealth of Massachusetts, at the Offices of
22  Attorney General's Office, 200 Portland Street,
23  Boston, Massachusetts on July 21, 2005 at 10:11
24  a.m., as follows:

## Page 2

1        APPEARANCES:
2   .
3   ON BEHALF OF PLAINTIFF:
4   DANIEL S. SHARP, ESQ.
5   Whitfield Sharp & Sharp
6   196 Atlantic Avenue
7   Marblehead, Massachusetts 01945
8   781.639.1862
9   dansharp@sharplaw.biz
10  .
11  ON BEHALF OF DEFENDANTS:
12  JEAN KELLEY, AAG, ESQ.
13  Commonwealth of Massachusetts
14  Office of the Attorney General
15  200 Portland Street
16  Boston, Massachusetts 02114
17  617.727.2200
18  .
19  ALSO PRESENT:
20  JACQUELINE FAHERTY, GENERAL COUNSEL, OCME
21  LAUREN SULLIVAN, STUDENT REPORTER
22  .
23  .
24  .

## Page 3

1    EXAMINATION INDEX OF ABRAHAM PHILIP, M.D.
2           JULY 21, 2005
3   .
4   EXAMINATION OF                PAGE
5   .
6   ABRAHAM PHILIP, M.D.:
7   EXAMINATION BY MS. KELLEY        5
8   .
9   .
10  .
11  .
12  .
13  .
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .

## Page 4

1        DEPOSITION OF ABRAHAM PHILIP, M.D.
2           JULY 21, 2005
3        PROCEEDINGS:
4        MS. KELLEY:  Dan, is it
5   okay if we agree that all objections,
6   except as to form, and all motions to
7   strike are reserved until the time of
8   trial?
9        MR. SHARP:  That's okay.
10       MS. KELLEY:  And your
11  witness would like to read and sign the
12  deposition transcript?
13       MR. SHARP:  Yes.
14       MS. KELLEY:  But waive
15  notarization?
16       MR. SHARP:  Yes.
17       MS. KELLEY:  And can we
18  deem it to have been signed 30 days after
19  receipt?
20       MR. SHARP:  Thirty days is
21  good.
22       ABRAHAM PHILIP, M.D., the deponent,
23  having been satisfactorily identified and
24  duly sworn by the Notary Public, was



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                        www.jackdanielreporting.com
         617.557.0039                        888.922.JACK                        FAX 617.557.0040

**ABRAHAM PHILIP, M.D.    07/21/05**

2 (Pages 5 to 8)

Page 5

1  examined and testified as follows:
2      EXAMINATION
3      BY-MS.KELLEY:
4  Q.  As I indicated off the record to
5  the stenographer, this deposition is being
6  taken in conjunction with both the federal
7  case that you have filed against John
8  Cronin and the state case that you have
9  filed against Doctor Evans and others.  Do
10  you understand that, Doctor Philip?
11  A.  Yes.
12      MS. KELLEY:  Could we have
13  this marked as the first exhibit?
14      (Exhibit-1, Curriculum Vitae
15  Bates Stamped AGO-0181 through AGO-0189,
16  marked for identification).
17      BY MS. KELLEY:
18  Q.  Doctor Philip, I'm putting before
19  you what's been marked Exhibit Number 1 at
20  this deposition.  Can you review that
21  document?
22      MR. SHARP:  Don't let me
23  hold you up.
24      BY MS. KELLEY:

Page 6

1  Q.  Okay.  Are you able to identify
2  that document, Doctor Philip?
3  A.  (Witness viewing document).  Yes.
4      Q.  What is that?
5  A.  (Witness viewing document).  It's
6  an old version of my curriculum vitae.
7  Q.  Do you recall approximately the
8  date that that document was prepared?
9  A.  No.  I would think at some time in
10  2003.
11  Q.  Since that time have you prepared
12  an updated curriculum vitae?
13  A.  Yes, I have.
14  Q.  And do you still retain a copy of
15  that document?
16  A.  Yes, I do.
17      MS. KELLEY:  I'd like to
18  request a copy of that be produced.
19      BY MS. KELLEY:
20  Q.  Now, since this document that's
21  been produced as Exhibit Number 1, Doctor
22  Philip, can you orally update us on what
23  you've done since this curriculum vitae
24  was prepared?

Page 7

1  A.  This was, according to the cover
2  letter attached to the document, was
3  prepared or submitted around August 2003.
4  Since then, on September 2nd, I started
5  work at the Office of the Chief Medical
6  Examiner, and the employment was terminated
7  March 3rd.
8  Q.  And when you say March 3rd, March
9  3rd of 2004?
10  A.  2004.
11  Q.  What did you do after that?
12  A.  Since June 2004, I've been working
13  part time at the Office of the Chief
14  Medical Examiner in Syracuse.
15  Q.  Syracuse, New York?
16  A.  That's correct.
17  Q.  When you say part-time, how many
18  hours a week do you work?
19  A.  I worked all weekends during summer
20  of last year and have been working about
21  three to four days every month since
22  January.
23  Q.  And what do you get paid for that?
24  A.  I get paid a per diem amount of

Page 8

1  $600.
2  Q.  And other than that, have you had
3  any other employment since your termination
4  in March of '04?
5  A.  Yes.
6  Q.  What other employment have you had?
7  A.  I used to review workplace drug
8  testing for a company based in
9  Philadelphia.
10      Q.  What company is that?
11  A.  University Services.
12  Q.  When did you do that?
13  A.  I was working with the company on
14  and off since 1998.
15  Q.  Are you still employed by them?
16  A.  No.  The last cases I did was in
17  December last year.
18  Q.  And during the time that you were
19  employed at the Medical Examiner's Office,
20  did you have any employment with this
21  University Services?
22  A.  Yes.  I was moonlighting for them.
23  Q.  When you say you've been working
24  with them on and off, approximately how


**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                            888.922.JACK                            FAX 617.557.0040

ABRAHAM PHILIP, M.D.  07/21/05

3 (Pages 9 to 12)

Page 9

1  much -- how many hours per month would you
2  work during that period 1998 to December?
3  A.  It would come to less than about
4  ten hours a week.
5  Q.  Is that an average or was it always
6  less than ten hours a month [sic]?
7  A.  It was always less than ten hours.
8  Q.  What did you get paid for that?
9  A.  Again, it used to be per case, and
10 I would be paid initially 15 and then
11 later $20 per case.
12 Q.  Fifteen dollars?
13 A.  Per case.
14 Q.  And what would a case entail?
15 A.  A case entailed reviewing a drug
16 screen -- workplace drug screen report
17 and seeing if the results could be
18 canceled based on the person getting
19 medical -- having a medical explanation
20 for the positive result.
21 Q.  And about how many of those cases
22 would you be able to complete in an hour?
23 A.  Fifteen in a couple of hours.
24 Q.  Fifteen cases in a couple of hours?

Page 10

1  A.  Yes.
2  Q.  Are you no longer employed with
3  University Services?
4  A.  No, I'm not.
5  Q.  And why is that?
6  A.  They decided to move the work
7  in-house and hire two people in
8  Philadelphia.
9  Q.  Who is your supervisor in Syracuse?
10 A.  Doctor Mary Jumbelic.
11 Q.  How do you spell that?
12 A.  J-U-M-B-E-L-I-C.
13 Q.  And would you say you have a good
14 relationship with him?
15 A.  With her.  Yes.
16 Q.  Oh, excuse me.  I thought you said
17 Larry.
18 A.  Mary.
19 Q.  Mary.  Oh, sorry.  You have a good
20 relationship with Doctor Jumbelic?
21 A.  Yes.
22 Q.  Other than the employment you've
23 just described, have you had any other
24 employment since March of '04?

Page 11

1  A.  No.
2  Q.  Have you applied for any other
3  positions in medical examiners' offices
4  since March of '04?
5  A.  I have.
6  Q.  Excuse me?
7  A.  I have.
8  Q.  Where else have you applied?
9  A.  I've applied to several places that
10 advertised positions on the name list
11 serve.
12 Q.  Where were those located?
13 A.  Peoria, Illinois; Houston, Texas;
14 Austin, Texas; Atlanta, Georgia; Memphis,
15 Tennessee.
16 Q.  Did you have interviews with any of
17 those places?
18 A.  I had interviews with Peoria,
19 Houston and Atlanta.
20 Q.  And were those for full-time
21 positions?
22 A.  Yes.
23 Q.  And you weren't hired?
24 A.  I didn't come to that.  Initially,

Page 12

1  I had these interviews, and then I decided
2  to complete the boards and look for
3  employment after I finished the boards.
4  Q.  When you say "boards," is that the
5  exams to become board certified?
6  A.  In forensic pathology, yes.
7  Q.  And you've taken those boards
8  several times?
9  A.  Twice.
10 Q.  You've taken them twice and failed
11 twice?
12 A.  No, I passed the last time.
13 Q.  Didn't you fail twice before you
14 passed?
15 A.  No, just once.
16 Q.  What were the dates that you took
17 the boards?
18 A.  I took it in September 2002 -- oh,
19 you're right.  September 2002, 2003 and
20 2004, November 2004.
21 Q.  So September 2002, September
22 2003 --
23 A.  And November 2004.
24 Q.  Oh, okay.  And the first two times



Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                          888.922.JACK                          FAX 617.557.0040

ABRAHAM PHILIP, M.D.    07/21/05

4 (Pages 13 to 16)

Page 13

1    you failed.
2    A.   That's correct.
3    Q.   And the third time you passed?
4    A.   Yes.
5    Q.   And that's to become board
6    certified as a forensic pathologist.
7    A.   That's correct.
8    Q.   So currently you are board
9    certified.
10   A.   I am.
11   Q.   So is it fair to say from your
12   testimony you withdrew your application
13   from these places where you were
14   interviewed?
15   A.   That's correct.
16   Q.   And no decision was made by them to
17   not hire you.
18   A.   That's correct.
19   Q.   Doctor, were you involved in a
20   fellowship at the Medical Examiner's Office
21   in Massachusetts in the year 2000?
22   A.   Yes.
23   Q.   Was that the first time that you
24   were employed in any capacity at the

Page 14

1    Medical Examiner's Office in Massachusetts?
2    A.   That's correct.
3    Q.   And can you describe the
4    circumstances of that fellowship?
5         MR. SHARP:  Objection.  I
6    don't understand that question.
7         BY MS. KELLEY:
8    Q.   Well, how did that come about, the
9    fellowship?
10   A.   I applied for the fellowship, and
11   initially I was told that I'd been
12   selected by Doctor Stanton Kessler.  And
13   he said I would be able to start earlier
14   than the normal starting period of July,
15   1st of July, but then that didn't work
16   out, so I started on 1st of July, 2000.
17   Q.   And was this a paid fellowship?
18   A.   Yes, it was.
19   Q.   And who was -- Strike that.
20        Where did the money come to fund
21   this fellowship?
22        A.   From the New England Organ Bank.
23   Q.   Is that who you had to apply to?
24   A.   No.  I just applied to the Office

Page 15

1    of the Chief Medical Examiner.
2    Q.   And as part of this fellowship,
3    were you given any training?
4    A.   Not formally.
5    Q.   What did you do during this
6    fellowship?
7    A.   Autopsies, court testimony.
8    Q.   Had you worked as a forensic
9    pathologist before July of 2000?
10   A.   Yes.
11   Q.   Where had you worked?
12   A.   In India.
13   Q.   Was there a particular reason that
14   you applied for a fellowship in 2000?
15   A.   I was interested in forensic.
16   Q.   Excuse me?
17   A.   I was interested in forensic.
18   Q.   Was it your understanding that this
19   would somehow help you become a
20   pathologist on a full-time basis in the
21   United States?
22   A.   No.
23   Q.   Is there a reason you applied for a
24   fellowship as opposed to just applying for

Page 16

1    a job as a forensic pathologist?
2    A.   Oh, my Indian qualifications are
3    not recognized here and I have to do a
4    fellowship.
5    Q.   And how long a fellowship did you
6    have to do?
7    A.   One year.
8    Q.   And then that would be sufficient
9    to have your qualifications recognized?
10   A.   Yes.
11   Q.   During that fellowship, were you
12   under the supervision of Doctor Kessler?
13   A.   Yes, until he left in the middle of
14   the year.
15   Q.   Who replaced him?
16   A.   I believe Faryl Sandler.
17   Q.   I'm sorry.  Who?
18   A.   Faryl Sandler.
19   Q.   And she's still employed at the
20   Medical Examiner's Office, to your
21   knowledge?
22   A.   I have no clue.
23   Q.   She was still employed there in
24   March of '04?

**Jack Daniel**
Court Reporting & Video Services inc

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                              888.922.JACK                              FAX 617.557.0040

ABRAHAM PHILIP, M.D.   07/21/05

5 (Pages 17 to 20)

Page 17

1   A.  Yes.
2       Q.  So you worked during that one year
3   fellowship; is that correct?
4   A.  That's right.
5   Q.  Did that end at the end of June of
6   2001?
7   A.  Yes.
8   Q.  What did you do next?
9   A.  I was employed as staff
10  pathologist.
11  Q.  Still by the Medical Examiner's
12  Office in Massachusetts?
13  A.  That's correct.
14  Q.  Was that as -- Strike that.
15      Were you employed as an employee or
16  were you under a contract?
17  A.  I was under a contract.
18  Q.  Was that a one-year contract?
19  A.  No, it was not.
20  Q.  Six-month contract?
21  A.  I don't recall.  Might have been
22  three months or six months.
23  Q.  Okay.  Do you recall -- Does it
24  refresh your recollection that it may have

Page 18

1   been a six-month contract followed by two
2   three-month extensions?
3   A.  That's likely.
4   Q.  And during that period of time were
5   you supervised by Doctor Sandler?
6   A.  No.
7   Q.  Who was your supervisor?
8   A.  Richard Evans.
9   Q.  During that whole period?
10  A.  Yes.
11  Q.  When had he become chief medical
12  examiner in Massachusetts?
13  A.  I believe 1993.
14  Q.  Your fellowship ended in 2001 --
15  A.  Correct.
16  Q.  -- and then you said you were
17  supervised after that as a staff
18  pathologist.  You were supervised by
19  Doctor Evans?
20  A.  That's correct.
21  Q.  So was he the chief medical
22  examiner in 2001?
23  A.  Yes, he was.
24  Q.  And that continued through until

Page 19

1   2003 and into 2004?
2   A.  No.  I think in 2003, his status
3   changed to active -- acting chief medical
4   examiner.
5   Q.  Okay.  And he remained in that role
6   until March of 2004 to the best of your
7   knowledge?
8       A.  Yes.
9   Q.  After your fellowship, is it fair
10  to say that you did work as a staff
11  pathologist for one additional year under
12  contract?
13  A.  Yes.
14  Q.  And that would have terminated in
15  the summer of 2002.
16  A.  June 30, 2002.
17  Q.  What did you do next?
18  A.  I sent out several applications.
19  Q.  And was one of those applications
20  to the New York Medical Examiner's Office?
21  A.  Yes, it was.
22  Q.  Were you hired to work in New York?
23  A.  Yes, I was.
24  Q.  And was that New York City?

Page 20

1   A.  Yes, it was.
2   Q.  Who did you work under in that
3   office?
4   A.  Doctor Charles Hirsch.
5   Q.  And could you spell that for the
6   record?
7   A.  H-I-R-S-C-H.  Charles.
8   Q.  Were you an employee or were you
9   under a contract?
10  A.  I was an employee.
11      Q.  And were you continuing to function
12  as a staff pathologist?
13  A.  Yes.
14  Q.  How long did you remain in that
15  position?
16  A.  'Til June -- end of June 2003.
17  Q.  Had you started the end of June
18  2002 --
19  A.  No.
20  Q.  -- or at the beginning of July?
21  A.  I started in October 2002.
22  Q.  And did you have any evaluations
23  while you were in that position?
24  A.  There must have been.


Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                      888.922.JACK                                    FAX 617.557.0040

Page 21

1    Q.  You don't recall any?
2    A.  I was not given any copies.
3    Q.  Were you spoken to about any
4    evaluation of yourself?
5    A.  No.
6    Q.  Did you have reason to believe that
7    you could continue your employment there
8    if you wanted to?
9    A.  Yes.
10   Q.  Why did you leave the New York
11   Medical Examiner's Office?
12       A.  Because it was just too much of a
13   stress on my wife and daughter.
14   Q.  Because they were up here in
15   Massachusetts?
16   A.  That's correct.
17   Q.  Was there a reason they had to stay
18   up here in Massachusetts?
19   A.  Yes.  My wife holds a tenured
20   faculty position on the North Shore of
21   Boston.
22   Q.  Where is that?
23   A.  Wenham.
24   Q.  In what school?

Page 22

1    A.  Gordon College.
2    Q.  I'm sorry?
3    A.  Gordon College, G-O-R-D-O-N.
4    Q.  And how old is your daughter?
5    A.  She's five now.
6    Q.  So the end of June 2003, you left
7    that employment in New York; is that
8    correct?
9    A.  That's correct.
10   Q.  When you left there, did you have
11   another job?
12   A.  I was promised a job.
13   Q.  Where?
14       A.  At the Office of the Chief Medical
15   Examiner in Boston.
16   Q.  And you already had been promised
17   that job before you left your New York
18   job?
19   A.  Yes.
20   Q.  Who had made that promise to you?
21   A.  Doctor Richard Evans.
22   Q.  But you did have to apply for the
23   job at the Medical Examiner's Office in
24   Boston; is that correct?

Page 23

1    A.  Yes, I did.
2       MS. KELLEY:  Could we have
3    this marked as Exhibit 2, and then this
4    one as Exhibit 3?
5       (Exhibit-2, Job Posting
6    Bates Stamped AGO-0178 through AGO-0179;
7    Exhibit-3, Standard Contract Form and
8    Instructions Bates Stamped AGO-0177, marked
9    for identification.)
10      BY MS. KELLEY:
11   Q.  Doctor Philip, I've just put in
12   front of you what's been marked Exhibits 2
13   and 3.  Do you see those documents?
14   A.  (Witness viewing document).  Yes.
15   Q.  Referring you to what's been marked
16   as Exhibit Number 2, do you know what that
17   document is?
18      A.  This is an advertisement -- a job
19   posting on the Massachusetts government Web
20   site for a -- assistant medical examiner.
21   Q.  And is this the posting that you
22   responded to in your position as -- in the
23   Chief Medical Examiner's Office?
24   A.  Not exactly.  I had a phone

Page 24

1    conversation with Doctor Evans, and in
2    March -- I'm sorry, April or May, when he
3    said, send me a letter and a copy of the
4    CV, which I did.  This is much later that
5    I was told about this application, and I
6    did send another formal application.
7    Q.  Okay.  Well, first of all.  You
8    said you had your conversation with Doctor
9    Evans in April or May.  Would that have
10   been of the year 2003?
11   A.  2002 -- 2003, correct.
12   Q.  Okay.  And was that before there
13   had been, to your knowledge, any job
14   posting?
15   A.  Yes.
16   Q.  And you said that he had already
17   made you a promise that you would have a
18   position --
19   A.  Yes.
20   Q.  -- is that correct?
21   A.  Yes.
22      Q.  Did he advise you that you would
23   have a position as a full-time employee or
24   was it going to be a contract position?



Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
       617.557.0039                      888.922.JACK                          FAX 617.557.0040

Page 25

1    A.  He said he had to work on it and
2    look into that, but didn't commit himself
3    to anything.
4    Q.  The document that's been marked as
5    Exhibit Number 2 has a date up at the top
6    of August 5, 2003.  Do you see that?
7    A.  (Witness viewing document).  Yes.
8    Q.  And it says, "Application deadline:
9    August 15, 2003."  Do you see that?
10   A.  (Witness viewing document).  Yes.
11   Q.  By August of 2003, what was the
12   situation of your job position with Doctor
13   Evans?
14   A.  I had not heard from Doctor Evans.
15   And on the 6th of August, I had a
16   doctor's appointment, so I swung by the
17   office and this was given to me.  And I
18   already had a vitae and a cover letter,
19   which I handed over at the same time.
20   Q.  I'm sorry.  You said you had a
21   doctor's appointment on August 6, 2003?
22   A.  With my primary care physician,
23   yes.
24   Q.  Okay.  And this document, Exhibit

Page 26

1    Number 2, was handed to you?
2    A.  Yes.
3    Q.  By whom?
4    A.  Mr. Cronin.
5    Q.  So you went into the Office of the
6    Chief Medical Examiner?
7    A.  That's correct.
8    Q.  Oh, on the same day that you had
9    an appointment with your internist.
10   A.  That's correct.
11   Q.  Well, when Mr. Cronin handed you
12   this posting, what did you say?
13   A.  We had a brief conversation.  I
14   gave him my vitae and the cover letter
15   that's attached to Exhibit Number 1, and
16   he said the formalities would be completed
17   soon.
18   Q.  Did he advise you whether they were
19   interviewing anybody else for the position?
20   A.  He didn't.
21   Q.  Did you talk to him at all about
22   whether this was going to be a full-time
23   position or a contract position?
24   A.  He said he could only offer me a

Page 27

1    contract position.
2    Q.  When you had left to go to the New
3    York Medical Examiner's Office, would you
4    have stayed here in Boston if they had
5    offered you a full-time position?
6          MR. SHARP:  Objection. But
7    go ahead.
8    A.  Yes.
9    Q.  In fact, you wanted a full-time
10   position.  Is that fair to say?
11   A.  That's only half the story.
12   Q.  What's the rest of the story?
13   A.  I also wanted to see a good Medical
14   Examiner's Office.
15   Q.  So we're now talking about June
16   2002?
17   A.  Yes.
18   Q.  So you wanted a full-time position,
19   but you also wanted a better-run office?
20   A.  Correct.
21   Q.  Did you discuss that with anyone,
22   that you wanted a better-run office before
23   you would consider staying at the Boston
24   Medical Examiner's Office?

Page 28

1    A.  Discuss it with a specific person?
2    Q.  Yes.
3          MR. SHARP:  When?
4    A.  When?
5    Q.  Around June of 2002, when you
6    wanted a full-time position, but you also
7    wanted a better-run office, did you
8    discuss that fact with anyone at the
9    Medical Examiner's Office?
10   A.  I must have spoken about it to
11   Doctor Chirkov, to Doctor Zane.
12   Q.  Did you speak about it to Doctor
13   Evans?
14   A.  I never could get to meet him.
15   Q.  Around June of 2002, were there, in
16   fact, full-time positions being offered to
17   anybody?
18   A.  It's my understanding there were
19   two full-time positions being offered.
20   Q.  And who got those positions?
21   A.  I believe one was given to Faryl
22   Sandler, but that was after June 2002,
23   after I left.
24   Q.  Okay.  But sometime in 2002?


**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                            888.922.JACK                          FAX 617.557.0040

Page 29

1    A.  Yes.
2    Q.  And the second position?
3    A.  I have no idea.
4    Q.  Can you describe your relationship
5    with Doctor Sandler?
6    A.  We were just colleagues.  We had
7    differences of opinion.
8        Q.  Did you have any resentment towards
9    her that she received this full-time
10   position and you didn't?
11   A.  No.
12   Q.  Okay.  Going back to August of
13   2003, you said you had a conversation with
14   Mr. Cronin about this job posting marked
15   as Exhibit Number 2; is that correct?
16   A.  That's correct.
17   Q.  Did you read the job posting?
18   A.  Yes, I did.
19   Q.  And it's -- Is it in front of you
20   right now?
21   A.  (Witness viewing document).  It is
22   now.
23   Q.  Okay.  Do you see under the section
24   called "Duties" there are several

Page 30

1    paragraphs?  Do you see those?
2    A.  (Witness viewing document).  Yes.
3    Q.  And the second full paragraph under
4    "Duties," can you read the very last
5    sentence out loud for the record from that
6    paragraph?
7    A.  "Reviews reports of death received
8    from hospitals, police agencies and private
9    physicians" --
10   Q.  I'm sorry, Doctor.  Under "Duties,"
11   the second full paragraph, which is up
12   above that section you were just reading
13   from.
14   A.  "At the discretion of the Chief
15   Medical Examiner and Assistant Medical
16   Examiner may be" -- something is missing
17   -- "administrative duties ranging from such
18   functions as teaching assignments,
19   statistical and," I assume,"scheduling of
20   service activities, managing of autopsy
21   services at an OCME facility; up to
22   directorship of a regional satellite
23   office.  Additional compensation will be
24   provided within range in line with the

Page 31

1    level of additional administrative
2    responsibilities assigned.  This
3    compensation will be at" --"at the
4    discretion of the Chief Medical Examiner,
5    comma, Assistant Medical, always adhere to
6    the highest ethical standards and serve as
7    role models for all other OC."
8    Q.  Did you have an understanding when
9    you saw this posting that one of the
10   things that was going to be asked of you
11   was that you were going to be a role
12   model for staff at the Chief Medical
13   Examiner's Office?
14       MR. SHARP:  Objection.  Go
15   ahead, if you can.
16   A.  Could you repeat that question?
17       MS. KELLEY:  Could you read
18   that back, please?
19       (Record read).
20   A.  This was not specifically discussed
21   at any point in my application process.
22   Q.  Okay.  My question, Doctor, is, you
23   saw the posting before your formal
24   application; is that correct?

Page 32

1    A.  No.
2    Q.  You saw the posting before you took
3    the position; is that correct?
4    A.  Yes.
5    Q.  And you understood that this was a
6    posting for the position that you were
7    going to take; is that correct?
8    A.  Yes.
9    Q.  And I take it you did read Exhibit
10   Number 2 before you took the position.  Is
11   that correct?
12   A.  Yes.
13   Q.  So my question again to you is,
14   whether at the time you took this position
15   you understood that one of the duties
16   expected of you was to act as a role
17   model for staff at the Chief Medical
18   Examiner's Office.
19       A.  This was the posting.  On the same
20   day I got the posting I submitted my
21   application on August 6th.  When I signed
22   the contract, there was nothing about a
23   role model mentioned in the contract.  I
24   signed the contract to be a medical


Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
                                www.jackdanielreporting.com
617.557.0039                        888.922.JACK                    FAX 617.557.0040

Page 33

1    examiner, a forensic pathologist. That's
2    all.
3    Q.  So I take it from your answer, your
4    answer to my question is, no, you didn't
5    understand that to be part of your duties.
6    Is that correct?
7    A.  That's your interpretation.
8    Q.  Excuse me?
9    A.  That is your interpretation of it.
10   Q.  Well, I'll ask it again, Doctor.
11   At the time when you took this position,
12   is it correct to say that you did not
13   consider it one of your duties that you
14   act as a role model for other members of
15   the staff?
16   A.  That is correct.
17   Q.  At the time you took this position,
18   was it your understanding that one of your
19   duties was to adhere to the highest
20   ethical standards?
21   A.  Yes.
22   Q.  So you did understand that part of
23   the posting --
24   A.  Yes.

Page 34

1    Q.  -- is that correct?
2        MR. SHARP:  Objection. Go
3    ahead.
4        BY MS. KELLEY:
5    Q.  Yes?
6    A.  Yes.
7    Q.  Doctor, how long have you had a
8    relationship with your current counsel?
9    When did you first retain your current
10   counsel's law firm?
11   A.  October 2003.
12   Q.  And without revealing any
13   attorney/client confidential statements,
14   can you describe in very general terms the
15   purpose of your retention of the law firm
16   at that point?
17       MR. SHARP:  Objection. Don't
18   answer.
19       MS. KELLEY:  And what's the
20   basis for the objection.
21       MR. SHARP:  Privilege.
22       MS. KELLEY:  It's not
23   privileged when he retained a law firm.
24       MR. SHARP:  He answered when

Page 35

1    we were retained.
2        MS. KELLEY:  And the
3    purpose. I think that's going to be at
4    issue in this case because of the nature
5    of your firm's involvement in 2004.
6        MR. SHARP:  Fine.
7        MS. KELLEY:  Okay.
8        BY MS. KELLEY:
9    Q.  Have you ever acted as an expert
10   witness for your current law firm?
11   A.  No.
12   Q.  Have you ever done any professional
13   responsibility things for your current law
14   firm?
15   A.  No.
16   Q.  With respect to a possible claim
17   against the Chief Medical Examiner's
18   Office, when did you first retain your
19   current law firm?
20   A.  On the day the suspension notice
21   was served on me.
22   Q.  Was that February 25th of 2003
23   [sic]?
24   A.  I believe so, yes.

Page 36

1    Q.  Doctor, referring you to what's
2    been marked as Exhibit Number 3 -- Do you
3    still have that document in front of you?
4    A.  (Witness viewing document). Yes, I
5    do.
6        Q.  Can you describe what that is?
7    A.  (Witness viewing document). This
8    is the standard contract form and
9    instructions.
10   Q.  Was that a contract that you signed
11   at the time that you became employed at
12   the Medical Examiner's Office in September
13   '03?
14   A.  Yes, it is.
15   Q.  And what date did you sign that?
16   A.  The 2nd of September, 2003.
17   Q.  As of that time, was it your
18   understanding that you had a one-year
19   contract?
20   A.  Yes.
21   Q.  Did you have any discussions with
22   anyone at the Medical Examiner's Office
23   about whether there were possibilities that
24   that contract might be renewed?

**Jack Daniel**
Court Reporting & Video Services

TRCHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                              888.922.JACK                          FAX 617.557.0040

Page 37

1    A.   It was -- No, I didn't.
2    Q.   Did you have an understanding one
3    way or the other whether that contract
4    could be renewed?
5    A.   I -- The issue did not come up
6    because there was still a lot of time for
7    the contract to expire.
8    Q.   So at that point at least, you just
9    knew you had one year of employment there.
10       A.   Yes.
11   Q.   Can you describe the first few
12   months of your employment there, your
13   relationship with your supervisors?
14   A.   My relationship with my supervisors
15   was excellent.
16   Q.   And would this have been Doctor
17   Evans?
18   A.   When he appeared at the office.  He
19   was very rarely there.
20   Q.   Is it fair to say during that
21   period of time, Doctor Evans was often in
22   the Worcester office?
23   A.   That's correct.
24   Q.   So you didn't see him very often.

Page 38

1    A.   That's correct.
2    Q.   So which supervisors were they that
3    you had an excellent relationship with?
4    A.   All the administrators in the
5    office.
6    Q.   And who were those people?
7    A.   Mr. Cronin, Lieutenant Edith Platt,
8    Counsel Jackie Faherty.
9    Q.   What was Lieutenant Platt's role at
10   the Medical Examiner's Office?
11   A.   She was a senior administrator.
12       Q.   Did you report to her on anything?
13   A.   We discussed several things.
14   Q.   What types of things would you
15   discuss with her?
16   A.   Questions that families asked,
17   issues that needed clarification about the
18   autopsy report or death certificate or
19   something like that.
20   Q.   What about your relationship with
21   your coworkers?  During those first
22   several months, how would you describe
23   your relationship with your coworkers?
24   A.   It was always good.

Page 39

1    Q.   Always good right up until March of
2    '04?
3    A.   Even after March, I suppose.
4    Q.   And would that include Doctor
5    Sandler?
6    A.   Yeah.
7    Q.   Doctor Evangelista?
8    A.   Yes.
9    Q.   What about John Cronin?  Was your
10   relationship with him good right up until
11   March of '04?
12   . A.   No, it was not.
13   Q.   When did your relationship with
14   John Cronin start to deteriorate?
15       A.   I would think early January
16   onwards.
17   Q.   When you say "early January," was
18   there an incident or an event that
19   happened in early January that you can
20   recall?
21   A.   Yes.
22   Q.   What was that?
23   A.   There was a supervisor who asked if
24   the autopsy start times could be

Page 40

1    rescheduled.
2    Q.   And?
3    A.   And I e-mailed saying that if we
4    could have a meeting and discuss this, it
5    might be helpful.
6    Q.   Who was the supervisor who asked if
7    the autopsy start times could be
8    rescheduled?
9    A.   Marcel Garcia.
10   Q.   And what was -- Strike that.
11       When you say the autopsy start
12   times could be rescheduled, what do you
13   mean by that?
14   A.   Autopsies start at the Office of
15   the Chief Medical Examiner really late,
16   sometimes at 11, 11:30, by which time it
17   is lunchtime for some of the technicians
18   so there was difficulty manning the
19   autopsy rooms.  And his request was could
20   things start between nine and 9:30.
21       Q.   And you followed up on that with an
22   e-mail.
23   A.   Yes.
24   Q.   Was that to John Cronin?



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                   www.jackdanielreporting.com
617.557.0039                              888.922.JACK                              FAX 617.557.0040

Page 41

1    A.  To everyone in the office.
2    Q.  And what was the response, if any,
3    to your e-mail?
4    A.  John Cronin asked me what my plan
5    was and then forbade me to release it to
6    the rest of the office.
7    Q.  Did he say why?
8    A.  No.
9    Q.  Did he indicate any dissatisfaction
10   with your e-mail?
11   A.  Not with my e-mail.
12   Q.  Well, did he indicate any
13   dissatisfaction with the position you were
14   taking?
15   A.  No.
16   Q.  Why did he forbid you to release
17   your plan to the rest of the office?
18       MR. SHARP:  Objection.
19   A.  You'll have to ask him.
20       MR. SHARP:  Objection.
21   Answer if you can.
22       BY MS. KELLEY:
23   Q.  He didn't tell you?
24   A.  No.

Page 42

1    Q.  Was there anything else in that
2    discussion with Mr. Cronin that you can
3    recall other than that he forbade you to
4    release it to the rest of the office?
5    A.  No.
6    Q.  He didn't say anything else?
7    A.  No.
8        MS. KELLEY:  Can you mark
9    that as the next exhibit?
10       (Exhibit-4, A Proposal to
11   Perpetuate the Legacy of Lieutenant Edith
12   Platt, M.S.P., Bates Stamped P-0031 through
13   P-0034, marked for identification).
14       BY MS. KELLEY:
15   Q.  Doctor Philip, we just passed a
16   document to you that's been marked as
17   Exhibit Number 4 to this deposition.  Do
18   you see that?
19   A.  (Witness viewing document).  Yes.
20   Q.  What is that?
21   A.  (Witness viewing document).  I was
22   trying for a global change in the attitude
23   and working of the office and came up with
24   a plan where everybody in the office could

Page 43

1    meet, have a lunch together and discuss
2    some common topics.  And I developed a
3    proposed plan to make this international
4    with representatives from all assigned
5    nations from various parts of the world
6    where we could just have some conversation
7    besides dead bodies and funeral homes.
8    Q.  So you prepared this document?
9    A.  Yes, I did.
10   Q.  And it's entitled "A Proposal to
11   Perpetuate the Legacy of Lieutenant Edith
12   Platt, M.S.P."
13   A.  Yes.
14   Q.  Is that correct?  What about this
15   document is for the purpose of
16   perpetuating her legacy?
17   A.  I had learned that Lieutenant Edith
18   Platt had asked for a transfer out of the
19   agency at that time, and since she was a
20   person who had done quite a bit to try
21   and get the various people in the office
22   together working and sharing, I thought it
23   would be good to perpetuate that
24   recollection of her by having these

Page 44

1    luncheon sessions.
2    Q.  Okay.  Now, you said at the
3    beginning you wanted to change the whole
4    attitude, I think you said, at the Medical
5    Examiner's Office; is that correct?
6    A.  The -- Yes.
7    Q.  What was there about the attitude
8    that you felt needed to be changed?
9    A.  I found the morale was very low.
10   People were unnecessarily snapping at each
11   other.  People were not cooperating with
12   each other's work.  People were not client
13   friendly.  And all of that needed change.
14   Q.  So you suggested this sort of
15   international luncheon type of --
16   A.  Yes.
17   Q.  -- proposal; is that correct?  And
18   you divided people up into different
19   segments according to country; is that
20   correct?
21   A.  Yes.
22   Q.  Was there any rhyme or reason to
23   how you assigned people to particular
24   countries?



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street - Boston, MA 02114        EXPERIENCE YOU CAN TRUST
                                        www.jackdanielreporting.com
617.557.0039                           888.922.JACK                              FAX 617.557.0040

ABRAHAM PHILIP, M.D.   07/21/05

12 (Pages 45 to 48)

Page 45

1    A.  No, just arbitrarily.  And I did
2    mention that it could be changed and just
3    suggested -- these were just suggestions.
4    Q.  I see Jackie Faherty is listed
5    under Ireland; is that right?
6    A.  Yes.
7    Q.  Is that because her name is Irish?
8    A.  No, I just picked 12 countries.
9    I'm not from Egypt.
10   Q.  Okay.  And then at the end of this
11   document there's a sheet -- I take it this
12   sheet was attached to the document.
13   People could participate or not if they
14   wanted to.
15   A.  Yes.
16   Q.  Who did you send this document to?
17   A.  I handed it over to Mr. John
18   Cronin.
19   Q.  And did he make any response when
20   you handed it to him?
21   A.  No.
22   Q.  Didn't say anything?
23   A.  No.
24   Q.  Did you have an understanding he

Page 46

1    was going to give it to other people in
2    the department?
3    A.  I don't know what he did.
4    Q.  Did you try to give it to anyone
5    else?
6    A.  No.
7    Q.  As far as you know, did anyone ever
8    supply you with a sheet indicating that
9    they voted to participate or not
10   participate?
11   A.  No.
12   Q.  No one ever did that?
13   A.  No.
14   Q.  Did you ever have any discussions
15   with any -- anybody in the department
16   after you handed this to John Cronin
17   about --
18   A.  No.
19   Q.  -- whether they wanted to
20   participate in this?
21   A.  I thought John Cronin would
22   initiate the discussion and pass it
23   around.  Never got done.
24   Q.  But he didn't say a single word to

Page 47

1    you when you gave it to him?
2    A.  No.  He did exactly what he did
3    with several of my suggestions, picked it
4    up and kept it on the side.
5    MS. KELLEY:  Could we have
6    these marked as a single exhibit, Number
7    5?
8    (Exhibit-5, Documents Bates
9    Stamped P-0187 through P-0193, marked for
10   identification.)
11   BY MS. KELLEY:
12   Q.  Doctor Philip, you now have in
13   front of you what's been marked Exhibit
14   Number 5 to this deposition.  Do you see
15   that document?
16   A.  (Witness viewing document).  Yes.
17   Q.  And do you see down at the -- or
18   somewhere on each page there's a Bates
19   stamp that indicates a P and then certain
20   numbers?
21   A.  (Witness viewing document).  Yes.
22   Q.  And it goes from P-187 to P-193.
23   Do you see that?
24   A.  (Witness viewing document).  Yes.

Page 48

1    Q.  I'll represent for the record that
2    these were included in the documents that
3    you have recently produced to this office
4    in response to a request for production of
5    documents. As far as you know, is that an
6    accurate statement?
7    A.  Yes.
8    Q.  And can you describe generally what
9    Exhibit Number 5 consists of?
10   A.  (Witness viewing document).
11   Exhibit Number 5 consists of six -- one,
12   two, three, four, five, six -- seven
13   sheets of paper.  Some of them are e-mails
14   sent to John Cronin and some of them are
15   an analysis of the workload distribution
16   of cases.
17   Q.  First of all, Doctor, the sheet
18   that you're referring to, the workload
19   distribution, that's marked as P-0189; is
20   that correct?
21   A.  (Witness viewing document).  That's
22   correct.
23   Q.  And I'll represent for the record
24   that this was included within the e-mails



Jack Daniel
Court Reporting & Video Services

Page 49

1    in the exact same order that it's been
2    produced here today. Was there some reason
3    that this would have been produced right
4    in the middle of those e-mails?
5    A.   That's not accurate.  This was not
6    sent as an e-mail, it was handed over to
7    Mr. Cronin.
8    Q.   My question, Doctor, is, it was
9    produced to me in this order.  Is there
10   some reason that this document was
11   included within those e-mails or is it
12   just an accident that it ended up in the
13   e-mails?
14   A.   I'm not the one -- the person to
15   answer that question.  You would have to
16   ask whoever produced it to you.
17   Q.   Okay.  Well, with respect to that
18   document, P-0189, can you describe what
19   that is?
20   A.   (Witness viewing document).  That
21   shows the number of autopsies and external
22   examinations done by the different doctors.
23   On the top -- the top table is all the
24   cases done between 2000 -- in the year

Page 50

1    2002 and 2003.  And the second table is
2    from September 1 of 2003, to December
3    31st, 2003.
4    Q.   Did you prepare this document?
5    A.   Yes, I did.
6    Q.   Do you know when you prepared it?
7    A.   One of the days before discussions
8    with John Cronin. Sometime in January.
9    Q.   Sometime in January of '04?
10   A.   Yes.
11   Q.   And what was the purpose of your
12   preparing this document?
13   A.   To highlight the issue that there
14   was an unequal distribution of workload.
15   Q.   Did you consider that some of the
16   medical examiners weren't pulling their
17   fair share?
18   A.   Well, that's obvious from the data
19   presented.
20   Q.   Well, was that your understanding
21   or your belief?
22   A.   That's my analysis of the data.
23   Q.   Who did you think wasn't doing
24   enough?

Page 51

1    A.   Several people.
2    Q.   Who?
3    A.   Doctor Cannon -- Doctor Sandler did
4    13 percent of the cases compared to 24
5    percent done by me.  Doctor Cannon did 10
6    percent.  Richard Evans did less than 10
7    percent.
8    Q.   Were there any other people that
9    you thought really weren't doing their
10   job?
11   A.   The rest seem to be -- I mean, me
12   and Frank Evangelista were doing about 20,
13   25 percent of the cases.  Zane did
14   slightly less than 20 percent.
15   Q.   Was it your understanding that
16   Richard Evans -- At the point when you
17   created this document, he was still acting
18   as chief medical examiner; is that
19   correct?
20   A.   That's correct.
21   Q.   So I take it you thought -- Strike
22   that.
23        Did you think it was reasonable
24   that he was doing fewer autopsies than you

Page 52

1    and Doctor Evangelista?
2    A.   I did.
3    Q.   Excuse me?  Yes, you did?
4    A.   I did.
5    Q.   So the only people that weren't
6    really pulling their weight were Faryl
7    Sandler and Marie Cannon; is that correct?
8    A.   Yes.
9    Q.   Were those the only two full-time
10   female pathologists?
11   A.   Yes.
12   Q.   And you said that you prepared this
13   in connection with a meeting that you had
14   with John Cronin in January of '04; is
15   that correct?
16   A.   That's correct.
17   Q.   And who called that meeting?
18   A.   I requested the meeting.
19   Q.   And what was the purpose of
20   requesting that meeting?
21   A.   This tied in with my previous
22   response to Marcel Garcia's e-mail about
23   earlier autopsy times.  And I came up with
24   a proposal where both of these could be

**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE    141 Portland Street . Boston, MA 02114    EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039    888.922.JACK    FAX 617.557.0040

ABRAHAM PHILIP, M.D.    07/21/05

14 (Pages 53 to 56)

Page 53

1    corrected; there would be fair distribution
2    as well as the autopsies would start
3    earlier.
4    Q. And what was your plan in that
5    regard?
6    A. It's too long to go over now.
7    Q. Well, what are the general
8    concepts?
9    A. The general concepts are that the
10   cases be assigned by the first doctor who
11   reaches the Medical Examiner's Office and
12   strictly in a sequential manner.
13   Q. How was it being done before that?
14   A. Randomly. And at --
15       Q. Who was doing it?
16   A. It would be done at the morning
17   conference which would start late, and at
18   the end of the conference the cases would
19   be divvied up.
20   Q. And who would do the dividing up?
21   A. Whoever was chairing the conference
22   at that time.
23   Q. Is it fair to say that the person
24   who divided up the cases might take into

Page 54

1    account whether some cases were more
2    complex than others?
3    A. An attempt was made to divide the
4    cases equally among all, but some people
5    wouldn't complete their cases because
6    things would get late started. And then
7    they would get back -- they would get
8    thrown over for the next day or be done
9    by somebody else late in the day.
10   Q. And the some people that you're
11   talking about, was that Marie Cannon and
12   Faryl Sandler?
13   A. That's what you're saying.
14   Q. Are those the people you're talking
15   about?
16   A. Yeah.
17   Q. Excuse me?
18   A. That's what the numbers show.
19       Q. Okay. So when you just said there
20   were some people who wouldn't get their
21   cases done, you're referring to Doctors
22   Sandler and Cannon.
23   A. Yes.
24   Q. And Doctor Sandler is the person

Page 55

1    who was hired instead of you as a
2    full-time employee; is that correct?
3    A. Not instead of me. She was --
4    Q. She was offered a full-time
5    position which you weren't offered; is
6    that fair to say?
7    A. Because I was not there.
8    Q. Do you know when she was offered
9    the full-time position?
10   A. I don't. It's after I left.
11   Q. What about Doctor Cannon? How long
12   had she been there?
13   A. She was there when I started.
14   Q. When you started the first time?
15   A. In September 2003.
16   Q. Was she there when you left your --
17   after your first contract year?
18   A. No.
19   Q. Did you actually have this
20   discussion with John Cronin in January of
21   '04 --
22       A. Yes.
23   Q. -- about starting -- having
24   starting times different and a different

Page 56

1    way of assigning cases?
2    A. Yes.
3    Q. And what did -- What, if anything,
4    did Mr. Cronin say to you during that
5    discussion?
6    A. He listened to me and then said I
7    was not to announce it to the general
8    public.
9    Q. Did he say why?
10   A. No.
11   Q. Did you start to have an
12   understanding at that point in time that
13   he was not terribly appreciative of your
14   efforts to redesign the functioning of the
15   office?
16   A. Soon afterwards, yes.
17   Q. When did you come to that
18   understanding?
19   A. His responses to my several e-mails
20   that I sent out, meetings would be
21   announced and then canceled or postponed.
22   And then when the meetings were held, he
23   wouldn't listen to it, just took whatever
24   I gave him.



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                      888.922.JACK                    FAX 617.557.0040

ABRAHAM PHILIP, M.D.    07/21/05

15 (Pages 57 to 60)

Page 57

1    Q.  And what's the time frame
2    approximately that you're describing?
3    A.  Early January to mid January.
4        Q.  Of 2004?
5    A.  Yeah.
6    Q.  And so at some point you felt that
7    he was not being responsive to your
8    requests; is that fair to say?
9    A.  Yes.
10   Q.  Now, going back to what's been
11   marked as Exhibit Number 5, the first page
12   of that document --
13   A.  Yes.
14   Q.  -- that's an -- I guess it's just
15   one e-mail from you to John Cronin; is
16   that correct?
17   A.  Yes.
18   Q.  So these are -- When you were
19   describing before that you were having
20   suggestions for meetings with John Cronin,
21   this is your proposed agenda for one of
22   those meetings.
23   A.  Yes.
24   Q.  After that first group numbered one

Page 58

1    through 12, there's a statement, "You are
2    trapped in a buy-one-get-one-free program.
3    Sit back and enjoy the show." Do you see
4    that?
5    A.  (Witness viewing document).  Yes.
6    Q.  What were you referring to?
7    A.  That I had 12 more suggestions.
8        Q.  In that second group of 12, Number
9    11, persons and personalities, what was
10   that all about?
11   A.  I don't recall exactly, but I must
12   have been talking about some people.
13   Q.  Do you remember who?
14   A.  No.
15   Q.  Okay.  And Number 12, "It's time to
16   pay the piper," what were you talking
17   about there?
18   A.  I was talking that a chief medical
19   examiner should be at the main office as
20   well as the deputy chief medical examiner
21   who takes over when the chief medical
22   examiner is not there.
23   Q.  And then down at the end you say
24   you think it's going to take two hours of

Page 59

1    his undivided time to meet with you and
2    discuss these issues.
3    A.  Yes.
4    Q.  Then you say something about
5    "Remember to evolve your own strategies,
6    to fight with a mind that flits like a
7    butterfly and stings like a bee." Do you
8    see that?
9    A.  (Witness viewing document).  Yes.
10   Q.  Is that you?
11   A.  Yes.
12   Q.  By the way, down at the bottom of
13   this there's a date, 1/8/2004.  Do you see
14   that?
15   A.  (Witness viewing document).  Yes.
16   Q.  There's no date incorporated into
17   the e-mail message itself; is that
18   correct?
19   A.  Yes.
20   Q.  Did your e-mails at the Medical
21   Examiner's Office not usually incorporate
22   dates?
23   A.  They did.
24   Q.  They did?  But this one doesn't

Page 60

1    have one.
2    A.  Yes.
3    Q.  Why is that?
4    A.  I don't know.
5    Q.  The date down at the bottom, what
6    does that reflect?
7    A.  (Witness viewing document).  I
8    guess the date it was printed.
9    Q.  That you printed it off?
10   A.  This is not my printing, it's
11   something that the office has produced.
12   Q.  Well, I'll represent to you this
13   was included within the documents that you
14   produced recently in a response to our
15   request for production of documents.  Are
16   you aware of that?
17   A.  I'm not sure.
18       Q.  Going to the second page, up at the
19   top of this, this is yet another agenda
20   that you're providing to John Cronin for
21   yet another meeting.
22   A.  (Witness viewing document).  Yes.
23   Q.  And this is a meeting that is also
24   going to be occurring sometime in January

Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE    141 Portland Street . Boston, MA 02114    EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039    888.922.JACK    FAX 617.557.0040

Page 61

1  of '04; is that correct?
2  A. (Witness viewing document). Yes.
3  It says here I requested a meeting on the
4  30th and then on the 31st, and that I
5  hoped to talk to him sometime soon.
6  Q. Okay. This listing also has 12 --
7  A. Yes.
8  Q. -- separate items; is that correct?
9  A. (Witness viewing document). Yes.
10  Q. But they appear to be different
11  items from the ones on the first page; is
12  that correct?
13  A. (Witness viewing document). Yes.
14  Q. And you tell him that you doubt
15  that you can fit a discussion of this into
16  three-quarters of an hour; is that
17  correct?
18  A. Correct.
19  Q. Number 10 on this sheet, "Bill Zane
20  issues," what are those?
21  A. Bill Zane gave me a CD on which he
22  had been collecting data about workload
23  distribution, and I wanted to tell him I
24  was planning to do an analysis and produce

Page 62

1  this next sheet attached here.
2  Q. Okay. So this is still having to
3  do with the fact that some of the medical
4  examiners weren't pulling their weight in
5  the office.
6  A. Yes.
7  Q. Were you suggesting some of these
8  people be fired?
9  A. No.
10  Q. What was your suggestion on how to
11  deal with people who couldn't finish an
12  equal number of cases for whatever reason?
13  A. They had to be formed for a more
14  equitable distribution of workload.
15  Q. They had to be what for a more --
16  A. A more equitable distribution of
17  workload.
18  Q. What if they couldn't finish their
19  cases?
20  MR. SHARP: Objection. Go
21  ahead, if you can.
22  A. It was up to the senior management.
23  Q. Did you have any proposal about
24  what should happen under those

Page 63

1  circumstances?
2  A. No.
3  Q. Okay. Page -- The page after the
4  chart, and it's entitled P-0190, do you
5  see that page?
6  A. (Witness viewing document). Yeah.
7  Q. And this document does have a date,
8  January 9, 2004; is that correct?
9  A. (Witness viewing document). Yes.
10  Q. This is another e-mail to John
11  Cronin with nine more suggestions about
12  things you want to discuss.
13  A. Yes.
14  Q. And these are new suggestions?
15  A. Yes.
16  Q. And Number 2, "How do you solve a
17  problem like Faria," do you see that?
18  A. (Witness viewing document). Yes.
19  Q. What is that?
20  A. How do you -- I think it was how
21  about -- how do we solve the problem of
22  keeping Evans far away from the chief --
23  from the Office of the Chief Medical
24  Examiner, if there could be some sort of

Page 64

1  reshuffle of the people assigned to the
2  office, because I was also trying to
3  develop a plan for teaching purposes of
4  the residents -- of the people who were
5  going to take the boards and we needed to
6  see him and he kept canceling the...
7  Q. Who's Faria?
8  A. Just a name I came up with.
9  Q. Oh, but you meant to refer to
10  Doctor Evans?
11  A. Yes.
12  Q. Now, the next page, P-0191, do you
13  see that?
14  A. (Witness viewing document). Yes.
15  Q. Up at the top of that, there's
16  another e-mail from you to John Cronin
17  dated January 14th; is that correct?
18  A. (Witness viewing document). Yes.
19  Q. And you're asking him when are we
20  going to have the meeting about those
21  other things that I talked to you about --
22  A. Correct.
23  Q. -- is that fair to say? Do you
24  know whether you ever had a meeting about


Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                    888.922.JACK                              FAX 617.557.0040

Page 65

1   those -- the first 12 and the second 12
2   and the next five that are listed below in
3   this e-mail?
4   A. We had one meeting which got
5   interrupted by a phone call from someone
6   downtown, he said, and the meeting got
7   canceled. Then he had another meeting at
8   which his attitude was "Okay, just give me
9   what you want to give and get out of my
10  office."
11          MS. KELLEY: Could we have
12  this marked as the next exhibit?
13          (Exhibit-6, Agenda Dated
14  1/16/04, Bates Stamped P-0194 through
15  P-0197, marked for identification).
16          BY MS. KELLEY:
17  Q. Doctor Philip, with respect to
18  what's been put in front of you as Exhibit
19  Number 6, do you recognize that several
20  pages of documents?
21  A. (Witness viewing document). Yes, I
22  do.
23  Q. And what are they?
24  A. These were maybe either first

Page 66

1   drafts or actual printouts of these
2   e-mails that were being sent.
3   Q. So these tie into the e-mails --
4   A. The same e-mail additions that I
5   made, yes.
6   Q. And did you print these out for the
7   purpose of having a sheet to --
8   A. To go over when we were talking,
9   yes.
10  Q. Okay.
11          MS. KELLEY: Could you
12  please mark this as the next exhibit?
13          (Exhibit-7, Agenda, July 12,
14  2001, Bates Stamped P-0201 through P-0202,
15  marked for identification).
16          BY MS. KELLEY:
17  Q. Doctor Philip, with respect to
18  what's been marked Exhibit Number 7, do
19  you have that document in front of you
20  now?
21  A. (Witness viewing document). Yes.
22  Q. What is that?
23  A. (Witness viewing document). This
24  was an agenda item that Doctor Evans asked

Page 67

1   me to prepare for a discussion with then
2   Under Secretary Mr. Bolden or his
3   representative who was heading the office
4   at that time. I believe it's Deb
5   Reynolds, but I could be mistaken. She
6   was some Debbie. Deb Reynolds.
7   Q. Now, this is dated July 12, 2001;
8   is that correct?
9   A. (Witness viewing document). That's
10  correct.
11  Q. Hadn't -- Strike that.
12          This was after your one-year
13  fellowship ended; is that correct?
14      A. Yes.
15  Q. But during your first contract year
16  with the Medical Examiner's Office.
17  A. That's correct.
18  Q. And Doctor Evans came to you and
19  requested that you do up an agenda?
20  A. Yes.
21  Q. Was it your understanding that he
22  was going to be meeting with Under
23  Secretary Bolden?
24  A. It was Doctor Evans, Deb Reynolds

Page 68

1   and the other doctors.
2   Q. Which other doctors?
3   A. James Weiner, William Zane, Faryl
4   Sandler and Doctor Philip.
5   Q. You, yourself?
6   A. Yes.
7   Q. Okay. You were all going to be
8   meeting with Mr. Bolden?
9   A. Mr. Bolden or Deb Reynolds.
10  Q. Oh, I'm sorry.
11  A. Yeah.
12  Q. And do you know who had called the
13  meeting?
14  A. I think it was Deb Reynolds.
15      Q. What was her position?
16  A. She was -- I believe she was sent
17  from the EOPS to head the agency.
18  Q. To head the medical --
19  A. Yeah, as the person in charge of
20  the Medical Examiner's Office.
21  Q. Was she a physician?
22  A. No.
23  Q. So she would be in the nature of
24  an administrative officer?



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                      888.922.JACK                              FAX 617.557.0040

Page 69

1    A.  Yes.
2    Q.  And as of July 12, 2001, was she
3    already in that role?
4    A.  Yes.
5    Q.  And, I'm sorry, you said she had
6    actually called this meeting; is that
7    correct?
8    A.  That's correct.
9    Q.  And what was the purpose of the
10   meeting?
11   A.  To discuss issues that doctors had
12   with the functioning of the office.
13   Q.  And when Doctor Evans talked to
14   you, did he request that you draw up an
15   agenda?
16   A.  Yes.
17   Q.  And did he tell you what needed to
18   be in the agenda?
19   A.  Yes.
20   Q.  What did he tell you about that?
21   A.  He said the topics and who will
22   deal with the -- with the issue or make a
23   presentation about the issue.
24   Q.  Did he actually provide these

Page 70

1    topics like Item Number 1, continuous
2    quality improvement program?  Did he tell
3    you that was one of the topics?
4    A.  Yeah.  He said I could speak about
5    -- I had spoken to him previously about it
6    and he said I could speak at that meeting
7    about it to Mr. Bolden or Ms. Reynolds.
8    Q.  What about Item Number 2?  Did
9    Doctor Evans specifically mention that that
10   item should be on the agenda?
11   A.  Yes.  And Doctor -- he said Doctor
12   Sandler would talk about it.
13   Q.  What about Item Number 3, improving
14   telemedicine utilization?
15   A.  That -- He said he wanted it on
16   the discussion and he would talk about it.
17   Q.  And Item 4, rationalization of
18   specimen storage, did he also ask that
19   that be included?
20   A.  Yes.
21   Q.  And with respect to Page 2 of this
22   document, you've got a further outline --
23   A.  Yeah.  This --
24   Q.  -- of Item Number 1.

Page 71

1    A.  These were the topics that I would
2    discuss as my part of the discussion.
3    Q.  Okay.  In addition to providing you
4    with the general topics that were going to
5    be included within the agenda, did Doctor
6    Evans have any discussions with you about
7    any concerns that he had about the agency?
8    A.  About the agency?
9    Q.  About the Medical Examiner's
10   Office.
11   A.  No.
12   Q.  Did you have any understanding one
13   way or the other that he had any concerns
14   as of July 12, 2001, about the running of
15   the Medical Examiner's Office?
16   A.  I'm sure he would have had -- had
17   concerns about the medical examiners
18   because we were getting a lot of bad
19   press.  There were several horrific
20   incidents in the office.  But he was not
21   the type who would discuss those with me.
22   Q.  Around the time that this agenda
23   was being prepared in July of 2001, did
24   you have any discussions with anybody at

Page 72

1    the Medical Examiner's Office about the
2    lack of funding for the office?
3    A.  Generating the funds, I didn't feel
4    was my responsibility to do it.  I knew
5    the administrators were working on it and
6    Doctor Evans probably was in the know of
7    it.  I might have -- I did suggest what
8    we would need from the EOPS to maintain a
9    continuous quality improvement program and
10   the time and the manpower requirements.  I
11   didn't put it in dollar figures.
12   Q.  Okay.  Well, apart from actually
13   going out to obtain the money, did you
14   have any discussions with anybody at the
15   office about the fact that the office was
16   underfunded?
17   A.  We were constantly talking about
18   it.  Mr. Bolden himself admitted at the
19   meeting that he called that there are
20   problems and some of it has to deal with
21   money, and then he was going to fix it.
22   Q.  Now, you started to say a minute
23   ago you had some proposals about things
24   the office would need even though you


Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
                                www.jackdanielreporting.com
617.557.0039                         888.922.JACK                           FAX 617.557.0040

Page 73

1    didn't put dollar amounts on it.
2        A.  The office would need to run a
3    continuous quality improvement program,
4    yes.
5        Q.  Did you have any suggestions for
6    what that would include that might, in
7    fact, end up costing more money?
8        A.  No.  I was going to put it up to
9    Mr. Bolden and then hope he would come up
10   with -- Mr. Bolden or Deb Reynolds, on how
11   it could be funded and managed.
12       Q.  Well, did you propose any
13   additional staff, for instance, that would
14   need to be hired?
15       A.  Yes, I did.
16       Q.  What were your suggestions in that
17   regard?
18       A.  We'd need a secretary and we'd need
19   a statistician.
20       Q.  Anybody else?
21       A.  And a physician.
22       Q.  An additional pathologist?
23       A.  No, one of the physicians could be
24   assigned to that task.

Page 74

1        Q.  Did you feel that you needed any
2    more pathologists in the office?
3        A.  Again, I was not the person to make
4    those decisions.
5        Q.  Is there any indication on Page 2
6    of what's been marked as Exhibit Number 7
7    as to the additional staffing that you
8    would recommend?
9        A.  (Witness viewing document).  No.  I
10   said I need a secretary who can do data
11   entry, Access/Excel and PowerPoint,
12   dedicated time for a physician supervisor
13   of the program, dedicated space for the
14   program implementation, dedicated time for
15   a conference on these topics and budgetary
16   allocation for required items.
17       Q.  And after this agenda was drawn up,
18   did this meeting actually take place?
19       A.  Yes.
20       Q.  And Mr. Bolden was at the meeting?
21       A.  Deb Reynolds was at the meeting.
22       Q.  Was Mr. Bolden there?
23       A.  No.
24       Q.  Was Doctor Evans there?

Page 75

1        A.  Yes.
2        Q.  And can you describe generally what
3    was discussed at the meeting?
4        A.  These various topics were
5    discussed, topics as outlined over here.
6        Q.  Specifically with respect to
7    continuous quality improvement program, can
8    you describe what was discussed about
9    that?
10       A.  I went over these points, why it
11   was essential, how it works in industry,
12   how it works in hospital and some of the
13   indicators that could be used to monitor
14   the program, and then we could come up
15   with steps on how they can be monitoring
16   and improvements can be made.
17       Q.  Was there any discussion at this
18   meeting about the amount of toxicological
19   screening that was done by the office?
20       A.  No.  The discussion was done about
21   turnaround times of toxicology reports, not
22   amount of screening that was done.
23       Q.  Was there any discussion at this
24   meeting about the number of autopsies

Page 76

1    performed by the office?
2        A.  Not at that meeting, no.
3        Q.  In connection with your continuous
4    quality improvement program where you were
5    making certain suggestions about staffing,
6    was one of your suggestions that this
7    additional staff might free up pathologists
8    to be able to do more work?
9        A.  I don't think I raised that point.
10       Q.  Was there any discussion at all
11   about the fact that the office wasn't able
12   to do the amount of work that it could do
13   if it had more staff or more funding?
14       A.  I don't recall the complete
15   discussions.
16       Q.  Well, do you recall whether that
17   was discussed?
18       A.  I don't think so.
19       Q.  Okay.  You said a few minutes ago
20   that at some point Bolden stated that he
21   would try to get more funding for the
22   office; is that correct?
23       A.  Yes.
24       Q.  When did that happen?


Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                           www.jackdanielreporting.com
617.557.0039                                 888.922.JACK                              FAX 617.557.0040

20 (Pages 77 to 80)

Page 77

1    A.  That happened after the -- after a
2    meeting he held when there was a complete
3    lockdown at the agency after one employee
4    threatened to kill a doctor.
5    Q.  When did that happen?
6    A.  Mid March 2001.
7    Q.  And that incident, who was the
8    employee who threatened to kill a doctor?
9    A.  From whatever has been reported to
10   me, it was Rocky -- he was called Rocky.
11   Q.  What was his position?
12       A.  He was the technical supervisor.
13   Some -- Brendan Tillman, something like
14   that.  I don't recall the full spelling of
15   his name.
16   Q.  Okay.
17   A.  But he was called Rocky.
18   Q.  Okay.  And who did he threaten to
19   kill?
20   A.  Doctor Zane.
21   Q.  Do you know the reason?
22   A.  It should be in the records of the
23   Medical Examiner's Office.
24   Q.  What did you hear?

Page 78

1    A.  That there was some pushing and
2    shoving, and soon afterwards it seems
3    Rocky made this threat.
4    Q.  And there was a shutdown of the
5    whole office?
6    A.  Yes.
7    Q.  And as a result of that incident,
8    you said Mr. Bolden said that he would try
9    to get additional funding for the Medical
10   Examiner's Office?
11   A.  He was going to fix the office and
12   all its problems.
13   Q.  How did you get this information
14   that Mr. Bolden said this?
15   A.  I was at the meeting.
16       Q.  Oh, okay.  So when Mr. Bolden said
17   he was going to fix the office and its
18   problems, did he describe what those
19   problems were or was -- Strike that.
20       When Mr. Bolden made this statement
21   at the meeting, was there any discussion
22   about what the problems at the office
23   were?
24   A.  He identified several problems.  I

Page 79

1    was not taking notes.
2    Q.  Do you recall any of them?
3    A.  Partly finances. Partly
4    leadership. Partly work attitude, morale,
5    temperament.
6    Q.  What did he say about leadership
7    problems?
8    A.  There is shortage of people and
9    there is shortage of leadership.
10   Q.  A shortage of leadership and also a
11   shortage of staff?
12   A.  Yes.
13   Q.  Did he tie that into funding?
14   A.  Also, yes.
15   Q.  Did he indicate what additional
16   staff he thought was necessary to avoid
17   these problems?
18   A.  No.  He -- he was going to review
19   the entire situation.
20   Q.  Did he discuss what things he could
21   accomplish by obtaining more money for the
22   agency -- for the office?
23   A.  It was just a brief meeting that he
24   was telling us that EOPS is going to work

Page 80

1    wonders in the agency, but he didn't
2    outline specific details.
3    Q.  Was Doctor Evans at this meeting?
4    A.  Yes, he was.
5    Q.  Was there any follow-up to this
6    meeting?
7    A.  Not that I have seen.
8    Q.  Did you ever hear anything else
9    that Mr. Bolden said about the Office of
10   the Medical Examiner?
11   A.  No.
12   Q.  How long was Mr. Bolden in that
13   position?
14   A.  I don't know.
15   Q.  Was he replaced at some point?
16   A.  I don't know.
17   Q.  So at least as far as you know,
18   there was never any follow-up to the
19   statements that he made at this meeting;
20   is that correct?
21   A.  That's correct.
22       MS. KELLEY:  Could we have
23   this marked as the next exhibit, please?
24   .

**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                              888.922.JACK                          FAX 617.557.0040

Page 81

1       (Exhibit-8, Document Bates
2   Stamped AGO-0157 through AGO-0160, marked
3   for identification).
4       BY MS. KELLEY:
5       Q.  Doctor Philip, have you had an
6   opportunity to review what's been placed
7   before you as Exhibit 8 to this
8   deposition?
9       A.  (Witness viewing document).  Yes.
10      Q.  Can you describe what that is?
11      A.  (Witness viewing document).  This
12  is a memorandum that I sent out to the
13  doctors and senior administrators in the
14  office.
15      Q.  And the top page of this is your
16  e-mail; is that correct?
17      A.  (Witness viewing document).  Yes.
18      Q.  And then the next three pages are
19  the memorandum?
20      A.  Yes.
21      Q.  When was the memorandum prepared by
22  you?
23      A.  Probably mid January -- no, mid
24  February.

Page 82

1       Q.  Of 2004?
2       A.  2004.
3       Q.  And this involved an incident at
4   the very end of January of 2004?
5       A.  That's correct.
6       Q.  What was your purpose in producing
7   this memo in mid February?
8       A.  This was a matter of serious
9   concern to me and had -- I was inviting a
10  discussion among the doctors and people
11  responsible.
12      Q.  Well, first of all, you don't send
13  it out to the other doctors 'til,
14  according to this e-mail, March 2nd of
15  '04, right?
16      A.  (Witness viewing document).  Oh,
17  yes.  Sorry.  It was sent out on March
18  2nd, not mid February.
19      Q.  Well --
20      A.  It was prepared and sent out on
21  March 2nd.
22      Q.  So you didn't prepare this memo
23  until March 2nd?
24      A.  That's correct.

Page 83

1       Q.  So more than a month after this
2   happened, you suddenly prepared a memo and
3   sent it to everybody?
4       A.  That's correct.
5       Q.  Did you have any notes or anything
6   that you used to prepare this memo?
7       A.  The notes were in the medical
8   records of this case maintained at the
9   office.
10      Q.  Why didn't you prepare it in late
11  January or during February?
12      A.  Because the -- the medical records
13  of this case were not received at the
14  office.  I prepared it as soon as I
15  received the medical records from the
16  hospital.
17          MS. KELLEY:  And for the
18  record, I'll just state that we are
19  producing -- or attaching to this -- we're
20  attaching this exhibit to the deposition
21  in the form that the name of the deceased
22  person has been redacted.
23          BY MS. KELLEY:
24      Q.  But you do recognize the memo

Page 84

1   otherwise, Doctor?
2       A.  (Witness viewing document).  Yes.
3       Q.  This particular case -- And I guess
4   for purposes of this deposition why don't
5   we refer to this as the Patient X case?
6   Is that all right with you?
7       A.  Yeah.
8       Q.  How did you first become aware of
9   the Patient X case?
10      A.  I was called by Tracy Aurigemma,
11  the person on the front desk, about this
12  case.  I was told about this case by her
13  around the time I was leaving from the
14  office.
15      Q.  What did she say to you?
16      A.  That there was a case that was --
17  had not died, but the New England Organ
18  Bank would be calling me about it.
19      Q.  Did she say why the New England
20  Organ Bank would be calling you?
21      A.  Because they call the Medical
22  Examiner's Office for permission for organ
23  harvest.
24      Q.  Where was Patient X located at that



Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                         888.922.JACK                     FAX 617.557.0040

ABRAHAM PHILIP, M.D.   07/21/05

22  (Pages 85 to 88)

Page 85

1    time?
2    A.  I believe it's Beth Israel
3    Hospital.
4    Q.  And what was the normal procedure
5    in a case where a patient was not dead,
6    but somebody from the Medical Examiner's
7    Office was being contacted by the New
8    England Organ Bank?
9    A.  They alert the office that there is
10   a potential organ donor case and then
11   inform the -- inform the office about the
12   case, sort of take a preemptive approval.
13       Q.  What do you mean by "preemptive
14   approval"?
15   A.  They anticipate.
16   Q.  And, Doctor, can I ask you to
17   describe when you say "they," who are you
18   talking about?  Can you describe --
19   A.  The organ harvest is a very
20   planned, orchestrated procedure which
21   involves a harvest team and a transplant
22   team.  And the patient is on a life
23   support system and the organ bank apprises
24   the Medical Examiner's Office of the

Page 86

1    situation and indicates that a harvest is
2    going to be done.
3    Q.  And if that occurs, what does the
4    Medical Examiner's Office do?
5    A.  The Medical Examiner's Office
6    evaluates the details of the case,
7    recommends consent of the District
8    Attorney, if required, and also whether
9    they could go ahead with the procedure or
10   not.
11   Q.  So it's your understanding that at
12   least as of 2004, it was necessary before
13   there could be recovery of any organs that
14   someone from the Medical Examiner's Office
15   had to sign off.
16   A.  Or give oral consent, yes.
17   Q.  And was it your understanding that
18   that was what was occurring with respect
19   to Patient X in late January of '04?
20   A.  Yes.
21   Q.  So when Tracy talked to you, what
22   was your understanding of the patient's
23   condition?
24   A.  She hinted that it was not one of

Page 87

1    the routine brain-dead cases, there were
2    some -- some other issues that were
3    involved.
4    Q.  What do you mean "hinted"?
5    A.  She couldn't give me the full
6    details, but this would be a different
7    procedure, she said.
8    Q.  Did she use that word, different
9    procedure?
10   A.  Yes.
11   Q.  Well, first of all, I take it there
12   are several different types of cases that
13   come into the Medical Examiner's Office
14   with respect to the recovery of organs.
15   Is that fair to say?
16   A.  Yes.
17   Q.  And in some of those instances, you
18   have what is referred to as a brain-dead
19   person; is that correct?
20   A.  Correct.
21   Q.  And in other cases, you have a
22   person whose heart has stopped beating and
23   they are technically dead; is that
24   correct?

Page 88

1    A.  This was the first case of that
2    sort that came to the Medical Examiner's
3    Office.
4    Q.  That you were aware of?
5    A.  Correct.
6    Q.  Are you able to say that there had
7    never been any other cases like that,
8    Doctor?
9    A.  I'm not able to say that.
10   Q.  The first one you knew of?
11   A.  The first one I was asked to give
12   permission for.
13   Q.  I'm going to ask you again to tell
14   me as precisely as you can exactly what
15   words Tracy used which she talked to you.
16   A.  I think precisely something like
17   this.  They were not following the usual
18   protocol, which are the words I put down
19   into my memo.
20   Q.  Well, first of all, start at the
21   beginning.  What did Tracy say to you as
22   you were about to leave the office?
23   A.  There is likely to be an organ
24   harvest.



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                   www.jackdanielreporting.com
         617.557.0039                    888.922.JACK                      FAX 617.557.0040

Page 89

1    Q.  Did she say where that was going to
2    occur?
3        A.  Yes.
4    Q.  Did she say Beth Israel Hospital?
5    A.  I don't recall.
6    Q.  Okay.  But did she tell you there
7    was a patient at a hospital somewhere in
8    Boston?
9    A.  Yes.
10   Q.  Without giving the name on the
11   record, did she tell you the name of the
12   patient?
13   A.  Yes.
14   Q.  Did she give you any indication of
15   how the patient had become injured or why
16   he was near death?
17   A.  She said it was a vehicular
18   accident, yes.
19   Q.  What else did she say?
20   A.  That's about it.
21   Q.  Well, at this point, all you've
22   said is Tracy told you there is likely to
23   be an organ harvest, it involved a patient
24   at a hospital in Boston, she gave you the

Page 90

1    name of the patient and said that he had
2    been involved in a vehicular accident.
3    What else did she say?
4    A.  And he was not brain dead, but they
5    were following -- they were not following
6    the usual protocol.
7    Q.  He was not brain dead, but who was
8    not following the usual protocol?
9    A.  The hospital and the organ harvest
10   -- the organize harvest people, New
11   England Organ Bank.
12   Q.  So the hospital or the organ bank
13   were not following the usual protocol?
14   A.  Right.  He would not be pronounced
15   brain dead, but it would be some other
16   protocol.
17   Q.  Did she say what the other protocol
18   was?
19   A.  No.  She didn't have any details.
20   Q.  And did she tell you that you were
21   supposed to contact someone?
22   A.  No, they would be in touch with me.
23   Q.  You said you were just leaving the
24   office for the evening; is that correct?

Page 91

1    A.  Yes.
2    Q.  How were these people going to be
3    in touch with you?
4    A.  I was on call that night and they
5    would page me and I would call back, or
6    they would call me at home.
7    Q.  And what happened next with respect
8    to Patient X, from your perspective?
9        A.  Around 11 o'clock, I received a
10   phone call from Larry from the New England
11   Organ Bank.
12   Q.  Do you know his last name?
13   A.  No.
14   Q.  Do you know what his position was?
15   A.  No.
16   Q.  Or what role he appeared to you to
17   be filling?
18   A.  He was some coordinator.
19   Q.  And what did he say to you?
20   A.  He said they were going to do an
21   organ harvest on a motor vehicle accident
22   victim.
23   Q.  Did he use those terms or did he
24   say --

Page 92

1    A.  I think so.
2    Q.  -- organ recovery?
3    A.  I think it was harvest.
4    Q.  Okay.  So to your memory at least,
5    he said they were going to do an organ
6    harvest on what?
7    A.  On a motor vehicle accident victim.
8    Q.  Did he say anything else?
9    A.  So I said, "Is the deceased brain
10   dead?"
11   Q.  Did he respond to that?
12   A.  He said that they were going to
13   induce asystole.
14       Q.  And did you have any understanding
15   what that meant?
16   A.  Asystole means stoppage of the
17   heart beating.
18   Q.  And Larry told you they were going
19   to induce that?
20   A.  Yes.
21   Q.  Did he say how they were going to
22   induce it?
23   A.  Yes.
24   Q.  How?



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                        888.922.JACK                        FAX 617.557.0040

Page 93

1    A.  They were going to stop mannitol.
2    Q.  I'm sorry.  Stop what?
3    A.  Mannitol, M-A-N-N-I-T-O-L.
4    Q.  And?
5    A.  Stoppage of mannitol causes brain
6    swelling.  Subsequently, it causes the
7    heart to stop.
8    Q.  And did he say anything else before
9    you responded?
10   A.  That's what my recollection of the
11   episode is.
12   Q.  Okay.  And did you make any
13   response to that?
14       A.  I said that the procedure was
15   highly irregular.
16   Q.  Did you say anything else?
17   A.  I said I had not heard of this
18   criteria of asystole for pronouncement of
19   death.
20   Q.  Did you say anything else?
21   A.  I asked him why the routine
22   protocol of brain dead could not be
23   applied.
24   Q.  Did he respond?

Page 94

1    A.  He responded that the body then
2    would be in permanent vegetative state and
3    delay the harvest.
4    Q.  And again, it's your memory he used
5    the word "harvest"?
6    A.  Yes.
7    Q.  Okay.  At any point during this
8    conversation, did Larry ask you to do
9    something?
10   A.  I don't understand your question.
11   Q.  Did he ask you, as the
12   representative of the Medical Examiner's
13   Office, to sign off on the recovery of any
14   organs?
15   A.  That was the purpose of the phone
16   call.
17   Q.  Okay.  So I take it at some point
18   in this call, he mentioned that to you.
19   A.  Yes.
20       Q.  Did you make any response to that?
21   A.  I did.
22   Q.  What was your response?
23   A.  That I was not comfortable with the
24   procedure as described.

Page 95

1    Q.  Did you say anything else?
2    A.  No.  To that, no.
3    Q.  Well, did you say one way or the
4    other whether you would sign off on the
5    recovery of organs from Patient X?
6    A.  To which Larry responded that it
7    had been cleared by Jackie Faherty and
8    Richard Evans.
9    Q.  Okay.  Why don't you just describe
10   now, Doctor, as much as you can recall
11   about how the conversation went from that
12   point?
13   A.  I explained that Jackie Faherty was
14   on maternity leave and I couldn't contact
15   her at that point, and I told Larry he
16   was welcome to contact Richard Evans.
17   Q.  But according to you, Larry had
18   just told you it had already been cleared
19   by those two people.
20   A.  Such a protocol had been cleared by
21   these people, not this case.
22   Q.  Oh, okay.  So you said Larry was
23   welcome to contact Doctor Evans; is that
24   correct?

Page 96

1    A.  That's correct.
2    Q.  Did you indicate that you were not
3    willing to sign off on this?
4    A.  Obviously.
5    Q.  Excuse me?
6    A.  Obviously.
7    Q.  Well, unfortunately for the record,
8    we have to express; even if you believe
9    it's something that might be obvious you
10   still have to say it.
11       So I take it you told Larry during
12   this phone conversation that you were not
13   willing to sign off on the recovery of any
14   organs.
15   A.  That's correct.
16   Q.  Do you recall anything else that
17   was said by you or by Larry during that
18   conversation?
19   A.  No.
20   Q.  What's the next thing that you
21   heard with respect to Patient X?
22   A.  Later that night, I got a message
23   from Tracy that apparently Richard Evans
24   had approved the harvest.


Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
                                www.jackdanielreporting.com
617.557.0039                    888.922.JACK                                 FAX 617.557.0040

Page 97

1    Q.  You didn't actually talk to Tracy,
2    you just got a message?
3    A.  I spoke to Tracy and she told me.
4    Q.  Oh, you got a message from Tracy to
5    call her?
6    A.  No, she called me at home and told
7    me.
8    Q.  Oh, okay.  Okay.  You said you got
9    a message from Tracy, but you mean she
10   actually called you and spoke to you.
11   A.  Yes.  She called me.
12   Q.  Okay.
13   A.  I was the doctor on call so she
14   called me.
15   Q.  Okay.  And she said that Doctor
16   Evans had approved the harvest?
17   A.  Yes.
18   Q.  Did she say anything else in that
19   conversation?
20   A.  No.
21   Q.  Did you say anything?
22   A.  Not at that point.
23   Q.  Other than hello and good-bye.
24   A.  Yes.

Page 98

1    Q.  What's the next thing that you can
2    recall with respect to Patient X?
3    A.  I brought this case up at the next
4    morning's morning conference.
5    Q.  Was Doctor Evans present?
6    A.  No.
7    Q.  Who was present?
8    A.  All the other doctors on staff at
9    the OCME, several administrators, front
10   desk personnel, police.
11   Q.  Was John Cronin there?
12   A.  I don't recall.
13   Q.  And do you recall anything that was
14   said by anybody at that meeting?
15   A.  Nobody made any comments about the
16   situation.
17   Q.  Well, first of all, you -- at the
18   meeting you stood up and described
19   everything that had happened to the best
20   of your knowledge?
21   A.  Yes.
22   Q.  About how long did it take you to
23   describe this case?
24   A.  Five or ten minutes.

Page 99

1    Q.  So you stood up and addressed this
2    group for five or ten minutes; is that
3    right?
4    A.  It's not stood up.  We all sit
5    around a table and discuss.
6    Q.  You sat at a table --
7    A.  And discussed.
8    Q.  -- and addressed the group for five
9    or ten minutes; is that correct?
10   A.  We discussed all the cases that
11   came in last night and discussed the
12   issues that we need to talk about, and I
13   discussed this case.
14   Q.  You discussed this case with the
15   group for five or ten minutes; is that
16   correct?
17   A.  Correct.
18   Q.  And when you were done describing
19   what had happened, no one said a word?
20   A.  That's correct.
21   Q.  Did anyone in the room say anything
22   about the protocol, about the asystole?
23   A.  No.
24   Q.  Did you think that was strange that

Page 100

1    no one even responded to your meeting?
2    A.  No.  That's the kind of bunch of
3    people we have at the Medical Examiner's
4    Office.
5    Q.  Since that time, have you ever had
6    any discussions with anybody at the
7    Medical Examiner's Office about that
8    particular protocol, the asystole protocol?
9    A.  No, I have not.
10   Q.  Since this case came up, have you
11   done research or spoken with any other
12   physicians regarding the asystole protocol?
13   A.  I have done some research.
14   Q.  What research did you conduct?
15   A.  I found several articles.
16   Q.  And those were articles that you
17   submitted in connection with your document
18   response?
19   A.  Perhaps.  Not sure.
20   Q.  Doctor, one article that you
21   submitted in connection with your document
22   response is an article entitled "Donation
23   After Cardiac Death, the University of
24   Wisconsin Experience with Renal



Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                    888.922.JACK                    FAX 617.557.0040

Page 101

1  Transplantation." Do you recall that
2  article?
3     A.  Is that an article or an abstract?
4  I'd like to check that.
5     Q.  It may be an abstract. It's
6  prepared apparently by J.T. Cooper and
7  others.
8     A.  I can't comment until you show it
9  to me.
10    Q.  Okay.
11        MR. SHARP:  Let's just go
12  off a second.
13        (Recess taken).
14    BY MS. KELLEY:
15    Q.  So we were just off the record,
16  Doctor, and you were reviewing some of the
17  papers that you've produced. And there is
18  an abstract, as I understand it, entitled
19  "Donation After Cardiac Death, the
20  University of Wisconsin Experience with
21  Renal Transplantation;" is that correct?
22    A.  That's correct.
23    Q.  And that's part of the research you
24  conducted?

Page 102

1     A.  Yes.
2     Q.  And how did you locate this
3  abstract?
4     A.  From a Pub Med search, MEDLINE
5  search.
6     Q.  Okay. And you also discovered,
7  through a MEDLINE search, another abstract
8  entitled "Organ Donation and Utilization in
9  the USA."
10    A.  Yes.
11    Q.  And another one "Executive Summary
12  from the Intraoperative Advisory Council on
13  Donation After Cardiac Death of the United
14  Network for Organ Sharing."
15    A.  Yes.
16    Q.  And another, "Development of the
17  University of Wisconsin Donation After
18  Cardiac Death Evaluation Tool;" is that
19  correct?
20    A.  Yes.
21    Q.  Also among the documents that
22  you've produced, there's a document, and,
23  Doctor, you can tell me -- it appears to
24  be an abstract entitled "Are Non-brain" --

Page 103

1  Excuse me. "Are Non-brainstem Dead Cardio
2  Donors Acceptable Donors?" Do you see
3  that abstract?
4     A.  (Witness viewing document). Yes.
5     Q.  How did you locate that abstract?
6     A.  Also came from a literature search.
7     Q.  A what search?
8     A.  A literature search.
9     Q.  So you conducted a literature
10  search, you conducted a MEDLINE search in
11  order to discover articles or abstracts
12  with respect to this asystole protocol; is
13  that correct?
14    A.  Yes, correct.
15    Q.  Did you speak to any persons with
16  respect to this issue?
17    A.  Where?
18    Q.  Anywhere?
19       A.  I might have.
20    Q.  Do you recall any such
21  conversations?
22    A.  Yes. I did speak to doctors at
23  Syracuse about it.
24    Q.  You mean other pathologists in the

Page 104

1  Syracuse Medical Examiner's Office?
2     A.  That's correct.
3     Q.  Who did you speak to there about
4  this issue?
5     A.  Doctor Stopacher, S-T-O-P-A-C-H-E-R.
6     Q.  S-T-O-P-A-C-H-E-R?
7     A.  H-E-R.
8     Q.  What's that doctor's first name?
9     A.  Robert.
10    Q.  Okay. Anybody else at that office
11  that you spoke to?
12    A.  No.
13    Q.  And did Doctor Stopacher have any
14  opinion that he provided to you?
15    A.  He also felt he had not enough
16  information on the topic.
17    Q.  To have an opinion one way or the
18  other?
19    A.  Yes.
20    Q.  When you say "he also felt," are
21  you referring to yourself?
22    A.  Yes.
23    Q.  You felt you don't have enough
24  information on the topic?



Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE         141 Portland Street . Boston, MA 02114      EXPERIENCE YOU CAN TRUST
                                 www.jackdanielreporting.com
         617.557.0039                    888.922.JACK                         FAX 617.557.0040

Page 105

1    A.  Yes. I didn't have enough
2    information at that point.
3    Q.  But at least when you talked to
4    Doctor Stopacher, he didn't have an
5    opinion one way or the other; is that
6    correct?
7    A.  Yes.
8    Q.  But by the time you spoke to him,
9    you felt that you had an opinion; is that
10   correct?
11   A.  No. I felt the medical examiner
12   community needed to be more aware of this
13   and discuss this more.
14   Q.  Sitting here today, do you have an
15   opinion on whether the asystole protocol
16   is an appropriate means of determining
17   whether an organ donation is appropriate?
18   A.  I --
19        MR. SHARP: Objection. Go
20   ahead and answer, if you can.
21   A.  I still think a wider discussion on
22   the topic needs to be held just like it
23   was held about the brain-dead criteria in
24   the '70s and '80s -- '70s.

Page 106

1    Q.  Do you have an opinion today
2    whether the asystole protocol is an
3    appropriate means of determining whether
4    harvesting of organs is appropriate?
5        MR. SHARP: Objection. Go
6    ahead and answer.
7    A.  Not until a better discussion is
8    held on the topic.
9    Q.  So until such discussion occurs,
10   you don't have an opinion yourself one way
11   or the other?
12   A.  Until such a discussion takes
13   place, I do not think the procedure should
14   be done.
15   Q.  And have you ever -- Strike that.
16        In discussions with anyone else in
17   the medical community, has anyone else
18   ever told you that they agree with that
19   position -- with your position?
20   A.  No.
21   Q.  During your time working at the
22   Medical Examiner's Office in Boston, did
23   you have any opinion about whether the
24   medical examiners had appropriate

Page 107

1    protective clothing and equipment?
2    A.  I did.
3    Q.  What was your opinion?
4    A.  The quality of the clothing that we
5    bought were not good. They leaked.
6    Q.  What kind of clothing was it?
7    A.  It's called a bunny suit in medical
8    examiner language.
9    Q.  In regular English, what is it?
10   A.  It's a full body suit that one zips
11   up, something like the astronaut.
12   Q.  Do you know what it's made out of?
13   A.  Some synthetic material, Tyvek.
14   Q.  And that was a suit that was
15   available to you in the Medical Examiner's
16   Office?
17   A.  Yes.
18   Q.  Was that the clothing that was
19   typically worn by pathologists when they
20   were conducting autopsies?
21   A.  Yes.
22   Q.  And in addition to that suit, would
23   they wear any other protective clothing?
24   A.  They did wear an apron on top.

Page 108

1    Q.  What was that made out of?
2    A.  There were two options. There was
3    a plastic apron and an apron made from
4    similar material.
5        Q.  Tyvek material?
6    A.  Tyvek material.
7    Q.  And what about gloves? Were any
8    gloves worn?
9    A.  Yes.
10   Q.  What kind of gloves?
11   A.  Blue, yellow, latex, rubber.
12   Q.  And what about on the feet? Did
13   you have anything on your feet when you
14   were conducting autopsies?
15   A.  Shoe covers.
16   Q.  Made out of what?
17   A.  Same Tyvek material.
18   Q.  Were there any other protective
19   equipment or clothing that was worn by the
20   pathologists?
21   A.  Face shield.
22   Q.  Was that made out of plastic?
23   A.  Yes.
24   Q.  And on --



Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        144 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
617.557.0039                    www.jackdanielreporting.com              FAX 617.557.0040
                                888.922.JACK

（）

ABRAHAM PHILIP, M.D.   07/21/05

28 (Pages 109 to 112)

Page 109

1    A.  And a mask.
2    Q.  -- anything else on your head?  A
3    mask?
4    A.  A cap and a mask.
5    Q.  Now, when you said before that you
6    thought the quality of the clothing was
7    not good and leaked, was there any
8    particular one of these parts of the
9    clothing that you're referring to?
10   A.  On the bunny suit.
11   Q.  Anything else?
12   A.  And the aprons.
13   Q.  Anything else?
14   A.  The shoe covers.
15   Q.  I take it it's the Tyvek material
16   that you're not pleased with.
17   A.  No, each one of them had separate
18   problems.
19   Q.  What was the problem with the bunny
20   suit?
21   A.  The bunny suits leaked.
22   Q.  Leaked how?
23   A.  Blood and liquids would seep in,
24   into the undergarments.

Page 110

1    Q.  And that could happen even if you
2    were wearing an apron?
3    A.  Yes.
4    Q.  And what about the aprons?  What
5    were the problems with that?
6    A.  The plastic aprons were food
7    service aprons which would be very loose
8    at the arms and keep falling off.  The
9    Tyvek aprons leaked.
10   Q.  And what about the shoe covers?
11   What was your problem with those?
12   A.  They were non -- they were not the
13   nonskid variety so there was always a
14   possibility of slipping.
15   Q.  Did you ever know of anybody -- of
16   that happening to anybody?
17   A.  Frequently happened.  Nobody fell
18   fortunately.
19   Q.  And did you bring this -- your
20   concerns about the quality of the clothing
21   to the attention of anybody in
22   administration at the Medical Examiner's
23   Office?
24   A.  Yes, I did.

Page 111

1    Q.  Who did you tell that to?
2    A.  Mr. John Cronin.
3    Q.  Did you talk to Doctor Evans about
4    it?
5    A.  Yes.
6    Q.  Well, first of all, with respect to
7    John Cronin, when did you tell him?
8    A.  I brought it up as a topic at one
9    of my meetings between January -- December
10   30th to mid January.  I don't remember --
11   recall the exact date.  I showed him an
12   alternative set of apparel that we would
13   wear in New York.
14   Q.  What did he say?
15   A.  He said the Tyvek suits were very
16   expensive and he welcomed a suggestion,
17   and asked me to see if any of the other
18   medical examiners would experiment with it,
19   with the suggestions that I had made.
20   Q.  And what did -- did you do anything
21   in response?
22   A.  The next autopsy that I got, I
23   demonstrated how the material could be
24   used.

Page 112

1    Q.  And what material was this?
2    A.  This was OR -- operating room
3    scrubs and a plastic poncho-like apron.
4    Q.  That goes over your shoulders?
5    A.  Go over my shoulders, yes.
6    Q.  Anything else in the new outfit?
7    A.  Shoe covers.
8    Q.  And what did they look like?
9    A.  Nonskid variety.
10   Q.  And did you talk to the other MEs
11   about using this new equipment?
12   A.  Yes, I did.
13       Q.  What did any -- Strike that.
14       Did any of them make any response?
15   A.  A few of them said they would be
16   happy to try it if supplies were
17   available.
18   Q.  Did anybody give any negative
19   response?
20   A.  Yes.  One ME said -- was outraged.
21   Q.  Who was that?
22   A.  I don't recall.
23   Q.  Why were they outraged?
24   A.  Felt it was regressive.



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street , Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
        617.557.0039                      888.922.JACK                          FAX 617.557.0040

Page 113

1  Q.  Regressive?
2  A.  Regressive.
3  Q.  Going back to worse equipment?
4  A.  Yes.  She thought -- She or he
5  felt it was like a sack cloth being worn.
6  Q.  So it was probably one of the
7  female MEs?
8  A.  I said he or she.
9  Q.  Right.  You said she first.
10  A.  That was a mistake.
11  Q.  Okay.  Whoever it was, they felt
12  like it was something going backwards in
13  time instead of forwards in time.
14  A.  Correct.
15  Q.  Did anything happen with respect to
16  using the new equipment that you were
17  proposing?
18  A.  I did an autopsy with that.
19  Q.  Did anything further happen other
20  than you doing one autopsy?
21  A.  No further supplies of that
22  material was made available.
23  Q.  Was that because the other MEs
24  weren't interested?

Page 114

1  A.  I said there were a couple people
2  who were interested.
3  MS. KELLEY:  Could you mark
4  this as the next exhibit, please?
5  (Exhibit-9, January 7, 2004,
6  E-mail Bates Stamped AGO-0128, marked for
7  identification.)
8  BY MS. KELLEY:
9  Q.  Is that Number 9?
10  A.  (Witness viewing document).  Yes.
11  Q.  Can you describe what Exhibit
12  Number 9 is, please, Doctor?
13  A.  (Witness viewing document).
14  Exhibit Number 9 is an e-mail from me to
15  Mr. John Cronin.
16  Q.  And among other things, does this
17  e-mail discuss the fact that you had
18  spoken to some of the MEs and tech
19  supervisors regarding the Tyvek versus
20  plastic aprons?
21  A.  (Witness viewing document).  Yes.
22  Q.  You say there were three kinds of
23  responses:  A, will try and comment; B,
24  just not interested; C, stony silence.  Is

Page 115

1  that a fair reading of that?
2  A.  Yes.
3  Q.  And then you say, "I will leave it
4  to you to guess who did what."
5  A.  Yes.
6  Q.  Overall, did you have -- Strike
7  that.
8  Overall, was it your understanding
9  that most of the other MEs were not
10  particularly interested in trying the new
11  equipment that you were proposing?
12  A.  Overall, my understanding is that
13  some were willing to experiment with it.
14  Q.  After you sent this e-mail, did you
15  have any discussion with John Cronin about
16  moving forward with the new equipment?
17  A.  No.
18  Q.  So you sent this e-mail and never
19  got any response?
20  A.  Correct.
21  Q.  Did you raise it again?
22  A.  No.  There were other things to
23  raise.
24  Q.  Like what?

Page 116

1  A.  The other items on these agendas.
2  Q.  Oh, okay.  The other things on the
3  agendas that you had written out.
4  A.  Yes.
5  MS. KELLEY:  Could I have
6  these marked as the next three exhibits,
7  please?
8  (Exhibit-10, November 10,
9  2000, Letter Bates Stamped P-0529 through
10  P-0536; Exhibit-11, September 19, 2001,
11  Report to the Governor Bates Stamped
12  P-0527 through P-0556; Exhibit-12, April 4,
13  2002, Needs Assessment of Services Report
14  Bates Stamped P-0557 through P-0572, marked
15  for identification.)
16  BY MS. KELLEY:
17  Q.  Doctor Philip, I just requested
18  that three documents be placed in front of
19  you, and they have been marked as Exhibits
20  10, 11 and 12 to this deposition.  And
21  I'll represent to you that these documents
22  were produced by you in response to our
23  request for production of documents.  Could
24  you just review those for a minute?


Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                               888.922.JACK                          FAX 617.557.0040

Page 117

1    A.  (Witness viewing document).
2        (Recess taken).
3      BY MS. KELLEY:
4    Q.  Doctor, have you had the chance to
5    review what's been marked Exhibits 10, 11
6    and 12?
7    A.  Yes.
8    Q.  Is it accurate to say that you
9    produced these documents together with your
10   response to our document request?
11   A.  That's only partially accurate.
12   Q.  Okay.  What's inaccurate about it?
13   A.  You sent these documents to us
14   first, and then I have selected portions
15   of it to be produced back to you --
16   Q.  Okay.
17   A.  -- because they support some of the
18   interrogatories and things like that that
19   we responded.
20   Q.  Okay.  Before we produced copies of
21   all or portions of these documents that
22   have been marked as Exhibits 10, 11 and
23   12, had you ever seen any portion of any
24   of these documents?

Page 118

1    A.  I received a copy of the Needs
2    Assessment of Forensic Services in the
3    Commonwealth of Massachusetts Report.
4    Q.  So that's the --
5    A.  But not the other reports.
6    Q.  That's the document marked as
7    Exhibit Number 12?
8    A.  Twelve.
9    Q.  The needs assessment marked as
10   Exhibit Number 12 is dated April 4th,
11   2002.  Do you see that?
12   A.  (Witness viewing document).  Yes.
13   Q.  Can you describe the circumstances
14   under which you first saw this document?
15   A.  It was handed out to us at the
16   office.
17   Q.  In approximately April of 2002?
18   A.  Yeah, or once the higher
19   authorities had reviewed the report.
20   Maybe even being May or June.
21   Q.  Of 2002?
22   A.  Yes.
23   Q.  And when you say it was handed out
24   in the office, did all of the medical

Page 119

1    examiners in the office receive a copy of
2    this?
3    A.  Yes.
4    Q.  Did other people in the office
5    receive it also?
6        A.  Yes.
7    Q.  What other people received it?
8    A.  All the Medical Examiner's Office
9    medical examiners.
10   Q.  Any of the technicians?
11   A.  I don't know.
12   Q.  And was it provided to you in this
13   form?
14   A.  I'm not sure if the entire report
15   was given or only the portions relevant to
16   the Medical Examiner's Office was handed
17   out.
18   Q.  Who handed out the report or the
19   portion of the report?
20   A.  I don't recall.  It was at our
21   morning conference.
22   Q.  Was there any discussion about the
23   reason that you were receiving a copy of
24   this report?

Page 120

1    A.  Because we had been interviewed for
2    the generation of this report.  I could be
3    wrong, but I think it was Doctor Zane who
4    kept asking to see what the report was and
5    then it was handed out -- over to all the
6    medical examiners.
7    Q.  You said you had been interviewed
8    for this report?
9    A.  Yes.
10       Q.  How did that come about?
11   A.  This -- This team from Florida,
12   including two medical examiners from
13   Canada, were at the office interviewing
14   the functioning of the office, and they
15   had -- they had discussions with all the
16   medical examiners.
17   Q.  At the point -- And you were one
18   of those people --
19   A.  Correct.
20   Q.  -- who were interviewed?
21   A.  Yes.
22   Q.  At the point when you were
23   interviewed, did you have any understanding
24   of the reason you were being interviewed?



**Jack Daniel**
Court Reporting & Video Services

Page 121

1    A.  Because the Governor's office was
2  going to fix the problems and needed an
3  assessment of what and how it needed to be
4  done.
5    Q.  Who told you that?
6    A.  The person leading the team.  I
7  forget his name, but if you gave me the
8  complete document I might be able to
9  recall.
10    Q.  When you say, "the person leading
11  the team," you mean the people from
12  Florida that were doing the interviewing?
13    A.  There were people from Florida and
14  Canada.
15    Q.  Now, you just said whichever person
16  it was that said that to you, he told you
17  that the Governor's office was going to
18  fix problems at the Medical Examiner's
19  Office; is that correct?
20    A.  That's correct.
21    Q.  And did you have any discussion
22  about what those problems were?
23    A.  He did ask me for my perspectives.
24    Q.  What did you tell him, as best as

Page 122

1  you can recall?
2    A.  I did say that -- and I gave him
3  concrete examples of this, there were
4  process failures.
5    Q.  What failures?
6    A.  Process.
7    Q.  Process failures.  Such as?
8    A.  I illustrated it with the example
9  of the microbiology testing.
10    Q.  What did you tell him about that?
11    A.  Specimens have remained in the
12  office for up to a year before being sent
13  to the lab.
14    Q.  Did you tell him any other problems
15  with the microbiology testing?
16    A.  No.  That I used as an
17  illustration.  But I did mention that there
18  was process failure, there was lack of
19  quality assurance, there was issues with
20  morale.
21    Q.  Do you recall any other process
22  failures that you discussed with the
23  testing person?
24    A.  It was a long discussion.  I don't

Page 123

1  remember every detail of...
2    Q.  About how long a discussion did you
3  -- Strike that.
4        Did you meet with one person or
5  more than one person?
6    A.  I believe three.
7    Q.  Three separate meetings?
8    A.  Yes -- or two meetings with -- one
9  with one person and then one with the two
10  Canadians.
11    Q.  And those two meetings, about how
12  long did each meeting last?
13    A.  Between 20 and 30 minutes.
14    Q.  Did you have an understanding that
15  the two Canadian people were doing
16  something different from the other Florida
17  team?
18    A.  The rest of the Florida team seemed
19  to be Ph.D. types.  The two MDs on the
20  team were from Canada.
21    Q.  Did they ask you different kinds of
22  questions?
23    A.  Yes.
24    Q.  Can you describe generally the

Page 124

1  difference in the questions asked you by
2  the Florida people as opposed to the
3  Canadian people?
4    A.  The management structure, process
5  failure, quality assurance, these seemed to
6  interest the leader from -- leader of the
7  team from Florida.  The problems with
8  workload, possibility of errors and all
9  that were more -- pay scales, et cetera,
10  were the discussions with the Canadian
11  doctors.
12    Q.  Do you know if the Canadian doctors
13  were pathologists?
14    A.  Yes, they were.
15    Q.  During the course of these
16  discussions, was there any discussion about
17  inadequate screening for drugs or for
18  toxins?
19    A.  I believe there was.
20    Q.  Can you describe everything you can
21  recall about those discussions?
22    A.  I did mention that the toxicology
23  screen was very limited and took a long
24  time to come for -- the turnaround times



**Jack Daniel**
Court Reporting & Video Services
Inc.

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                      888.922.JACK                      FAX 617.557.0040

Page 125

1    were extraordinarily long.
2        Q.  And what about -- anything about
3    any screening for toxins?
4        A.  Toxicology.
5        Q.  Oh, I'm sorry.  Did you have any
6    discussion with any of these persons about
7    the number of autopsies that were being
8    conducted in the office?
9        A.  They asked me what amount of
10    workload that I was dealing with, and they
11    felt it was too high and they put it into
12    their comments.  They were also given
13    statistics from the administrators.
14            (Pause).
15        Q.  Oh, I thought you were still
16    talking, Doctor.  I'm sorry.
17            Was there any discussion at all
18    about how decisions were made to perform
19    autopsies on a particular decedent to
20    begin with?
21        A.  No.
22        Q.  Was there any discussion about the
23    relatively low number of autopsies
24    performed by the Medical Examiner's Office

Page 126

1    with respect to the entire number of
2    decedents?
3        A.  I think there was.  I'd like to
4    review this in detail to comment on that.
5        Q.  Is it your best memory that you had
6    some discussions on that topic?
7        A.  Yes.
8        Q.  Do you recall anything about what
9    you said?
10        A.  That we should be doing more
11    autopsies and less external examinations.
12        Q.  As of the point when you were
13    interviewed in connection with this report,
14    was it your understanding that you weren't
15    doing more autopsies because you didn't
16    have sufficient staff?
17        A.  Yes.
18            MS. KELLEY:  Can we go off
19    the record for a minute?
20            (Lunch recess).
21        BY MS. KELLEY:
22        Q.  Doctor Philip, this morning your
23    attorney handed me a sheaf of papers and
24    I'm just going to show you these and ask

Page 127

1    what they are.
2        A.  (Witness viewing document).  These
3    are some death certificates.  And there's
4    a couple of cases, the records maintained
5    by the front -- the case intake people.
6    And then the daily case -- this is a
7    sheet of paper that would come to the
8    morning conference for discussion and --
9    discussion and assignment for whether it
10    would be autopsy or external examination
11    and the doctor who would deal with it.
12        Q.  Do you know the period of time that
13    these documents cover?
14        A.  It should be -- the information
15    should be available on the documents.
16        Q.  Sitting here today, do you have any
17    idea what time period they cover?
18        A.  I would think it's -- the daily
19    work sheets are from December 30th to
20    March.
21        Q.  December 30th of 2003, to March of
22    2004?
23        A.  It should be on this paperwork.
24    This is February 12th.  End of December,

Page 128

1    January, February.
2        Q.  So end of December 2003, January
3    and February of 2004?
4        A.  Yes.
5        Q.  And when did you make copies of
6    these documents?
7        A.  These were on my desk, not copies.
8    These were what were given to us during
9    the morning conference.  They just piled
10    up on my desk.
11        Q.  So they were on your desk when you
12    left your employment?
13        A.  Yes.
14        Q.  And what understanding do you have,
15    if any, of why you're producing these
16    documents to me in this case?
17        A.  It supports my argument that there
18    is unequal -- always was unequal
19    distribution of workload.  Too many cases
20    were assigned as externals when they
21    should have been autopsies.
22        Q.  Anything else that these documents
23    support, to the best of your knowledge?
24        A.  That the elderly tend to be

𝒥ack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                            888.922.JACK                            FAX 617.557.0040

Page 129

1    externals compared to -- compared to the
2    younger age groups.
3    Q.   Anything else?
4    A.   Not that I know of off the top of
5    my mind.  If I review everything, I might
6    have some other suggestions.
7    Q.   The document that was marked as
8    Exhibit Number 12, do you still have that
9    in front of you?
10    A.   (Witness viewing document).  Yes, I
11    do.
12    Q.   I believe you testified earlier
13    that this document was prepared, as far as
14    you understood, based upon the fact that
15    the Governor was going to fix certain
16    problems at the Medical Examiner's Office
17    and wanted information about how to fix
18    those; is that fair to say?
19    A.   No, it's not.
20    Q.   What's not fair about what I just
21    said?
22    A.   It's not just the Medical
23    Examiner's Office, it's the entire Criminal
24    Justice System including the crime labs

Page 130

1    and the toxicology setup and all that.
2    It's an entire bigger document.
3    Q.   Okay.  But it's your understanding
4    that the Governor intended to fix a number
5    of problems including problems in the
6    Medical Examiner's Office; is that fair?
7    A.   That's fair.
8    Q.   Okay.  So is it your understanding
9    when you were interviewed in connection
10    with the document that became what's now
11    Exhibit Number 12, it was your
12    understanding that the ultimate report was
13    going to be delivered to the Governor's
14    office?
15    A.   Yes.
16    Q.   And do you know whether that, in
17    fact, took place?
18    A.   I don't know.
19    Q.   But you assume it did?
20    A.   Yes.
21    Q.   Now, you just said a minute ago
22    that the documents that your attorney
23    produced to me today supported, in part,
24    your argument that too many externals were

Page 131

1    being done instead of autopsies; is that
2    correct?
3    A.   That's correct.
4    Q.   And when you refer to externals,
5    can you describe for the record what you
6    mean by that?
7    A.   External examination is an external
8    viewing of the body and -- with or without
9    a draw of blood for toxicology.  And a
10    death certificate is issued.
11    Q.   Referring to what's been marked as
12    Exhibit Number 12, the second page of that
13    document, which is -- has a P-0558 at the
14    bottom, do you see that?
15    A.   (Witness viewing document).  Yes.
16    Q.   Included within the findings of
17    this report, there's a section called "
18    2.1.8.2, Work Volume Conditions."  Do you
19    see that?
20    A.   (Witness viewing document).  Yes.
21    Q.   And it says that there's inadequate
22    technical and clerical support present in
23    the Medical Examiner's Office; is that
24    correct?

Page 132

1    A.   (Witness viewing document).
2    Correct.
3    Q.   And reading a few sentences into
4    that report, into that section of the
5    report, it says "In order to manage the
6    volume of cases with the available
7    personnel, the office is aggressive in
8    pursuing external examinations,
9    parentheses, views, close parentheses,
10    rather than full autopsies in approximately
11    25 percent of cases."  Did I read that
12    correctly?
13    A.   (Witness viewing document).  Yes,
14    you did.
15    Q.   So that was something that was
16    discussed with those people preparing this
17    report back in April 2002.
18    A.   Correct.
19    Q.   They go on to say, "They also
20    restrict toxicology testing because of a
21    cap on resources."  Do you see that?
22    A.   (Witness viewing document).
23    Correct.
24    Q.   Was it your understanding that the



Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE    141 Portland Street . Boston, MA 02114    EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039    888.922.JACK    FAX 617.557.0040

ABRAHAM PHILIP, M.D.   07/21/05

34 (Pages 133 to 136)

Page 133

1  people preparing this report were made
2  aware of that fact back in early 19 --
3  early 2002?
4    A.  Yes.
5    Q.  In the next paragraph, the first
6  sentence of that paragraph, "Another
7  problem is the agency cannot get complete
8  enough information concerning deaths to
9  qualified personnel in order for them to
10  make fully informed decisions as to
11  whether to take cases."  Did I read that
12  correctly?
13    A.  (Witness viewing document).  Yes,
14  you did.
15    Q.  So that was another thing that had
16  been discussed with these people preparing
17  the report for the Governor.
18    A.  That's correct.
19        MR. SHARP:  Objection.  Go
20  ahead.  Go ahead.
21        THE WITNESS:  I said that's
22  correct.
23        MS. KELLEY:  Could we have
24  these three marked as the next three

Page 134

1  exhibits, please?
2        (Exhibit-13; Group of
3  Documents Bates Stamped P-0389 through
4  P-0447; Exhibit-14, Group of Documents
5  Bates Stamped P-0448 through P-0473;
6  Exhibit-15, Memorandum Bates Stamped
7  P-0474, marked for identification).
8        BY MS. KELLEY:
9    Q.  Doctor Philip, do you have what's
10  been marked as Exhibit Number 13 to this
11  case?
12    A.  (Witness viewing document).  Yes, I
13  do.
14    Q.  I will represent to you that those
15  are documents produced by you in
16  response to Defendants' Request Number 6
17  for production of documents, and that
18  request seeks documents which evidence or
19  support the plaintiff's allegations in
20  Paragraph 12 of the amended complaint that
21  among the ways in which Doctor Philip
22  reasonably believed the operations of the
23  OCME violated state regulations or created
24  dangers to public health and safety,

Page 135

1  quote, was the failure of the OCME to
2  conduct adequate toxicological studies of
3  newly deceased hospital and nursing home
4  patients who presented to OCME with high
5  levels of morphine in their body, period,
6  close quotes.
7        Is it your understanding that the
8  documents that I've just shown you are, in
9  fact, documents which you believe support
10  that allegation?
11    A.  (Witness viewing document).  What
12  this Exhibit Number 13 contains is several
13  things puts together.  The first is a
14  bunch of death certificates from primarily
15  nursing homes with horribly crafted death
16  certificates which do not satisfy the
17  criteria of a properly framed death
18  certificate and which needed to have been
19  examined again or reviewed by the Medical
20  Examiner's Office.
21        The next set of documents are two
22  -- one -- sorry -- two autopsy reports
23  with -- in cases where there was
24  extraordinarily high levels of morphine in

Page 136

1  the person, and I had requested an
2  investigation into those cases.  And then
3  there's a bunch of e-mails that went
4  between me and the director of the tox lab
5  about these cases.
6        The third case is of a Sandra --
7  I'm trying to find out why this was
8  included.
9        (Witness viewing document).  Yes.
10  She had a very high level of hydrocodone
11  in her system -- hydromorphone in her
12  system.
13        Again, these are examples of cases
14  with head injury and a coincidental
15  finding of opiate levels which I
16  wanted to investigate and was prevented
17  from doing that.
18    Q.  When you say "prevented," how were
19  you prevented?
20    A.  I was told not to.
21    Q.  By whom?
22    A.  Doctor Evans and Edith Platt.
23    Q.  Did they tell you why they didn't
24  want you to investigate them?


**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
      617.557.0039                      888.922.JACK                      FAX 617.557.0040

Page 137

1    A.  To properly investigate these
2    cases, I had to share clinical records
3    with the pharmacist from the hospital
4    concerned, and they felt confidential
5    information was being given out and didn't
6    want me to further pursue this topic.
7       Q.  Did you believe that was a
8    reasonable explanation on their part?
9       A.  No, it isn't -- it wasn't, but
10   orders were orders and I complied.
11      Q.  You didn't think it was reasonable
12   that they were trying to hold back the
13   sharing of confidential information?
14         MR. SHARP:  Objection.  Go
15   ahead, if you can.
16      A.  Could you repeat that question?
17      Q.  You didn't think it was reasonable
18   that Doctor Evans and Edith Platt were
19   attempting to hold back the sharing of
20   confidential information?
21      A.  No.  I thought there was a matter
22   that needed investigation and it was the
23   role of the Medical Examiner's Office to
24   pursue these.

Page 138

1       Q.  Do you have what's been marked as
2    Exhibit Number 14 in front of you?
3       A.  (Witness viewing document).  Yes, I
4    do.
5       Q.  I'll represent that these, again,
6    were documents produced by you in response
7    to our request for production of
8    documents.  Looking through that packet of
9    documents, do you have an understanding of
10   what part of the allegations of your
11   complaint these documents are meant to
12   support?
13      A.  (Witness viewing document).  Yes.
14   These -- The first report is an example of
15   a coherent toxicology report compared to
16   the confusing kinds of report that is
17   generated by the toxicology lab in the
18   Boston -- attached to the Boston Medical
19   Examiner's system.  Also an example of the
20   full range of testing that is done at the
21   New York office in contrast to the limited
22   testing that we do here.  And then there is
23   a letter that I discussed initially with
24   Guy Vallaro, who is in charge of the

Page 139

1    toxicology lab in -- in Worcester attached
2    to the Medical Examiner's Office, and gave
3    further examples of reports from other
4    places that were concise, coherent and
5    legible compared to the kinds of reports
6    that were generated for medical examiners
7    in Boston.
8       Q.  The first thing you said about the
9    coherent report as compared to the
10   confusing Boston reports --
11      A.  That's correct.
12      Q.  -- I take it the coherent report is
13   the first page.
14      A.  It's one example.  There are
15   several examples.
16      Q.  Well, Page P-0448, is that an
17   example of a coherent report?
18      A.  (Witness viewing document).  Yes.
19      Q.  And is that the full report, just
20   that one page?
21      A.  Yes.
22      Q.  And what's an example of a
23   confusing Boston report?
24      A.  It's attached to these cases here

Page 140

1    (indicating).
2       Q.  Are there numbers on the page?
3       A.  (Witness viewing document).  Yes.
4    P-409 and P-0410.
5       Q.  And are they -- are those part of
6    another exhibit in this case?
7       A.  It's part of Exhibit 13.
8       Q.  And with respect to the report at
9    Page 409, 410, which is part of Exhibit
10   Number 13, what is it about that report
11   that you consider to be confusing as
12   compared to the New York report?
13      A.  The -- The numbers, which is the
14   significant finding in the report, is not
15   presented in a manner that can be
16   highlighted.  It's inserted into a large
17   number of words that talk about matters
18   that are nonessential to the forensic
19   pathologist.
20         For example, they give a report --
21   I'm reading Page 410, "Following a single
22   10-milligram oral dose of up to 39
23   nanogram per ML," I don't know what that
24   means.  "Reporting limit 20 nanogram per

Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
                                www.jackdanielreporting.com
617.557.0039                    888.922.JACK                 FAX 617.557.0040

ABRAHAM PHILIP, M.D.    07/21/05

36 (Pages 141 to 144)

Page 141

1    ML. Plasma concentrations from 18 to 27
2    nanogram." These are -- This is relevant
3    to the clinical doctor, not to the
4    forensic pathologist who's more concerned
5    with lethal levels, but national medical
6    services give that information. It's just
7    cut and patched onto the toxicology report
8    and sent out.
9    Q.   This report at Pages 409 and 410,
10   it's got Doctor Evangelista's name on it.
11   A.   He submitted the specimen.
12   Q.   Why do you have a copy of this?
13        A.   Because he was doing this autopsy
14   under my direct supervision and I had to
15   co-sign.
16   Q.   And why did you keep a copy of
17   this for your records?
18   A.   Because this is what I explained to
19   Guy Vallaro once, explained to other
20   doctors several times and to John Cronin
21   as failures of the toxicology lab.
22   Q.   So you kept this as evidence of
23   failures of the toxicology lab?
24   A.   That's correct.

Page 142

1    Q.   And the document that's been marked
2    as Exhibit Number 15, do you have that in
3    front of you?
4    A.   (Witness viewing document). Yes.
5    Q.   Again, I'll represent that these
6    are documents that were produced by you in
7    response to our request for production of
8    documents. Do you have any understanding
9    looking at that document, Doctor, as to
10   what part of the allegations of your
11   complaint that document supports?
12   A.   I don't know the number, but this
13   supports the argument that microbiological
14   testing is not properly done.
15        Q.   And did you feel that was a failing
16   at the Boston Medical Examiner's Office?
17   A.   Yes.
18   Q.   And what about microbiological
19   testing, what was done there that was not
20   properly done?
21   A.   I discussed three cases, one of
22   them was mine and two by Doctor Chirkov.
23   And at least my case hadn't been
24   transported from the Medical Examiner's

Page 143

1    Office to the microbiology lab for one
2    year.
3    Q.   So that was one problem, failure to
4    deliver in a timely way?
5    A.   Yes.
6    Q.   What other problems did you
7    perceive?
8    A.   There were always issues about
9    proper specimens being sent across. The
10   protocols were not there for testing of
11   some of the newer diseases that -- some of
12   the newer diseases that were cropping up
13   and needed to be monitored were not being
14   followed.
15        And there was not adequate
16   discussions between the office and the
17   microbiology lab. We just had a contract
18   and things happened or were done as and
19   when people felt like it.
20   Q.   Did you have any discussion with
21   anybody, either John Cronin or Doctor
22   Evans, about these failures?
23   A.   I did.
24   Q.   And do you recall anything that --

Page 144

1    Strike that.
2        Did you talk to both of them about
3    this or just one of them?
4    A.   I did talk to both of them about
5    it.
6    Q.   And do you recall what either one
7    of them said to you?
8    A.   No, but just one more of those
9    complaints that I kept making.
10   Q.   They said to you that's just one
11   more complaint you've made?
12   A.   No. The attitude was that it was
13   one more of those complaints that I was
14   making.
15   Q.   What did they say to you?
16   A.   I don't recall the exact words.
17   Q.   Do you recall generally the
18   substance of the words they used?
19   A.   No. I felt the response was as if
20   they were saying, "Okay. We know it's
21   wrong."
22   Q.   I take it it's your testimony
23   nothing was ever done in response to your
24   complaints.


**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
                                        www.jackdanielreporting.com
        617.557.0039                        888.922.JACK                        FAX 617.557.0040

Page 145

1    A.  This was a case in 2002, and I had
2    similar experiences in 2004.
3         MS. KELLEY:  Could we have
4    these marked as the next two exhibits,
5    please?
6         (Exhibit-16, Document
7    Entitled "The Strange Case of Michael
8    Williamson (2001-3459)" Bates Stamped
9    P-0383; Exhibit-17, Document Entitled "The
10   Missed Homicide of John L. Weil
11   (1997-3626)" Bates Stamped P-0384, marked
12   for identification).
13        BY MS. KELLEY:
14   Q.  Doctor, you have in front of you
15   what's been marked Exhibits 16 and 17.  Do
16   you see those?
17   A.  (Witness viewing document).  Yes.
18   Q.  First, with respect to Exhibit
19   Number 16, what is that?
20   A.  That was a 34-year-old male who
21   died --
22   Q.  Well, first of all, before we even
23   get -- What is this?  Is this a
24   memorandum that you prepared?

Page 146

1    A.  Yes.
2    Q.  When did you prepare it?
3    A.  In -- Before I left in 2002.
4    Q.  This particular person, when did
5    this occur?
6    A.  The case?
7    Q.  Yeah.
8    A.  Towards the end of 2001.
9    Q.  And, I'm sorry, you said you
10   prepared this before you left in 2002?
11   A.  Yes.  Might be April, May -- March,
12   April, May.
13   Q.  And what caused you to prepare this
14   memo?
15   A.  I handed this -- these two with a
16   cover letter to Rachel -- I forget her
17   last name.  She was the legal counsel at
18   the Medical Examiner's Office -- to
19   illustrate examples where district medical
20   examiners were falling flat on their faces
21   regarding evaluation of cases.
22        MS. KELLEY:  Could we have
23   these marked as 18 and 19, please?
24   .

Page 147

1         (Exhibit-18, Handwritten
2    Document Bates Stamped P-0382; Exhibit-19,
3    Handwritten Document Bates Stamped P-0387
4    through P-0388, marked for identification).
5         BY MS. KELLEY:
6    Q.  Doctor, I've just put in front of
7    you two additional documents marked
8    Exhibits 18 and 19.  Do you see those?
9    A.  (Witness viewing document).  Yes.
10   Q.  With respect to the -- Exhibit
11   Number 16, had that been submitted
12   together with one of these exhibits?
13   A.  Eighteen was submitted with Exhibit
14   Numbers 16 and 17.
15   Q.  So Exhibit Number 18 is the memo to
16   Rachel.
17   A.  The cover letter to the other two,
18   yes.
19   Q.  Okay.  And this was submitted at
20   some point in the spring of 2002.
21   A.  Yes.
22   Q.  Now, getting back to Exhibit Number
23   16, what was the reason that you submitted
24   this to Rachel?

Page 148

1    A.  She seemed to be interested in
2    cases where there were issues in the
3    Medical Examiner's Office.
4    Q.  And you thought this demonstrated
5    the --
6    A.  A major failing of the Medical
7    Examiner's Office.
8    Q.  Okay.  And what about the next
9    exhibit, Exhibit Number 17?  What is that?
10   A.  (Witness viewing document).  That
11   was another homicide that was missed
12   because it was evaluated at the scene by a
13   district medical examiner.
14   Q.  What's a district medical examiner?
15   A.  A district medical examiner are
16   retired practicing physicians picked at
17   local area hospitals who were doing part
18   of the medical examiner work, several of
19   them without any qualifications, licensing,
20   registration.
21   Q.  And was it your belief back when
22   you prepared this memo that these types of
23   evaluations should have been performed by
24   actual staff members from the Medical

Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                          888.922.JACK                              FAX 617.557.0040

Page 149

1    Examiner's Office?
2    A.  It is my contention that the
3    Medical Examiner's Office needs to maintain
4    a cadre of what is called as death
5    investigators.
6    Q.  Do you know why they didn't do that
7    back in 2002?
8    A.  I'm not going to interpret other
9    people's minds.
10    Q.  Did anyone ever indicate to you any
11    reasons why they didn't have that cadre of
12    investigators that you thought was needed?
13    A.  No.
14    Q.  You said you didn't recall Rachel's
15    name, but she was an attorney; is that
16    correct?
17    A.  Yes.
18    Q.  Was she in the Medical Examiner's
19    Office or in some other office?
20    A.  She was at the Medical Examiner's
21    Office.
22    Q.  Was she employed by the Executive
23    Office of Public Safety, if you know?
24    A.  Yes.

Page 150

1    Q.  Did she spend all of her time in
2    the Medical Examiner's Office?
3    A.  I believe so, yes.
4    Q.  Was she taking over for Jackie
5    Faherty when Jackie was on a maternity
6    leave?
7    A.  It could be.
8    Q.  When Jackie returned, do you know
9    where Rachel went?
10    A.  No.
11    Q.  Now, the document that's been
12    marked as Exhibit Number 19, what is that
13    document?
14    A.  (Witness viewing document).  That
15    document is a document that I quickly
16    wrote up about issues with the New England
17    Organ Bank.
18    Q.  What was your concern about the New
19    England Organ Bank?
20    A.  Concern Number 1 was about a stab
21    injury to the groin which a surgeon
22    working on the behalf of the New England
23    Organ Bank cut through the stab injury.
24    It was not for therapeutic reasons, but

Page 151

1    for extracting lymph nodes for some
2    testing that New England Organ Bank needed
3    to do.
4    Q.  And you felt that interfered with
5    the --
6    A.  Evaluation of the stab injury.
7    Q.  Okay.  What other concerns did you
8    have about the New England Organ Bank that
9    you wanted to call to her attention?
10    A.  The next case I discussed was a
11    case that was, again, a homicide,
12    maintained too long on a respirator, and
13    limited the evaluation of the brain. There
14    were several other cases where admission
15    bloods were taken by the organ bank and
16    relevant toxicology could not be done.
17    Q.  So it seems you were mostly
18    concerned with the fact that some of the
19    things they were doing were impeding your
20    ability to find out the cause of death or
21    whether or not something was related to a
22    crime.
23    A.  Correct.
24        THE WITNESS:  Attorney

Page 152

1    Kelley, I need a small break to go to the
2    restroom.
3        MS. KELLEY:  If you want to
4    take a short break, that's fine.
5        (Recess taken).
6        BY MS. KELLEY:
7    Q.  Doctor Philip, going back to
8    Exhibit Number 13 for a minute, do you
9    have that in front of you?
10    A.  (Witness viewing document).  Yes.
11    Q.  I believe you had testified that
12    some of the documents in this exhibit
13    consist of poorly prepared death
14    certificates, and I think you said they
15    should have been reviewed by the Medical
16    Examiner's Office.  Was that your
17    testimony?
18    A.  That's correct.
19    Q.  In the case of death certificates
20    that should have been reviewed by the
21    Medical Examiner's Office, who was actually
22    issuing these death certificates?
23    A.  Various hospitals and nursing
24    homes.


Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                            888.922.JACK                        FAX 617.557.0040

Page 153

1    Q.   And how did you come into
2    possession of them?
3    A.   Several of them were also cases for
4    commission certification, and I got --
5    when I would do my commission certificates
6    and find a certificate like this, I would
7    follow it up with a phone call to the
8    nursing home and give them a feedback.
9    But at several of the crematoria, I found
10   extra certificates from other cases still
11   lying there and I would request for a
12   copy.
13   Q.   To the best of your knowledge, was
14   it required that nursing homes submit
15   copies of death certificates in the event
16   of all nursing home deaths to the Medical
17   Examiner's Office?
18   A.   To the best of my knowledge, the
19   nursing homes report cases to the Medical
20   Examiner's Office and the Medical
21   Examiner's Office makes a decision whether
22   we are going to waive jurisdiction or
23   decide to investigate it further.
24   Q.   So it's your understanding that

Page 154

1    nursing homes report all deaths to the
2    Medical Examiner's Office.
3    A.   No, deaths that take place within
4    certain criteria.
5    Q.   What are those criteria?
6    A.   Dying within 24 hours of reaching
7    the nursing home, not adequate history,
8    cases in which it looks like there might
9    be trauma.
10   Q.   And when a nursing home does report
11   something, report a death to the Medical
12   Examiner's Office, who makes the decision
13   whether that death needs to be
14   investigated further or not?
15   A.   Depending on the hour of the call,
16   sometimes the case can take -- people will
17   take the decision themselves and then run
18   it by the medical examiner the next
19   morning, or they will tell a medical
20   examiner that this was the case, are we
21   interested.
22   Q.   So when you say "medical examiner,"
23   it could be any of the staff pathologists
24   in the office?

Page 155

1    A.   That's correct.
2    Q.   So any one of them could make that
3    decision?
4    A.   That's correct.
5    Q.   I take it as part of this case,
6    Doctor, one thing you're alleging is that
7    when you were working at the Medical
8    Examiner's Office not enough nursing home
9    patient deaths were being investigated.
10   Is that correct?
11   A.   That's correct.
12   Q.   Is it your position that some of
13   your fellow pathologists were not making
14   enough recommendations that these deaths be
15   investigated?
16   A.   No. The general attitude was that
17   anybody over 50 we are not going to really
18   pursue the case. A presumptive diagnosis
19   of heart disease would be made and then we
20   would say we waive jurisdiction. If the
21   doctor wanted a suggestion as to what
22   could be -- what could be put down on the
23   death certificate, we would say it was
24   cardiovascular disease.

Page 156

1    Q.   But this would be something that
2    would be left to the individual
3    pathologists to make a decision; is that
4    correct?
5    A.   What would be?
6    Q.   The question of whether to
7    investigate a nursing home death further
8    would be left up to the pathologist who
9    actually reviewed the particular death
10   certificate?
11   A.   Correct. But it is my contention
12   that by not having death investigators,
13   leaving the nursing homes to police
14   themselves, they gave us whatever
15   information they felt was needed and we
16   took a decision to decline jurisdiction
17   based on that without finding out from the
18   family if there were any accusations of
19   abuse, if the family had any issues about
20   the treatment.
21   Q.   So you're suggesting that in at
22   least certain cases, the medical examiners
23   didn't have enough information to make a
24   correct decision about whether to

**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                              888.922.JACK                          FAX 617.557.0040

Page 157

1  investigate further.
2     A.   The -- The entire setup of the
3  Medical Examiner's Office was one which
4  encouraged inadequate investigation of the
5  nursing home deaths.
6     Q.   You said -- You've testified
7  several times today that you felt that
8  there were too many externals being done
9  and not enough full autopsies; is that
10  correct?
11     A.   That's correct.
12     Q.   Who would make the final decision
13  as to whether or not an external were
14  going to be performed with respect to a
15  particular decedent or whether a full
16  autopsy would be performed?
17     A.   It would be very often decided at
18  the morning conference, but again, it was
19  left to -- some of the doctors would still
20  go ahead and do the autopsy even if it
21  was decided that an external was adequate.
22  So it's a combination of both a group
23  decision as well as individual decisions.
24     Q.   So that if a particular pathologist

Page 158

1     -- Strike that.
2        So I gather it's your testimony
3  that at the morning conference, a general
4  decision would be made that X, Y, Z
5  patients required full autopsies and the
6  remainder could be done just through
7  externals.  Is that correct?
8     A.   That's correct.
9     Q.   But then the individual pathologist
10  could decide to do more than a mere
11  external no matter what had happened at
12  the morning conference?
13     A.   That's correct.
14     Q.   And they weren't prohibited from
15  doing that; is that correct?
16     A.   Yes.
17     Q.   And that would be in the judgment
18  of the particular pathologist, that would
19  be left to his individual judgment?
20     A.   That's correct.
21     Q.   Doctor, I understand that there
22  came a time when there was a particular
23  incident with respect to the Medical
24  Examiner's Office where two women were

Page 159

1  misidentified after a fire.  Do you recall
2  that incident?
3     A.   I do.
4     Q.   Do you know when that had happened?
5     A.   December 30th, I think.
6     Q.   Of what year?
7     A.   2003.
8     Q.   Excuse me?
9     A.   2003.
10     Q.   And were you involved with that
11  incident in any way?
12     A.   I did the autopsy on one of the
13  two cases.
14     Q.   And did you sign a death
15  certificate with respect to that case?
16     A.   Yes, I did.
17        MS. KELLEY:  Actually, can
18  we just take a short break?
19        (Recess taken).
20        MS. KELLEY:  Could we have
21  these marked as the next three exhibits,
22  please?
23
24  .

Page 160

1        (Exhibit-20; Memorandum Bates
2  Stamped P-0527; Exhibit-21; E-mail Bates
3  Stamped P-0528; Exhibit-22, Letter Bates
4  Stamped AGO-0757 through AGO-0759, marked
5  for identification).
6     BY MS. KELLEY:
7     Q.   Doctor Philip, with respect to
8  Exhibit Number 20 that's in front of you,
9  can you describe what that document is?
10     A.   (Witness viewing document).  This
11  is a letter to the senior administrators
12  and doctors at the Medical Examiner's
13  Office, and this is what I already
14  testified about.  This was a request for
15  changing -- starting autopsies earlier,
16  which would synchronize with the doctors'
17  schedule and the technicians' schedule.
18     Q.   And what's -- Strike that.
19        Do you know approximately when this
20  document was prepared?
21     A.   I believe it was January 5th, but
22  there's no date.
23     Q.   January of 2004?
24     A.   Four.

**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street , Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                      888.922.JACK                    FAX 617.557.0040

Page 161

1  Q.  And was this prepared by Mr.
2  Garcia?
3  A.  This was e-mailed by Mr. Garcia.
4  Q.  And the next exhibit, Exhibit
5  Number 21, what is that?
6  A.  (Witness viewing document).  This
7  was -- On January 9 -- This was an
8  e-mail, again, to everybody that on
9  January 9th, I said I had a plan and a
10 proposal and I was not being allowed to
11 explain the proposal to everybody.  And a
12 question, what is it the administration is
13 so afraid of, of even suggestions?
14 Q.  So who did you direct -- Strike
15 that.
16     You produced this document which
17 has been marked as Exhibit Number 21?
18 A.  That's correct.
19 Q.  And you e-mailed it to whom?
20 A.  To all the medical examiners.
21 Q.  Did you also e-mail it to the
22 administration?
23 A.  Yes.
24 Q.  To John Cronin and Doctor Evans?

Page 162

1  A.  Yes.
2  Q.  And so in an e-mail to them, you
3  said, "Are those in charge so caught up in
4  their political maneuvers and seat-warming
5  exercises that they cannot come to the
6  conference room to discuss solutions to
7  burning issues?"  You said that?
8  A.  That's correct.
9  Q.  Did you get any response to this
10 e-mail from either Doctor Evans or John
11 Cronin?
12 A.  No, I didn't.
13     Q.  And Exhibit Number 22, can you
14 describe what that document is?
15 A.  (Witness viewing document).
16 Exhibit Number 22 was a letter I had
17 prepared to be sent out to several DAs who
18 I had been working with explaining my side
19 of the story because I was sure they would
20 be hearing rumors once they found out that
21 I had left the office.
22 Q.  Okay.  So when was this document
23 prepared?
24 A.  This was prepared, I believe, March

Page 163

1  1st or March 2nd.
2  Q.  Of 2004?
3  A.  2004.
4  Q.  At that point when you drafted this
5  document, had you been terminated yet?
6  A.  No.
7  Q.  Did you think you were going to be?
8  A.  No.  I was facing a one-day
9  suspension.
10 Q.  I think you started to say that
11 this was something you were sending to
12 DAs; is that correct?
13 A.  That's correct.
14 Q.  Which DAs?
15 A.  The DAs I've been working on --
16 working with on my cases.
17     Q.  Did you actually send it to those
18 DAs?
19 A.  No, I didn't.
20 Q.  Why not?
21 A.  I drafted this, I printed it out,
22 collected it from the printer, left it on
23 my desk saying I would think about it and
24 then send it out next day as an attachment

Page 164

1  to an e-mail.  It disappeared from my
2  office.
3  Q.  Backing up a little, it was your
4  intention to send this to DAs that you had
5  cases with; is that correct?
6  A.  That's correct.
7  Q.  Was it your intention to send it to
8  anybody else?
9  A.  No.
10 Q.  Just to the DAs?
11 A.  Yes.
12 Q.  So you left it overnight on your
13 office desk --
14 A.  Yes.
15 Q.  -- either March 1st or 2nd?
16 A.  Correct.
17 Q.  And the next day when you came in,
18 it was gone?
19     A.  Yes.
20 Q.  But it was something you prepared
21 on the computer; is that correct?
22 A.  That's correct.
23 Q.  So you still had it on your
24 computer?



Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                      888.922.JACK                    FAX 617.557.0040

**ABRAHAM PHILIP, M.D.   07/21/05**

42 (Pages 165 to 168)

---

Page 165

1   A.  That's correct.
2   Q.  Where did you get the copy that
3   you've produced in this case?  Strike
4   that.
5       Have you produced a copy of it in
6   this case?
7   A.  I believe you all sent us a lot of
8   information and this sheet was in that, so
9   it was returned to you --
10  Q.  This may have actually been
11  produced by us.  I don't -- I don't know
12  sitting here today, Doctor, whether you
13  produced this back to us or not and I'm
14  asking you whether you know.
15  A.  I don't know.
16  Q.  Okay.  So you get back on either
17  March 2nd or March 3rd, and --
18  A.  The 1st or 2nd.
19  Q.  Oh, excuse me.  You left it on
20  your desk overnight on which night?
21  A.  It's either the 1st or the 2nd,
22  yes.
23      Q.  Okay.  So you come in the next
24  day, and is it fair to say that's either

---

Page 166

1   the 2nd or the 3rd?
2   A.  Yes.
3   Q.  And it's no longer on your desk,
4   right?
5   A.  Correct.
6   Q.  But you could have produced another
7   copy with your computer?
8   A.  If I wanted to, yes.
9   Q.  Why did you make a decision not to
10  send this letter out to the DAs?
11  A.  I just got caught up with the work
12  on the 3rd.
13  Q.  And never got back to it?
14  A.  Yes.
15  Q.  Have you reviewed this document
16  recently, Doctor?
17  A.  Not in detail.
18  Q.  Is it your understanding that the
19  things that you say in this document are
20  factually accurate?
21  A.  Yes.
22  Q.  Well, one of the things you say in
23  this document with respect to an incident
24  occurring on February 13th of 2004, you

---

Page 167

1   say that you, "agreed to sign a death
2   certificate and left the death certificate
3   on a side counter in the autopsy rooms."
4   Do you see that down near the bottom of
5   the first page of this exhibit?
6   A.  (Witness viewing document).  Yes.
7   Q.  And then you say, "Someone later
8   picked up the death certificate to find it
9   contaminated."
10  A.  Correct.
11  Q.  Do you see that?  Is that an
12  accurate description of what occurred on
13  that day?
14  A.  (Witness viewing document).  Yes.
15  Q.  Actually, Doctor, I would ask you
16  to review this document.  And when you're
17  finished reviewing it, advise me whether
18  this is, in fact, a copy of the document
19  that you prepared yourself.  Can you do
20  that, please?
21  A.  (Witness viewing document).  It is
22  a document that I prepared myself.
23  Q.  Okay.  Okay, Doctor.  Getting to
24  the incident of February 13th of 2004, you

---

Page 168

1   understand that there at least is alleged
2   to have occurred an incident involving a
3   bloodstained death certificate on that
4   date?
5   A.  Yes.
6       Q.  Can you describe as much as you can
7   recall factually about what occurred on
8   February 13th with respect to that
9   bloodstained death certificate?
10  A.  Someone first stuck their head in
11  through one door and said I should sign
12  the death certificate.
13  Q.  And who was that person?
14  A.  Leslie Ward.
15  Q.  Do you remember the words she used?
16  A.  Not exactly, no.  I can't recall
17  that.
18  Q.  When she stuck her head in the
19  door, did you have an understanding of
20  whose death certificate it is she wanted
21  you to sign?
22  A.  No.
23  Q.  Did she say why she needed you to
24  sign one?

**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                    888.922.JACK                    FAX 617.557.0040

Page 169

1   A. Because a funeral home was waiting.
2   Q. And at that point when she had
3   stuck her head in the door, what were you
4   doing?
5   A. I was doing a homicide autopsy.
6   Q. Was anyone else present?
7   A. There was a technician with me.
8   Q. Who was that?
9   A. Edward Doyon.
10      Q. How do you spell his last name?
11  A. D-O-Y-O-N.
12  Q. Anyone else present?
13  A. There might -- There might have
14  been an autopsy going on on the other
15  table.
16  Q. Sitting here today, do you recall
17  whether that's true?
18  A. I know there was an autopsy going
19  on there when I started. I don't know
20  when that finished, but Evangelista was
21  doing the autopsy.
22  Q. Did he have a technician with him?
23  A. Yes, he did.
24  Q. Do you know who that was?

Page 170

1   A. No.
2   Q. Were there any state police in the
3   autopsy room at that time?
4   A. There was a state police trooper
5   taking photographs on Frank Evangelista's
6   case.
7   Q. Do you know who that was?
8   A. Sergeant L'Italien.
9       MS. KELLEY: And that's L,
10  apostrophe, I-T-A-L-I-E-N, I think.
11      MS. FAHERTY: (Nodded).
12      MS. KELLEY: Yeah.
13  BY MS. KELLEY:
14  Q. Were there any other police people
15  present in the room at that time?
16  A. There was a Boston -- a detective
17  from the Boston Police homicide department,
18  homicide division.
19  Q. Was he there in connection with the
20  homicide you were working on?
21  A. That's correct.
22  Q. What was his name?
23  A. I've been trying to remember, but I
24  don't. It should be on my autopsy report.

Page 171

1       MS. KELLEY: Can we go off
2   the record for a second?
3       (Discussion off the record).
4       MS. KELLEY: And I want
5   this to be part of the representation.
6   Off the record, Doctor Philip just
7   testified to the identity of the person
8   whose body he was autopsying at that time.
9       BY MS. KELLEY:
10  Q. Did you retain a copy of the
11  autopsy report for your records, Doctor?
12  A. No, I did not.
13      Q. And have you seen a copy of that
14  autopsy report since you left the Medical
15  Examiner's Office?
16  A. No, I have not.
17  Q. I'm sorry. What was the name of
18  the person you said stuck her head in and
19  asked you to sign the death certificate?
20  A. Leslie Ward.
21  Q. Okay. Did you say anything to
22  Leslie?
23  A. I told her that she would have to
24  ask the funeral home to wait about an

Page 172

1   hour, at which point I would stop the
2   autopsy and come upstairs and sign it.
3   Q. Did she make any response to that?
4   A. She left the autopsy room.
5   Q. What happened next?
6   A. When she came in, I was working on
7   the neck of this homicide victim, and
8   subsequently I cleaned up my gloves and
9   all that and was picking up either my
10  camera or formalin for taking histology
11  when the -- Leslie's supervisor poked her
12  head into the autopsy room.
13  Q. What was her name?
14  A. Deirdre Ward, no relation.
15  Q. And who is Kathleen Taylor?
16      A. Kathleen Taylor is a technical
17  supervisor of the technicians who assist
18  us.
19  Q. Is she physically located right
20  next to the autopsy room?
21  A. She was in what is called the annex
22  or the office attached to the autopsy
23  room.
24  Q. Was it Kathleen Taylor who actually

**ABRAHAM PHILIP, M.D.   07/21/05**

44 (Pages 173 to 176)

---

Page 173

1   opened the door to the autopsy room when
2   Deirdre Ward came down?
3   A.   It was Deirdre Ward.
4   Q.   Okay.  Was Kathleen Taylor present?
5   A.   In the annex, yes.
6   Q.   How far away was she from where you
7   and Deirdre were?
8   A.   Was standing behind Deirdre.
9   Q.   How far behind her?
10   A.   Feet, two feet.
11   Q.   Oh, so she was standing right next
12   to her?
13   A.   Right.
14   Q.   Okay.  So Deirdre comes in and
15   opens the door; is that correct?
16   A.   That's correct.
17   Q.   And how far were you from the door?
18       A.   From the stapler to where you are.
19   Q.   Well, I'm not very good at
20   distances, but would you say you were more
21   than six feet?
22   A.   Four or five feet.
23   Q.   Four or five feet?
24   A.   Four or five feet.

---

Page 174

1   Q.   And were you facing the door?
2   A.   Yes.  I had just turned after
3   picking up something.
4   Q.   And -- I'm sorry, you said you had
5   just picked something up?
6   A.   Yes.
7   Q.   What had you just picked up?
8   A.   A jar of formalin.
9   Q.   What's that?
10   A.   It's a preservative.
11   Q.   Were you still wearing your gloves?
12   A.   Clean gloves.
13   Q.   Excuse me?
14   A.   Clean gloves.
15   Q.   Had you just changed your gloves?
16   A.   Yes.
17   Q.   So you were standing four or five
18   feet from the door wearing clean gloves
19   when the door opens by Deirdre, right?
20   A.   Correct.
21   Q.   Did she say anything to you?
22   A.   She said, "John wants you to sign
23   certificate now."
24   Q.   Did you say anything back?

---

Page 175

1   A.   I just took the certificate.
2   Q.   Took it out of Deirdre's hand?
3   A.   Correct.
4   Q.   Into your clean glove?
5   A.   Yes.
6   Q.   And what did you do next?
7   A.   I took it to the side counter.
8   Q.   Where's that located vis-a-vis the
9   door?
10   A.   About six feet away.
11   Q.   So if Deirdre's standing at the
12   door, is the counter to her left or her
13   right or straight ahead?
14   A.   If she's standing at the door, the
15   counter is to her left.
16   Q.   On a wall that's the same wall with
17   the door?
18   A.   Yes.
19   Q.   And about how far away from Deirdre
20   were you when you -- Strike that.
21       You said you took the certificate
22   to the side counter; is that correct?
23   A.   Yes.
24   Q.   And did you put it down on the

---

Page 176

1   counter?
2   A.   Yes.
3   Q.   Was the counter clean?
4   A.   Yes.
5   Q.   And at the point where you put the
6   certificate down on the counter, about how
7   far was the certificate from the door?
8   A.   Certificate from the door was about
9   six feet.
10   Q.   And then at that point you signed
11   the death certificate.
12   A.   That's correct.
13   Q.   Where did you get a pen or a
14   pencil from?
15   A.   I had my pen, papers, autopsy
16   notes, camera kept on that side counter.
17   Q.   And then what did you do?
18   A.   Just then, Edward Doyon, who was
19   opening the head of the body that I was
20   working on, called me to show me
21   something.
22       Q.   And what happened next?
23   A.   So I walked up with the certificate
24   towards the body and a splash of blood

**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
                                www.jackdanielreporting.com
617.557.0039                    888.922.JACK                    FAX 617.557.0040

Page 177

1    fell on the certificate.
2    Q.  Did you see that happen?
3    A.  I saw -- Yes.
4    Q.  What did you do next?
5    A.  I tried to wipe it away.
6    Q.  With what?
7    A.  With my glove.
8    Q.  And what happened?
9    A.  Realized it was a mess.
10   Q.  What happened next?
11   A.  Left it back on the side counter.
12   Q.  And then what happened?
13   A.  And continued with the autopsy.
14   Q.  Now, during all this time is
15   Deirdre still standing in the doorway?
16   A.  No.
17   Q.  Where was she?
18   A.  In the annex.
19   Q.  So the door was closed?
20   A.  In the office.  Yes.
21   Q.  And she was outside.
22      A.  Yes.
23   Q.  At some point, did she come back in
24   or talk to you in any way?

Page 178

1       A.  At some point, Kathleen Taylor came
2    inside the autopsy room.
3    Q.  And what happened next?
4       A.  Picked up the death certificate,
5    scrutinized it and walked away.
6    Q.  Holding the death certificate?
7    A.  Yes.
8    Q.  Was there any conversation at all
9    between you and Kathleen Taylor during
10   that time?
11   A.  No.
12   Q.  So you didn't say, Stop, it's all
13   bloody, anything like that?
14   A.  I was concentrated on a homicide
15   autopsy.
16   Q.  But you did see her come in and
17   pick it up?
18   A.  Through the corner of my eye.
19   Q.  Well, then I repeat.  You didn't
20   say anything to her about don't pick that
21   up, it's a mess?
22   A.  I didn't.
23      Q.  And she didn't say anything to you
24   after scrutinizing it and seeing blood all

Page 179

1    over it?
2    A.  She didn't.
3       Q.  When Kathleen Taylor came in the
4    room, was she wearing one of those Tyvek
5    suits?
6    A.  No.
7    Q.  Was she wearing gloves?
8    A.  I don't recall.
9    Q.  As far as you can recall, do you
10   recall her wearing any protective clothing?
11   A.  No.
12   Q.  As a forensic pathologist, Doctor,
13   do you consider that it is or it can be
14   dangerous for someone not wearing
15   protective clothing to handle bloodstained
16   items?
17      MR. SHARP:  Objection. Go
18   ahead.
19   A.  I didn't ask her to pick up the
20   death certificate.
21   Q.  Do you consider it dangerous for
22   people not wearing protective clothing to
23   handle bloodstained items?
24   A.  Can you repeat that question?

Page 180

1       MS. KELLEY:  Could you
2    repeat that, please?
3       (Record read).
4    A.  I do.
5    Q.  And especially where the blood is
6    the blood of a homicide victim?
7    A.  Yes.
8    Q.  Did you consider that Kathleen
9    Taylor was in any danger as a result of
10   handling that bloodstained certificate?
11   A.  As I said, I was concentrating on a
12   homicide autopsy.  Through the corner of
13   my eye, I saw her coming and taking
14   something.  My focus was the homicide
15   autopsy, not what she was doing.
16   Q.  Okay.  Understanding that you
17   weren't focusing on Kathleen Taylor, as
18   she left the room without protective
19   clothing handling a bloodstained death
20   certificate from a homicide victim, did it
21   cross your mind that this could be a
22   dangerous thing for Kathleen Taylor to be
23   doing?
24      MR. SHARP:  Objection. You



Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        iEXPERIENCE YOU CAN TRUST
                                www.jackdanielreporting.com
617.557.0039                    888.922.JACK                    FAX 617.557.0040

ABRAHAM PHILIP, M.D.    07/21/05

46 (Pages 181 to 184)

Page 181

1    can answer, if you can.
2    A.  Well, she's an adult, compos
3    mentis, and I thought if she felt there
4    was anything dangerous about it she should
5    not have done it.  I was not holding a
6    gun to her head and say take it away.
7    Q.  I take it at the very least you
8    wouldn't have recommended that she do
9    that, would you, Doctor?
10         MR. SHARP: Objection. You
11   can answer it, if you can.
12   A.  That's correct.
13        MS. KELLEY:  Could we have
14   this marked as the next exhibit, please?
15        (Exhibit-23, Death
16   Certificate Bates Stamped AGO-0001, marked
17   for identification).
18        BY MS. KELLEY:
19   Q.  Doctor, the document that's been
20   put in front of you is Exhibit 23.  Do
21   you see that?
22   A.  (Witness viewing document). Yes.
23   Q.  Do you know what that document is?
24   A.  (Witness viewing document).  This

Page 182

1    is a copy of the death certificate that
2    got splashed with blood.
3    Q.  And understanding it's only a copy,
4    does the pattern of the blood stain on the
5    death certificate appear to you the same
6    as the blood stain that was on the death
7    certificate when you last saw it in the
8    autopsy room?
9    A.  (Witness viewing document). Yes.
10        Q.  Looking at the blood stain, Doctor,
11   down at the very bottom does it appear
12   that that's some sort of a fingerprint?
13        MR. SHARP: Objection.
14   BY MS. KELLEY:
15   Q.  If you can say.
16   A.  (Witness viewing document). No, I
17   cannot.
18   Q.  Okay.  So it's your testimony that
19   it is the result of a blood spatter onto
20   the death certificate; is that correct?
21   A.  Yes.
22   Q.  Did anything happen to the blood
23   spatter when you tried to wipe it clean
24   with your glove?

Page 183

1    A.  It spread.
2    Q.  Excuse me?
3    A.  It spread.
4    Q.  Okay.  So this that we're looking
5    at here shows spreading from where you
6    touched it --
7         MR. SHARP: Objection.
8    Q.  -- with your glove?
9         MR. SHARP: Answer, if you
10   can.
11   A.  Yes.
12   Q.  Okay.  And if you can, Doctor, and
13   I realize you may not be able to, was
14   this something that you went left to right
15   or right to left or up and down or -- how
16   did you spread the blood around with your
17   gloved hand?
18   A.  I don't think I can answer that.
19   Q.  After you saw Kathleen Taylor leave
20   the autopsy room holding the death
21   certificate --
22        MR. SHARP: Objection.
23        MS. KELLEY: I'm sorry. Is
24   that a mischaracterization of his

Page 184

1    testimony?
2         MR. SHARP:  I believe it
3    is.
4         BY MS. KELLEY:
5    Q.  Okay.  You can respond if you feel
6    that it's a mischaracterization, Doctor.
7         After you saw Kathleen Taylor leave
8    the autopsy room holding the death
9    certificate, what's the next thing that
10   you recall that happened with respect to
11   that incident?
12        MR. SHARP: Objection.
13   Answer, if you can.
14   A.  I focused back on the homicide -- I
15   continued with the homicide autopsy.
16   Q.  And what happened next?
17   A.  I went up -- My meeting at 1:30
18   was postponed 'til two, so I had lunch,
19   had my meeting.
20        Q.  Meeting with whom?
21   A.  Sheila Caulkin.
22   Q.  About something unrelated to this
23   death certificate?
24   A.  Another homicide.

Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE    141 Portland Street . Boston, MA 02114    EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039            888.922.JACK              FAX 617.557.0040

47 (Pages 185 to 188)

Page 185

1    Q. And what happened next?
2    A. Went down and finished the homicide
3    that I was doing.
4    Q. About what time did you finish
5    that?
6    A. Three or four o'clock.
7    Q. And at some point, did you come to
8    learn some additional information or did
9    anyone speak to you about the incident
10   with the death certificate?
11   A. The next I heard of it was February
12   25th.
13   Q. So this incident with Kathleen
14   Taylor and the death certificate happened
15   on February 13th of 2004; is that correct?
16   A. Correct.
17   Q. And between February 13th of 2004,
18   and February 25th, you didn't speak to
19   anybody about it?
20   A. No.
21   Q. And when you say you next heard of
22   it on February 25th, what happened on that
23   day?
24       A. That was the day I was called in

Page 186

1    to John Cronin's office.
2    Q. How did he contact you to come to
3    his office?
4    A. He came to my office and asked me
5    to come to his office.
6    Q. And did you do that?
7    A. Yes, I did.
8    Q. And who was there?
9    A. After I went into the office,
10   Lieutenant Platt came in.
11   Q. I'm sorry, who?
12   A. Lieutenant Edith Platt.
13   Q. Oh, okay. Anybody else?
14   A. No.
15   Q. So it was just you and John Cronin
16   and Edith Platt?
17   A. That's correct.
18   Q. And can you describe as much as you
19   can recall about what was said and by whom
20   during that meeting?
21   A. John Cronin mentioned that there
22   was an episode at which blood stains fell
23   on a death certificate.
24       Q. Did you know what he was talking

Page 187

1    about?
2    A. Vaguely.
3    Q. You had some vague knowledge of
4    what he might be talking about?
5    A. He briefed me about the case.
6    Q. Well, I'm asking you as much as you
7    can recall about what Mr. Cronin told you.
8    What did he tell you?
9    A. He said there was a death
10   certificate that was sent to the autopsy
11   room for signature and when it was
12   received back it was stained with blood.
13   Q. Did he say anything else?
14   A. And I asked him what did he expect,
15   to be stained by Chanel No. 5.
16   Q. What did he expect, that it would
17   be --
18   A. That it would be stained with.
19   Q. And did he respond to that?
20   A. He did say that he was going to
21   issue a one-day suspension.
22   Q. Do you recall anything else that
23   was said during that meeting?
24   A. He said there were four signed

Page 188

1    witness statements.
2    Q. Did he show them to you?
3    A. No.
4    Q. Did he tell you whose statements
5    they were?
6    A. No.
7    Q. Did you ask?
8    A. He said there was one uniformed
9    state police officer.
10   Q. Did he say anybody else?
11   A. And I said, "If there are four
12   witness statements, they are lying."
13   Q. Did you know yet what was even in
14   the statements?
15   A. No.
16   Q. How did you know they were lying?
17   A. If they said that I did something
18   deliberately, they had to be lying.
19   Q. Okay. Well, maybe we have to back
20   up. Did John Cronin tell you that the
21   witnesses said you had done something
22   deliberately?
23   A. That's what he insinuated.
24   Q. Is that what he said?


Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                         www.jackdanielreporting.com
         617.557.0039                        888.922.JACK                            FAX 617.557.0040

ABRAHAM PHILIP, M.D.    07/21/05

48 (Pages 189 to 192)

Page 189

1    A.  That's what he insinuated.
2    Q.  Well, when you say insinuate, what
3    were the words that he used that led you
4    to believe that he was saying that you did
5    something deliberately?
6    A.  I exposed -- I signed a death
7    certificate and exposed a technician to
8    blood products.
9    Q.  Are there any policies and
10   procedures in the Medical Examiner's Office
11   about exposing people not wearing
12   protective clothing to blood products?
13   A.  If there is, I have not been given
14   that.
15   Q.  Is it a matter of good practice as
16   a pathologist not to expose people not
17   wearing protective clothing to blood
18   products?
19   A.  (Witness gestured).
20   Q.  You have no opinion?
21   A.  No.
22   Q.  No, you don't have an opinion or --
23   A.  I'm not going to answer that
24   question.

Page 190

1    Q.  Why not?
2    A.  I explained it to you.  I didn't
3    tell her to pick that up.  I was
4    concentrating on a homicide autopsy.  She
5    came in, did something, went out.  What am
6    I supposed to do?
7    Q.  I'm asking you, Doctor, not even in
8    connection with this case.  Just as a
9    matter --
10   A.  What am I supposed to do at that
11   point?
12   Q.  As a matter of being a forensic
13   pathologist, is it your understanding that
14   generally speaking forensic pathologists
15   take pains to avoid having people handle
16   blood products unless they're wear
17   protective clothing?
18   A.  Could I --
19       MR. SHARP:  Objection.
20   Answer it if you can.
21   A.  It was the technician's
22   responsibility to wear protective clothing.
23   I don't have to teach her that, she's a
24   technical supervisor.

Page 191

1    Q.  So John Cronin told you in this
2    meeting that you had signed a death
3    certificate and had exposed someone to
4    blood products.
5    A.  Correct.
6    Q.  Okay.  Did he say anything else
7    about how that had occurred?
8    A.  No.
9    Q.  And he told you that four people
10   had signed witness statements to that
11   effect?
12   A.  Yes.
13   Q.  And you said if there are four
14   witnesses, they're lying.
15   A.  Correct.
16   Q.  What else did you say, if anything?
17       A.  He said, "I resent your response,"
18   and he gave me the letter of suspension.
19   Q.  What response was it of yours that
20   he resented?
21   A.  That they were lying.  And I got up
22   to leave the meeting.
23   Q.  I'm sorry?
24   A.  And I got up to leave the meeting.

Page 192

1    Q.  And left or --
2    A.  No.
3    Q.  -- did something else happen?
4    A.  Then he gave me the letter.
5    Q.  And you're now talking about the
6    letter about the one-day suspension?
7    A.  Correct.
8    Q.  And did Edith Platt say anything
9    during this meeting?
10   A.  No.
11       MS. KELLEY:  Could we have
12   this marked as the next exhibit?
13       (Exhibit-24, February 25,
14   2004, Memorandum Bates Stamped AGO-0024,
15   marked for identification).
16       BY MS. KELLEY:
17   Q.  Doctor, do you have in front of you
18   what's been marked as Exhibit Number 24 to
19   this deposition?
20   A.  (Witness viewing document).  Yes, I
21   do.
22   Q.  Is that a copy of the suspension
23   letter that you received in your meeting
24   with John Cronin on February 25th, 2004?

ꭎack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE    141 Portland Street , Boston, MA 02114    EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                      888.922.JACK                          FAX 617.557.0040

Page 193

1     A.  That's correct.
2     Q.  The last sentence of this document
3  says, "Any future occurrence of
4  unprofessional or unacceptable behavior
5  will result in immediate termination of
6  your contracted services pursuant to the
7  terms and conditions of the contract you
8  have endorsed with this office."  Did I
9  read that correctly?
10    A.  (Witness viewing document).  Yes.
11    Q.  As of February 25th, 2004, did you
12 understand that any further conduct which
13 the office deemed to be unprofessional
14 might subject you to a termination of your
15 contract?
16    A.  Yes.
17    Q.  And you also understood, as of
18 February 25th, that you were going to be
19 serving one suspended day?
20    A.  That's correct.
21    Q.  On March 4th?
22    A.  That's correct.
23    Q.  Did you have any discussion with
24 John Cronin about why the day of

Page 194

1  suspension was going to be March 4th?
2     A.  No, I didn't.
3     Q.  That was just the date that was in
4  the letter that he provided to you?
5     A.  Yes.
6     Q.  What did you do after that meeting?
7     A.  I went back to my office and
8  continued with whatever work I was doing
9  and left later that day.
10    Q.  After that meeting, did you have
11 any discussions with anybody about the
12 occurrences of February 13th?
13    A.  Yes, I did.
14    Q.  Who did you talk to?
15    A.  William Zane.
16    Q.  Did you talk to him on the 25th?
17    A.  One of those days after that.
18    Q.  And what did you say to Doctor Zane
19 and what did he say to you?
20       A.  He said, they treated us as if --
21 they treat this place as if it's a police
22 academy.
23    Q.  What did he mean by that?
24    A.  That --

Page 195

1        MR. SHARP:  Objection.
2     BY MS. KELLEY:
3     Q.  What was your understanding of what
4  he meant by that?
5     A.  That we were being treated as
6  recruits at a police academy.
7     Q.  Did Doctor Zane say anything about
8  the fact that someone had been exposed to
9  blood products?
10    A.  No.
11    Q.  Did you tell him your version of
12 events?
13    A.  Yes.
14    Q.  Did you say that John Cronin and
15 others were saying that something different
16 happened?
17    A.  I just gave him my version.
18    Q.  Did Doctor Zane indicate to you
19 that he had heard any other information
20 about that incident from anybody else?
21    A.  No.  But he commented that there
22 were twice the number of police officers
23 to medical examiners in the office.
24    Q.  Since that incident, you mean?

Page 196

1     A.  There always has been twice the
2  number of police officers compared to
3  medical examiners in the office.
4     Q.  I think you had testified
5  previously at some point you retained
6  Attorney Sharp's law firm after this
7  meeting of February 25th; is that correct?
8     A.  That's correct.
9     Q.  Do you know what day you retained
10 them?
11    A.  I called Elaine Sharp later that
12 day on my way home.
13    Q.  Had you ever had any prior dealings
14 with Elaine Sharp?
15       MR. SHARP:  Objection.
16    A.  I did tell you that I had some
17 dealing with her in mid October.
18    Q.  Okay.  Other than Elaine Sharp or
19 anybody from her law office, did you have
20 any discussions about the incident of
21 February 13th with anybody else other than
22 Doctor Zane after the Cronin meeting?
23    A.  No.
24    Q.  Now, at around that same time, were


Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114     EXPERIENCE YOU CAN TRUST
        617.557.0039                         www.jackdanielreporting.com
                                            888.922.JACK                      FAX 617.557.0040

50 (Pages 197 to 200)

Page 197

1    you involved with the autopsy of a
2    particular child who had been killed?
3    A.   I was working on the -- It was
4    much earlier, I believe in January, that I
5    performed the autopsy on the child.
6    Q.   Okay. And for purpose -- And this
7    was a case that you were working on with
8    a particular district attorney, Louis
9    Armistead?
10   A.   Correct.
11   Q.   Is that correct?
12        MS. KELLEY: A-R-M-I
13   -S-T-E-A-D.
14        And I guess for purposes of this,
15   can we refer to this as the -- I don't
16   know, what case?
17        Let's just call this the Patient Y
18   case. Is that agreeable just for purposes
19   of this deposition?
20        MR. SHARP: How about the
21   child case?
22        MS. KELLEY: The child case?
23        MR. SHARP: Yeah.
24        MS. KELLEY: Okay. We'll

Page 198

1    call it the child case. Can you mark this
2    as the next exhibit, these three pages,
3    please?
4        (Exhibit-25, Series of
5    E-mails Bates Stamped AGO-0691 through
6    AGO-0693, marked for identification).
7        BY MS. KELLEY:
8    Q.   Doctor, we've now put in front of
9    you what's been marked Exhibit 25 to this
10   deposition. Do you have that?
11   A.   (Witness viewing document). Yeah.
12   Q.   And just generally these three
13   pages are a series of e-mails; is that
14   fair to say?
15   A.   (Witness viewing document). Yes.
16   Q.   Okay. Now, with respect to the
17   first page of Exhibit Number 25, down at
18   the bottom of that page there's a message
19   from Louis Armistead to you dated February
20   29th, 2004; is that correct?
21   A.   (Witness viewing document). Yes.
22   Q.   And that's with respect to the
23   child case that we're now talking about?
24   A.   Correct.

Page 199

1    Q.   You had done the autopsy some
2    period of time before this; is that
3    correct?
4    A.   Yes.
5    Q.   But it was still a live case at
6    the DA's office.
7    A.   Yes.
8    Q.   Was this a homicide case?
9    A.   Yes.
10   Q.   Or a potential homicide?
11   A.   It was a homicide.
12   Q.   Were you working extensively with
13   Attorney Armistead on the case?
14   A.   He was the DA -- Assistant DA
15   assigned to the case.
16   Q.   Had you worked with him very much
17   on this particular case?
18   A.   I was called initially to testify
19   to grand jury on this case.
20   Q.   When was that?
21   A.   I don't recall the dates, but that
22   information should be available in the
23   files.
24   Q.   Now, on March 1st, 2004, you

Page 200

1    responded to his e-mail; is that correct?
2    A.   March 1st, yes.
3    Q.   And your response is at the top of
4    the first page of Exhibit 25; is that
5    correct?
6    A.   (Witness viewing document). Yes.
7    Q.   Now, the -- In your e-mail to Louis
8    Armistead, the second paragraph of that
9    e-mail, you state, "There are some other
10   very bizarre events going on in the office
11   with weird accusations being leveled
12   against me." Do you see that?
13   A.   (Witness viewing document).
14   Correct.
15   Q.   "So when you arrange with Jackie
16   Faherty to hand over the file to me,
17   please insist that a witness be present in
18   the room to prevent weird charges of
19   having urinated on the chart or farted
20   while working on the chart being leveled
21   against me by the head honcho who runs
22   this agency." Did I read that correctly?
23   A.   (Witness viewing document). Yes.
24   Q.   What was your purpose in making

**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                   www.jackdanielreporting.com
617.557.0039                       888.922.JACK                                   FAX 617.557.0040

Page 201

1    these comments to Louis Armistead?
2    A.  I was trying to get -- recruit
3    another person to be a witness while I was
4    working on the -- on the case.
5    Q.  Why?
6    A.  My request to having a witness be
7    present while I was working on the case
8    was denied previously.
9    Q.  So you had -- Before you even wrote
10   this e-mail, you had requested a witness
11   to be involved with the child case?
12   A.  Yes.
13   Q.  Who had made that request of?
14   A.  Somebody came and asked me that I
15   need to finish the report because there
16   was a DA asking for it.  And I said I
17   will if there's a witness while I'm
18   working in the case.
19   Q.  Who had asked you to finish the
20   report?
21   A.  I don't recall.
22   Q.  Why did you feel you needed a
23   witness to watch you finish the report?
24   A.  Because the climate that was at

Page 202

1    work -- the climate that was enforced at
2    the workplace.
3    Q.  Other than the incident with the
4    death certificate which we've already
5    discussed, had you ever been accused of
6    doing anything else with respect to
7    autopsy reports or death certificates that
8    would require a witness to be present to
9    protect you?
10   A.  No.
11   Q.  Did you have any honest belief that
12   anyone was going to accuse you of
13   urinating on a chart or farting while
14   working on a chart when you wrote this
15   letter to Louis Armistead?
16   A.  At that point, I did believe
17   anything was possible.
18   Q.  And who did you think was going to
19   make these accusations against you?
20   A.  Same person who accused me of
21   exposing a person to blood products.
22   Q.  John Cronin?
23   A.  (Witness gestured).
24   Q.  Is that who you're talking about?

Page 203

1    A.  Yes.
2    Q.  What about the four witnesses who
3    all accused you of the same thing?
4    A.  Them, too.
5    Q.  So John Cronin, Deirdre Ward,
6    Kathleen Taylor, Leslie Ward and Sergeant
7    L'Italien all were people who might
8    wrongly accuse you of bizarre things?
9    A.  No.
10        MR. SHARP:  Objection.
11   Answer, if you can.
12   A.  All of them could be orchestrated
13   to make an accusation that I was doing
14   bizarre things like the previous episode
15   had been orchestrated.
16   Q.  Is it your belief that John Cronin
17   orchestrated the witness testimony of those
18   four witnesses?
19   A.  Yes.
20   Q.  And encouraged them to lie about
21   you?
22   A.  Yes.
23   Q.  And what do you base that on?
24   A.  Because all my suggestions were to

Page 204

1    improve working at the office were being
2    prevented.  I was being prevented from
3    helping make changes in the office, and
4    then there was this accusation that I put
5    blood products on the death certificate
6    and exposed somebody to it.
7    Q.  And you think that these people
8    would all -- including a state police
9    officer would all lie because John Cronin
10   asked them to?
11   A.  Well, I didn't have their
12   statements so I couldn't make judgments
13   about them.  But it looked like they had
14   been orchestrated to produce statements
15   accusing me from the information that I
16   had to go on.
17   Q.  You've now seen the statements; is
18   that correct?
19   A.  Yes.
20   Q.  Do you still belief that all four
21   of those witnesses are lying?
22   A.  The --
23        MR. SHARP:  Objection.
24   Answer, if you can.



Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE    141 Portland Street . Boston, MA 02114    EXPERIENCE YOU CAN TRUST
                            www.jackdanielreporting.com
617.557.0039                888.922.JACK                      FAX 617.557.0040

Page 205

1    A.  The witness statements don't make
2    -- don't shed light on the situation of
3    being exposed to blood products.
4    Q.  Well, you're aware that the witness
5    statements are inconsistent with your
6    version of events in a number of
7    significant ways; is that fair to say?
8        MR. SHARP: Objection.
9    A.  They are inconsistent within
10   themselves.  They are contradicting each
11   other in those statements.
12   Q.  Don't they all consistently
13   indicate that you handed the death
14   certificate to someone or that you put it
15   through the door?
16   A.  They don't consistently do that.
17   Q.  So I guess my question is, now that
18   you've read the death certificate -- the
19   witness statements, is it your impression
20   that John Cronin encouraged all those
21   people to lie or is it your impression
22   that those people are telling inconsistent
23   stories?
24   A.  It's my contention that John Cronin

Page 206

1    conveyed to me incorrect information about
2    their statements.
3    Q.  So you no longer think that they
4    were lying?
5    A.  No.
6    Q.  Is that correct?
7    A.  What is correct?
8    Q.  Do you -- At this time, having seen
9    the witness statements, do you believe
10   that those witnesses were all lying?
11   A.  I don't believe they were lying.
12   Q.  Did you have any understanding when
13   you wrote this e-mail that's the first
14   page of Exhibit Number 25 to Louis
15   Armistead, that this was something that
16   could conceivably come out in discovery to
17   attorneys in the criminal case?
18   A.  I did think it could be possible.
19   Q.  Okay.  You understand that your
20   communications with the DA's office may
21   sometimes be made available in open court;
22   is that fair to say?
23   A.  Yes.
24   Q.  So knowing that, did you think that

Page 207

1    this was a professional way to conduct
2    yourself, including this information in the
3    second paragraph of your March 1st, 2004,
4    e-mail?
5    A.  I didn't.
6    Q.  Didn't what?
7    A.  Think it was unprofessional.
8    Q.  Didn't think it was unprofessional?
9    A.  Yes.
10   Q.  So you thought it was professional
11   to make those comments; is that correct?
12   A.  You're saying the same thing,
13   double negative or positive.
14   Q.  Okay.  So is that correct that it
15   was a professional thing to do to make
16   those comments?
17   A.  It's not a reflection of
18   professional competence.  It's got nothing
19   to do with the professional work that I'm
20   doing.
21   Q.  How about professional judgment?
22   A.  I don't see --
23       MR. SHARP: Objection.
24   A.  -- it as an issue.

Page 208

1    Q.  Well, that's what I want to know,
2    Doctor.  Do you believe that this -- these
3    comments that you made in your March 1st,
4    2004, e-mail to Louis Armistead evidence
5    professional -- good professional judgment
6    on your part?
7    A.  It is no reflection of my
8    competence -- professional competence to do
9    an autopsy or testify about it in court.
10   Q.  The fact that you made these
11   comments to Louis Armistead in a document
12   that you knew could come out in discovery,
13   do you consider that these comments
14   reflect good and appropriate professional
15   judgment on your part?
16   A.  I didn't think this would have any
17   bearing in the case so it didn't matter --
18   it was not any expression of my
19   professional competence.
20   Q.  Okay.  But I haven't been asking
21   you about your competence, have I, Doctor?
22   A.  Or my professional behavior.
23   Q.  Oh.  So you don't think it in any
24   way reflects on your professional behavior



Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                              888.922.JACK                              FAX 617.557.0040

Page 209

1   either --
2   A. Yes.
3   Q. -- is that correct? That's
4   correct?
5   A. Yes.
6   Q. And you understand that John Cronin
7   and others at the Medical Examiner's
8   Office disagreed with you on that.
9       MR. SHARP: Objection.
10  Answer it, if you know what they thought.
11  A. These are kinds of comments that
12  John Cronin and some others in the office
13  frequently make. It's not my style of
14  language. I was just copying them in this
15  e-mail.
16  Q. Did they make those comments to DAs
17  in open criminal cases?
18  A. I don't know who they made the
19  comments to, but they made these comments
20  in front of me.
21  Q. Once you sent this e-mail to Louis
22  Armistead, did he respond to it?
23  A. I think he called me on the phone.
24  Q. What did he say?

Page 210

1   A. He said, " Boy, your workplace is
2   much more bizarre than ours."
3   Q. Did he say anything else?
4   A. He said he'd try and speak to
5   Jackie Faherty and see that the case was
6   completed expeditiously.
7   Q. Did he say he was going to try to
8   get you a witness who would sit with you
9   the whole time?
10  A. He didn't say that, but he was
11  going to try and generate cooperation for
12  me to finish the certificate -- the
13  autopsy report.
14  Q. Other than asking for a witness,
15  were you indicating that there was a lack
16  of cooperation that was hindering your
17  ability to finish the autopsy?
18  A. No, it was the witness issue.
19  Q. So it was your understanding that
20  Louis Armistead intended to work it out so
21  that you would have a witness?
22  A. Yes.
23  Q. What was the next thing that you
24  heard or learned about this incident?

Page 211

1   A. Someone left a copy of the medical
2   records on my chair while I was doing
3   another autopsy or was downstairs in the
4   autopsy room doing something.
5   Q. And I take it you needed those
6   records in order to complete your report.
7   A. Correct.
8   Q. Were you upset because someone had
9   left a copy of the file on your chair?
10  A. Yes.
11  Q. Why?
12  A. Because I'd been searching for
13  these records for the last four days, and
14  when I wanted to work on the records I
15  wanted a witness and that was not
16  forthcoming.
17  Q. How had you been searching for the
18  records? What did you do to search for
19  them?
20  A. The records are stored in a
21  specific area in the office. And anybody
22  who takes a medical record out from that
23  area is supposed to fill out a card which
24  indicates who is the person taking the

Page 212

1   records, and there was no indication who
2   had taken the records.
3       I kept asking several people, and
4   then I was told that initially it was in
5   Lieutenant Platt's office for four days
6   and then Jackie Faherty's office for three
7   days.
8   Q. Now, there is, on the second page
9   of Exhibit 25, an e-mail from Jackie
10  Faherty to you dated March 2nd, 2004. Do
11  you see that?
12  A. (Witness viewing document). Yes.
13  Q. And she tells you that she left the
14  folder on your chair --
15  A. Correct.
16  Q. -- with respect to this case; is
17  that correct?
18  A. Yes.
19  Q. Did you see the e-mail at around
20  the same time that you saw the file on
21  your chair?
22  A. Yes.
23  Q. Okay. But you were still upset
24  that she had left it there; is that

𝒥ack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                          888.922.JACK                          FAX 617.557.0040

Page 213

1    correct?
2    A. I was not upset. I said -- I made
3    a simple request for someone to come and
4    be in the room while I work on that
5    report.
6    Q. So you expected one of the
7    employees at the Medical Examiner's Office
8    was going to sit in a room with you the
9    whole time you worked on the report?
10    A. Not the whole time. I just needed
11    to verify a few things in the report.
12    The report was ready. As I said here, I
13    finalized the report on March 1st. I just
14    needed to verify that some of the other
15    documents were there and in place in the
16    medical records, there were no
17    inconsistencies, and I would have released
18    the report. It was for a short while
19    that I wanted someone in my office.
20    Q. You then respond to Jackie Faherty
21    with your own e-mail dated March 2nd; is
22    that correct?
23    A. Yes.
24        Q. Again, on the second page of

Page 214

1    Exhibit Number 25, you accuse someone of
2    sneaking in and leaving the files on your
3    chair; is that correct?
4    A. I'm only reporting that somebody
5    did that.
6    Q. Okay. Then you say, "In order to
7    avoid any contamination of the file, they
8    have been left out on the table in the
9    corridor 'til a witness can be arranged."
10    Is that correct?
11    A. (Witness viewing document).
12    Correct.
13    Q. So basically, you're saying you're
14    not going to work on the report, even
15    though you have the file materials,
16    because you don't have a witness sitting
17    next to you; is that correct?
18    A. Until a witness is provided, yes.
19    Q. So you're just going to leave the
20    report papers out in the hall until
21    somebody comes and acts as your witness?
22    A. On my secretary's table until
23    somebody comes in as a witness.
24    Q. Okay. Actually, looking at the

Page 215

1    bottom of that same page, Doctor, there's
2    an e-mail from Jackie Faherty to you dated
3    February 25th where she actually tells you
4    that the file is in her office, doesn't
5    she?
6    A. (Witness viewing document). Yes.
7    Q. So at least as of the 25th, instead
8    of looking for it everywhere, you knew it
9    was in Jackie Faherty's office; is that
10    fair to say?
11    A. Right. And she went on vacation
12    for four days.
13    Q. But you knew where it was. Rather
14    than looking all over creation for it, you
15    knew it was in her office; is that
16    correct?
17    A. Right. That's how I -- I knew she
18    had it.
19    Q. And then on the third page of
20    Exhibit Number 25, you e-mail Louis
21    Armistead and advise him that you have now
22    completed the autopsy report; is that
23    correct?
24    A. (Witness viewing document). Yes.

Page 216

1    Q. Now, Doctor, as we said, this first
2    page of Exhibit Number 25, you receive an
3    e-mail from Louis Armistead on February
4    29th and you e-mail him on March 1st; is
5    that correct?
6    A. Yes.
7    Q. Now, also on March 1st, did you
8    prepare two letters to be sent to Governor
9    Romney?
10    A. Yes.
11        MS. KELLEY: Could we have
12    these marked as the next two exhibits,
13    please?
14        (Exhibit-26, March 1, 2004,
15    Letter Bates Stamped AGO-0002 through
16    AGO-0007; Exhibit-27, March 1, 2004, Letter
17    Bates Stamped AGO-0014 through AGO-0018,
18    marked for identification).
19        BY MS. KELLEY:
20    Q. Okay, Doctor. First of all, the
21    document that's in front of you that's
22    been marked as Exhibit 26, do you have
23    that?
24    A. (Witness viewing document). Yes.

**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE    141 Portland Street , Boston, MA 02114    EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039    888.922.JACK    FAX 617.557.0040

Page 217

1    Q.  And that's a letter to Governor
2    Romney from you dated March 1st, 2004; is
3    that correct?
4    A.  (Witness viewing document).  Yes.
5    Q.  And it's Re problems at the Office
6    of the Chief Medical Examiner?
7    A.  Yes.
8    Q.  And the first page of that document
9    is a fax cover sheet; is that correct?
10   A.  (Witness viewing document).
11   Correct.
12   Q.  Now, with respect to Exhibit Number
13   26, when did you actually prepare this
14   letter?
15   A.  Between the 25th of February and
16   1st of March, over several days.
17   Q.  Why did you prepare it?
18   A.  Because I felt that the situation
19   in the Medical Examiner's Office was not
20   improving.  Despite several public
21   announcements to that and despite several
22   changes in administrators, things were only
23   getting worse and I felt it was time to
24   go public.

Page 218

1    Q.  Did your drafting of this letter
2    have anything to do with the fact that you
3    had just been suspended from your job for
4    a day?
5    A.  No.  Several parts of this letter
6    was written actually in July 2001 when I
7    left the Medical Examiner's Office itself.
8    Q.  But you didn't finish the letter
9    and send it until March 1st of 2004,
10   right?
11   A.  Yes.  I was initially working on a
12   book form of the issues, and then we
13   decided that it would be -- we would make
14   one more attempt at getting attention by
15   informing the Governor.
16   Q.  I'm sorry.  When did you say you
17   had written part of this letter?
18   A.  Before leaving for New York.
19   Q.  In what year?
20   A.  2002.  July 2002.
21   Q.  Well, you left for New York in
22   2001; is that correct?
23   A.  2000 to 2001 -- 2002, June.
24   Q.  Oh, okay.  And was -- I take it

Page 219

1    from your testimony it was your belief
2    that these problems at the Medical
3    Examiner's Office needed to be brought to
4    the public's attention.
5    A.  Correct.
6    Q.  But you chose not to bring it to
7    the public's attention in June of 2002
8    when you had written a lot of this letter;
9    is that right?
10   A.  Yes.
11   Q.  And that was because you were
12   planning to write a book?
13   A.  No.  I felt the added news stories
14   were not having any effect, so unless it
15   came out in a book form there would be no
16   impact.
17   Q.  And what did you believe -- Strike
18   that.
19       What impact were you looking to
20   achieve by bringing these problems at the
21   Medical Examiner's Office to light?
22   A.  A drastic change in the way it
23   functioned, funded and was led.
24   Q.  And you felt that if the Governor

Page 220

1    were made aware of the problems, he would
2    take that drastic action?
3    A.  I hoped, prayed.
4    Q.  Now, do you still have in front of
5    you what was marked Exhibit Number 12 in
6    this case?
7    A.  (Witness viewing document).  Yes.
8    Q.  Okay.  Now, that's the document
9    that you said was provided to you in
10   approximately May or June of 2002 --
11   A.  Correct.
12   Q.  -- and that you understood to be a
13   document that was created for the express
14   purpose of providing the Governor with
15   information about things that were wrong
16   at the Medical Examiner's Office that
17   needed to be fixed?
18   A.  Correct.
19   Q.  Do you consider the letter that you
20   wrote on March 1st of 2004, and that's
21   been marked as Exhibit Number 26, is
22   giving the Governor new information over
23   and above what's contained in Exhibit
24   Number 12?



Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                         www.jackdanielreporting.com
617.557.0039                                    888.922.JACK                              FAX 617.557.0040

Page 221

1    A.  There are several items in the
2    letter that does give new information,
3    several other items that highlight how
4    much has deteriorated since the needs
5    assessment report.
6    Q.  Okay.  And you had a reasonable
7    belief in 2004 that if the Governor were
8    aware of the continued deterioration of
9    some of these items, that that would cause
10   a drastic change to be made on his part
11   even though the Exhibit Number 12 hadn't
12   caused that drastic change to be made?
13       MR. SHARP:  Objection.  Go
14   ahead.
15   A.  Again, I hoped and prayed he would
16   make the changes because the good people
17   of Massachusetts deserved better and they
18   were not getting it.
19   Q.  Okay.  Now, this letter that you
20   wrote on -- that's been marked Exhibit
21   Number 26, did you give it to your
22   attorneys?
23   A.  I worked with them on producing the
24   letter.

Page 222

1    Q.  Oh, so they helped you write it?
2    A.  They helped me send it out.
3    Q.  Did they help you write it?
4        MR. SHARP:  Objection. Don't
5    answer.
6        BY MS. KELLEY:
7    Q.  I believe you've already testified
8    they did; is that correct?
9        MR. SHARP:  Objection. Don't
10   answer.
11       BY MS. KELLEY:
12   Q.  Did you have any reason that you
13   specifically wanted that letter to get out
14   on March 1st as opposed to waiting a
15   couple of days or a week?
16   A.  No specific reason.  It had to get
17   out, that's all.
18   Q.  Did you have any reason to want the
19   letter to be sent by fax to John Cronin
20   on March 1st?
21   A.  I wanted him to be kept informed.
22   Q.  If you had put it in the regular
23   mail he would have been kept informed; is
24   that fair to say?

Page 223

1    A.  No.  It might have taken -- It
2    might have got lost in the mail.  It
3    might have taken a long time to get there.
4    Q.  So one of the things you yourself
5    wanted was that he be -- this letter be
6    faxed to him on that day to make sure he
7    got it?
8    A.  That was the strategy we adopted.
9    Q.  Okay.  I'm saying that's what you
10   wanted.  You wanted the letter faxed to
11   John Cronin that day to make sure he got
12   it right away.
13   A.  Faxed to John Cronin at the same
14   time we faxed it to the Governor and chief
15   of state police.
16   Q.  And I think you used the word
17   "strategy."  That was the strategy that you
18   had for getting this letter out; is that
19   accurate?
20   A.  Correct.
21   Q.  Now, what's been marked as Exhibit
22   Number 27, that's a -- yet another letter
23   that you wrote to the Governor dated March
24   1st; is that correct?

Page 224

1    A.  (Witness viewing document).  Yes.
2    Q.  And that one is about organ
3    donations; is that correct?
4    A.  (Witness viewing document).
5    Correct.
6    Q.  I believe you've already testified
7    today that you created that document right
8    around March 2nd; is that right?
9    A.  March 1st or 2nd, towards the end
10   of February.
11   Q.  Okay.  I believe you've testified
12   earlier today with respect to the
13   memorandum attached to that letter, that
14   you created that memorandum right around
15   March 2, 2004; is that correct?
16       A.  If I did precisely mention a date,
17   and I'm not sure about that, it was around
18   that time period, not -- I cannot be sure
19   about the exact date when I prepared it.
20   Q.  I think earlier, Doctor, you had
21   mentioned March 2nd because there was an
22   e-mail attached to it that was dated March
23   2nd and you were forwarding that memo
24   around the office.



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
       617.557.0039                       888.922.JACK                              FAX 617.557.0040

Page 225

1    A.  Yes -- No, this document was
2  prepared prior to that.  And the e-mail
3  was sent out on the 2nd, once I had
4  discussed it with my attorneys that it was
5  proper to send out at that point.
6    Q.  So the document attached to Exhibit
7  Number 27 saying "Memorandum, the strange
8  death of blank --
9    A.  Yes.
10   Q.  -- that may have been produced
11  March 1st; is that correct?
12   A.  May have been.
13   Q.  Around March 1st?
14   A.  Yes.
15   Q.  And again, was it important to you
16  that this document be faxed to John Cronin
17  right away?
18   A.  We sent faxes to all the people we
19  send the document to.
20   Q.  Why was that?
21   A.  Send faxes.  No specific reason.
22   Q.  Okay.  Do you do that in your
23  normal life, send a fax to everybody that
24  you send a letter to?

Page 226

1    A.  Frequently, yes.
2    Q.  To make sure that it doesn't get
3  lost in the mail?
4    A.  If they have a fax, yes.
5    Q.  Okay.  Now, this document, why did
6  you feel it was necessary to get this out
7  to Governor Romney right away on March
8  1st, 2004?
9    A.  Again, another example of problems
10  at the Medical Examiner's Office with the
11  New England Organ Bank, the conflict with
12  that agency and the lack of people willing
13  to discuss problematic issues at the
14  office.
15   Q.  And you were basically hoping that
16  a drastic change would be undertaken by
17  the Governor if he learned this from you
18  on March 1st, 2004.
19   A.  Yes.
20   Q.  Were you aware that these letters
21  were also sent by certified mail?
22     A.  Yes.
23   Q.  Was there -- So that would take
24  care of any problems about the letters

Page 227

1  getting lost; is that fair to say?
2    A.  Yes.
3    Q.  But you still felt it was important
4  that the faxes go out.
5    A.  Correct.
6    Q.  And what was the reason for that?
7    A.  Just dual ways of sending it out.
8    Q.  Excuse me?
9    A.  Dual ways of sending it out.
10   Q.  Now, around the time that these
11  e-mails were going back and forth, Doctor,
12  the ones that have been marked as Exhibit
13  Number 25 --
14   A.  Yes.
15   Q.  -- other than the e-mails
16  themselves, did you have discussions with
17  anybody in the office about what was going
18  on with respect to the baby case that you
19  were working on?
20   A.  No.
21   Q.  Well, at some point, did you have a
22  conversation with John Cronin about
23  completing the autopsy report?
24     A.  John Cronin stormed into my office

Page 228

1  when I was doing something, threw the
2  chart on my table and said, "Finish the
3  report.  Enough is enough."  And walked
4  out.
5    Q.  When did that happen?
6    A.  I believe it was on the evening of
7  the 2nd.
8    Q.  And how do you tie that into a
9  time frame?
10   A.  Sometime after normal office hours.
11   Q.  I mean what makes you think it was
12  on the 2nd as opposed to the 1st or the
13  3rd or any other date?
14   A.  Because I remember the sequence of
15  events that happened.
16   Q.  Well, can you describe that
17  sequence of events?
18   A.  I completed the report the next
19  day, after waiting for a witness to come
20  up on the 2nd and help me finish the
21  report earlier.  So it had to be on the
22  evening of the 2nd.
23   Q.  Okay.  So the evening of the 2nd,
24  John Cronin storms into your office.  By

Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street - Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                      888.922.JACK                                   FAX 617.557.0040

ABRAHAM PHILIP, M.D.    07/21/05

58 (Pages 229 to 232)

Page 229

1  this time you've already got the file that
2  you need to complete the autopsy report;
3  is that correct?
4    A.  He brought it with him.
5    Q.  I thought you said it was left on
6  your chair.
7    A.  It was, and I placed it outside on
8  what used to be my secretary's table.
9    Q.  Oh, okay.  So he picked it up off
10  your secretary's table and brought it into
11  your office.
12    A.  From somewhere.  I don't know.
13    Q.  Would you say that John Cronin was
14  angry with you about not completing the
15  autopsy report?
16        MR. SHARP:  Objection.
17    A.  I'm not reading his mind.
18    Q.  Did he appear to you to be angry?
19    A.  He appeared to use very threatening
20  body language.
21    Q.  Well, you've already said he
22  stormed into your office; is that correct?
23    A.  That's correct.
24    Q.  Is it fair to say that by that

Page 230

1  time the relationship between you and John
2  Cronin had deteriorated?
3    A.  Yes.
4    Q.  Is it fair to say that he used
5  threatening body language, foul language
6  and threw the charts on your table?
7    A.  Yes.
8    Q.  So it's fair to say that you
9  understood he was angry with you about
10  those charts.  Is that fair to say?
11        MR. SHARP:  Objection.  Do
12  you know what he was angry at you about?
13        BY MS. KELLEY:
14    Q.  Is it fair to say that he was
15  angry with you about not having completed
16  the autopsy report, Doctor?
17        MR. SHARP:  Objection.  Do
18  you know what he was angry about?
19        THE WITNESS:  No, I don't.
20        BY MS. KELLEY:
21    Q.  Did he tell you he was angry about
22  your not having completed the autopsy
23  report?
24    A.  He told me he wanted me to finish

Page 231

1  the autopsy report and threw things on my
2  desk.
3    Q.  But it's your testimony that you
4  really have no idea whether that's what he
5  was mad at you about?
6    A.  I'm not interpreting his mental
7  thought processes at that time.
8    Q.  Okay.  Now, after that meeting with
9  John Cronin where he came in and threw the
10  files on your desk, did you have any
11  further discussion with him about the
12  child case that we've been discussing?
13    A.  No, I didn't.
14    Q.  Did you have any further discussion
15  with Jackie Faherty about it?
16    A.  No, I didn't.
17    Q.  What's the next thing that
18  happened, Doctor, with respect to your
19  employment at the Medical Examiner's
20  Office?
21    A.  The next morning was a -- one of
22  those rare light days at the office where
23  there wasn't much -- many cases.  I did
24  paperwork the whole morning.  And in the

Page 232

1  afternoon I was leaving to do cremations,
2  as it was my turn to do that, and I was
3  told I could not go for cremations.
4    Q.  Who told you that?
5    A.  John Cronin.
6    Q.  Did he say why?
7    A.  No.
8    Q.  He just said you couldn't go?
9    A.  Yes.
10    Q.  Did he say anything else, any other
11  words in his conversation when he talked
12  to you?
13    A.  He asked me to return the office
14  car keys.
15    Q.  Did he say why?
16    A.  No.
17    Q.  Why did you have office car keys?
18    A.  We went for cremation rounds with
19  office car keys -- with the office car,
20  the Jeep.
21    Q.  Was that the only purpose that you
22  used the office car keys for?
23    A.  Yes.
24    Q.  Did he say anything else in this



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street · Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                      888.922.JACK                              FAX 617.557.0040

ABRAHAM PHILIP, M.D.   07/21/05

59 (Pages 233 to 236)

Page 233

1    conversation?
2    A.  He asked me to come up to his
3    office to discuss something.
4    Q.  And what happened next?
5    A.  I told him he would have to set it
6    up with my attorneys.
7    Q.  You weren't even willing to talk to
8    your boss without having your attorneys
9    talk to him?
10   A.  That's correct.
11   Q.  Did you consider you were already
12   fired?
13       A.  No.
14   Q.  And what was the basis for your
15   saying to talk to your attorneys?
16   A.  Because matters had deteriorated so
17   much that I felt the attorneys needed to
18   be present.
19   Q.  How did John Cronin respond to
20   that?
21   A.  Snorted.
22   Q.  Excuse me?
23   A.  He snorted.
24   Q.  Did he say anything?

Page 234

1    A.  No.
2    Q.  Then did you leave?
3    A.  I went back to my office.
4    Q.  And?
5    A.  Did some more paperwork.
6    Q.  Did you call your attorneys?
7    A.  No.
8    Q.  What did you do next?
9    A.  Once I finished my eight hours of
10   work, I left the office and went home.
11   Q.  During that time, did anybody else
12   from the office try to make any kind of
13   contact with you?
14   A.  No.
15   Q.  Did you try to make contact with
16   anybody else at the office?
17   A.  No.
18   Q.  As of that time -- We're now
19   talking about March 3rd; is that correct?
20   A.  Yes.
21   Q.  As of March 3rd, did you consider
22   that basically you were going to be fired?
23   A.  I considered I was going to be
24   fired on March -- February 25th.

Page 235

1    Q.  As soon as you got that letter with
2    the one-day suspension?
3    A.  Yes. The letter, to me, appeared
4    as a setup.
5    Q.  So as of February 25th, you felt
6    you were already on pretty shaky ground at
7    the Medical Examiner's Office; is that
8    fair to say?
9    A.  Yes.
10   Q.  And that you might well be fired
11   within the next week or two.
12   A.  Yes.
13   Q.  What's the next thing that you
14   heard or learned about your employment
15   with the Medical Examiner's Office?
16   A.  I got a letter in the mail that my
17   contract had been terminated.
18   Q.  When did you receive that?
19   A.  On the 4th.
20   Q.  Did it come by regular mail?
21   A.  Certified mail, UPS or whatever,
22   one of those.
23   Q.  Some kind of special delivery?
24   A.  Yes.

Page 236

1    Q.  Did you have to sign for it?
2    A.  Yes.
3        MS. KELLEY:  Could I have
4    this marked as the next exhibit, please?
5        (Exhibit-28, March 3, 2004,
6    Letter Bates Stamped AGO-0026, marked for
7    identification.)
8        BY MS. KELLEY:
9    Q.  Doctor Philip, the document that's
10   been placed before you is Exhibit Number
11   28. Is that a copy of the letter that
12   you received on the 4th of March, 2004?
13   A.  (Witness viewing document).  Yes.
14   Q.  There's a reference in this
15   letter --
16       (Interruption).
17       MR. SHARP:  Excuse me.
18       MS. KELLEY:  That's all
19   right.
20       (Recess taken).
21       BY MS. KELLEY:
22   Q.  There's a reference in this letter
23   to communicating with Denise Sarro, the
24   human resources director about having

**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE          141 Portland Street . Boston, MA 02114          EXPERIENCE YOU CAN TRUST
                                  www.jackdanielreporting.com
617.557.0039                      888.922.JACK                          FAX 617.557.0040

ABRAHAM PHILIP, M.D.    07/21/05

60 (Pages 237 to 240)

Page 237

1  certain property returned; is that correct?
2  A. (Witness viewing document).
3  Correct.
4  Q. Did Denise Sarro call you on March
5  4th?
6  A. I think she did -- or she called
7  Elaine Sharp, not me.
8  Q. Well, do you recall -- Do you
9  recall having a conversation with --
10  A. No, I don't.
11  Q. -- Denise? As far as you know,
12  were you first informed of your
13  termination by this letter or through
14  Denise Sarro's phone conversations?
15  A. I was informed of my termination
16  through this letter.
17  Q. But you believe that Denise Sarro
18  spoke to your attorney?
19  A. I have no proof of that.
20  Q. Okay. At some point, did you
21  receive from Denise Sarro her cell phone
22  number and a request that you contact her
23  to make arrangements about retrieving your
24  personal belongings?

Page 238

1  A. I didn't.
2  Q. So again, if there were such a
3  message, you believe it was probably
4  through your attorneys?
5  A. Correct.
6  MS. KELLEY: Could we have
7  this marked as the next exhibit?
8  (Exhibit-29, Handwritten
9  Document Bates Stamped AGO-0042, marked for
10  identification).
11  BY MS. KELLEY:
12  Q. Doctor, the document that's been
13  put in front of you is Exhibit Number 29.
14  Can you identify what that document is?
15  A. (Witness viewing document). Yes.
16  Q. What is it?
17  A. (Witness viewing document). It's a
18  note I passed out to Sosha Hayes, who was
19  a technician, in the presence of the
20  Deputy Chief Medical Examiner, Joann
21  Richmond.
22  Q. And I'm sorry, who's the person you
23  gave it to?
24  A. Sosha Hayes.

Page 239

1  Q. How do spell --
2  A. S-O-S-H-A.
3  Q. -- her first name?
4  A. Hayes, H-A-Y-E-S.
5  Q. And she was a technician?
6  A. Correct.
7  Q. And you did this on March 3rd of
8  2004?
9  A. Yes.
10  Q. The morning or the afternoon?
11  A. Morning.
12  Q. And you did it in the presence of
13  whom?
14  A. Joann Richmond.
15  Q. And what was your purpose in giving
16  Sosha this document?
17  A. Just change the -- make a fashion
18  statement.
19  Q. Well, you're asking them to make a
20  fashion statement by wearing suspenders and
21  a bow tie or scarf allegedly to show their
22  support of you; is that right?
23  A. I just asked them for a fashion
24  statement.

Page 240

1  Q. Well, did you ask that this be
2  submitted to most of the personnel in the
3  Medical Examiner's Office?
4  A. Yes.
5  Q. And you're asking that the
6  personnel in the Medical Examiner's Office
7  wear a scarf -- or wear suspenders and a
8  bow tie or scarf to work on the next day;
9  is that correct?
10  A. No. It says wear it permanently,
11  improve the quality of the clothing.
12  Q. I'm sorry. I didn't understand
13  what you said.
14  A. Just improve the quality of the
15  uniforms that people wore.
16  Q. Okay. Well, you say at the
17  beginning, "As you will probably hear I am
18  in big trouble with the senior
19  administrators in our agency." Did you
20  say that?
21  A. That's a fact.
22  Q. "If you have any regards for the
23  good and bad times we have shared over the
24  last six months, please wear suspenders

Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE       141 Portland Street . Boston, MA 02114       EXPERIENCE YOU CAN TRUST
                               www.jackdanielreporting.com
617.557.0039                   888.922.JACK                            FAX 617.557.0040

ABRAHAM PHILIP, M.D.   07/21/05

61 (Pages 241 to 244)

Page 241

1    and a bow tie or scarf to work tomorrow."
2    Did I read that correctly?
3    A. (Witness viewing document). Yes.
4    Q. So you're asking them to wear these
5    clothes, not just to look better, but in
6    support of you somehow; is that correct?
7    A. I have not said that.
8    Q. You're denying that that's true?
9    A. I -- Yes, I did request them to
10   wear a bow tie -- I was already wearing a
11   bow tie at that point and I suggested that
12   other people should wear a bow tie.
13   Q. Is that tied into the fact that
14   you're having problems with the senior
15   administrators or is it completely
16   separate?
17   A. It is tied into that.
18   Q. So you're suggesting that other
19   people, if they want to support you, they
20   should dress like this.
21   A. Correct.
22   Q. As far as you know, was this handed
23   out to anybody at the office other than
24   the person you gave it to?

Page 242

1    A. I don't know.
2    Q. As far as you know, did anyone wear
3    suspenders and a bow tie or a scarf?
4    A. I don't know. I was not there to
5    check.
6    Q. Did you ever hear from anybody that
7    that happened?
8    A. No, I didn't.
9    MS. KELLEY: Can we take a
10   short break?
11   (Recess taken).
12   BY MS. KELLEY:
13   Q. Doctor, are you making a claim in
14   this case that you've suffered some sort
15   of physical harm as a result of the
16   conduct of the Commonwealth or the Medical
17   Examiner's Office?
18   A. Yes, I am.
19   Q. And what -- Can you describe the
20   nature of the physical harm you say you're
21   suffering from?
22   A. I suffered from symptoms of
23   anxiety, and for some time I had raising
24   of pulse and shortness of breath.

Page 243

1    Q. Approximately when did that occur?
2    A. July, August.
3    Q. Of 2004?
4    A. 2004, yeah.
5    Q. Is that over now?
6    A. Yes, it is.
7    Q. And what symptoms of anxiety did
8    you express?
9    A. I was extremely fearful of things
10   happening. I felt I was being watched or
11   monitored. I had some strange visitors.
12   Q. What strange visitors?
13   A. I had the wife of a Beverly police
14   officer come to my home and probe for
15   information.
16   And I felt that I was being watched
17   or observed, my movements were being
18   recorded. I had a strange person opening
19   the door of my car while I was at a
20   parking lot and I panicked thinking that
21   the person might be a state police officer
22   trying to get at me.
23   Q. When did these things happen?
24   A. The person opening my car was, I

Page 244

1    think, on the 1st of March. The lady
2    visiting was within a couple of months
3    after that.
4    Q. First of March, 2004?
5    A. Four, yes.
6    Q. So on March 1st, even before you
7    were terminated --
8    A. Correct.
9    Q. -- you were concerned that there
10   were people trying to get at you?
11   A. Yes.
12   Q. And the wife of the Beverly police
13   officer, what's his name or her name?
14   A. He is Lieutenant Ray. Her name is
15   Corrine Ray.
16   Q. W-R-A-Y?
17   A. R-A-Y.
18   Q. R-A-Y.
19   Since that period a couple months
20   after March of 2004, have anything -- have
21   any other things like that happened to you
22   where you were fearful?
23   A. No. Since then, I decided to cut
24   off everything and just focus on my boards

Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE      141 Portland Street . Boston, MA 02114      EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039                          888.922.JACK                              FAX 617.557.0040

ABRAHAM PHILIP, M.D.    07/21/05

62 (Pages 245 to 248)

Page 245

1    so it worked itself out.
2    Q.  Now, in response to our request for
3    production of documents, you indicated that
4    you would be willing to sign medical
5    releases.
6    A.  Yes.
7        MS. KELLEY:  So, Dan, I
8    take it off the record, after we're done,
9    we can work on getting some release
10   language.
11       MR. SHARP:  Yeah.
12       BY MS. KELLEY:
13   Q.  Now, also, Doctor, Philip, in
14   response to our request for production of
15   documents, we had requested certain
16   information about your tax returns for a
17   period of time, and you've objected to
18   anything prior to 2001 as being irrelevant
19   to this case.  Do you have an
20   understanding of that?
21   A.  Yes.
22   Q.  And what's the basis for saying
23   that anything prior to 2001 is not
24   relevant?

Page 246

1    A.  I don't see what role it plays in
2    this -- in this case.
3    Q.  As part of this case, are you
4    making a claim that your income is
5    diminished from what it should have been?
6    A.  Yes.
7    Q.  Can you quantify that at all in
8    terms of amounts?
9        THE WITNESS:  Do we have
10   that?
11       MR. SHARP:  Well, you can
12   start with 117,000.
13   A.  Yeah.  The contract -- the salary
14   portion that was unpaid.
15   Q.  How much was your whole contract
16   for the year?
17   A.  One hundred seventeen.
18   Q.  And you were paid for part of that
19   year, but not the rest of it.
20   A.  Six -- Six months.
21   Q.  So approximately half of the 117?
22   A.  Yes.
23   Q.  Are you making any claim that after
24   that contract year, your salary has been

Page 247

1    diminished on account of the conduct of
2    the Commonwealth?
3    A.  No.
4    Q.  So in terms of financial loss,
5    you're just claiming those six months, the
6    last part of your contract?
7    A.  Yes, plus lawyer fees and all that.
8    Q.  Okay.  Plus lawyers' fees and what
9    else?
10   A.  Whatever has been put in the
11   complaint.
12   Q.  Well, sitting here today, do you
13   know of any financial loss that you're
14   making claim for other than six months
15   under that contract and your attorneys'
16   fees?
17       THE WITNESS:  Do we have
18   the complaint?
19       MR. SHARP:  Well, can you
20   distinguish perhaps between economic
21   damages and medical --
22       MS. KELLEY:  Okay.
23       MR. SHARP:  -- that might
24   be going on here?

Page 248

1        BY MS. KELLEY:
2    Q.  I'll separate that out, Doctor,
3    because I think it's a fair question.
4        Separating out for the moment any
5    medical-related issues and just focusing on
6    financial damage that you allege you have
7    suffered, you allege you've suffered
8    attorneys' fees; is that correct?
9    A.  Yes.
10   Q.  And approximately half of the
11   contract year of your contract with the
12   Medical Examiner's Office; is that correct?
13   A.  Correct.
14   Q.  Are you alleging that your present
15   employment -- in your present employment,
16   you're making less money that you would
17   have had made but for the conduct of the
18   Commonwealth?
19   A.  Yes.
20   Q.  And how are you alleging that?
21   A.  Because I would be fully employed
22   over here.
23   Q.  Well, you --
24   A.  The contract would continue until

Jack Daniel
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE    141 Portland Street . Boston, MA 02114    EXPERIENCE YOU CAN TRUST
www.jackdanielreporting.com
617.557.0039    888.922.JACK    FAX 617.557.0040

Page 249

1 permanent employment was offered. The
2 problem with offering permanent employment
3 was the nonavailability of a chief medical
4 examiner. Now, there's a new chief
5 medical examiner and I was hopeful that I
6 would be a state employee at some point.
7    Q.  But you've now had some time to go
8 out and look for other jobs. Are you
9 saying that somehow you have been harmed
10 in your search for other employment as a
11 result of anything the Commonwealth did?
12    A.  Yes. It has been difficult getting
13 another job which means relocating my
14 family, my wife giving up her job and
15 having very tough economic decisions to
16 make.
17    Q.  Has your wife given up her job?
18    A.  No, she hasn't.
19    Q.  Now, going over to medical things,
20 are you alleging that you suffered some
21 financial loss on account of medical
22 things?
23    A.  Minor financial losses due to
24 medical things.

Page 250

1    Q.  And can you describe those?
2    A.  The same; anxiety and depression,
3 loss of consortium.
4    Q.  To the extent that you were
5 suffering from anxiety and depression, do
6 you know approximately how long that
7 lasted?
8    A.  'Til about October -- September,
9 October.
10    Q.  Of 2004?
11    A.  2004.
12    Q.  And what about loss of consortium?
13    A.  It's ongoing.
14    Q.  Can you describe what you mean by
15 that?
16    A.  Decreased libido, loss of interest
17 in sex.
18    Q.  And you're saying that that's
19 related to what happened between you and
20 the Commonwealth?
21    A.  Yes, because money has been --
22 we've had a tremendous shortage of money
23 which leads to bickering between a husband
24 and spouse.

Page 251

1    Q.  Is that the primary problem between
2 you and your wife right now is shortage of
3 money?
4    A.  Among other things.
5    Q.  What else?
6    A.  I'm trying to start my own business
7 doing private autopsies and I can't fund
8 the business.
9    Q.  Are you saying that your ongoing
10 consortium problems with your wife are
11 related to money problems?
12    A.  No, to getting fired, not having a
13 job, being at home. All that.
14    Q.  Can I ask, Doctor, before you were
15 employed -- or before you entered into the
16 fellowship at the Medical Examiner's Office
17 in the year 2000, were you ever employed
18 in the United States before that?
19    A.  Yes.
20    Q.  Where were you employed?
21    A.  In Nashville, Tennessee.
22    Q.  And what period of employment?
23    A.  July and August of '99.
24    Q.  What was your job there?

Page 252

1    A.  Pathologist.
2    Q.  And before that, were you employed
3 anywhere in the United States?
4    A.  Before that, I was doing a
5 fellowship at Emory University Hospital.
6 Emory, E-M-O-R-Y.
7    Q.  And what was the period of time you
8 were doing that?
9    A.  Ninety-eight -- July '98 to June
10 '99.
11    Q.  Any other employment in the United
12 States?
13      A.  I was a resident at the Boston
14 University Medical Center.
15    Q.  In what period of time?
16    A.  July '93 to June '98.
17    Q.  Anything else?
18    A.  I worked for University Services.
19 I was reviewing --
20    Q.  You've already described that.
21    A.  That's it.
22    Q.  When did you first come to this
23 country?
24    A.  January 15, 1991.



**Jack Daniel**
**Court Reporting & Video Services**

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
                                www.jackdanielreporting.com
617.557.0039                    888.922.JACK                             FAX 617.557.0040

## Page 253

1  Q.  And what did you do from January of
2  '91 to July of '93?
3  A.  I was studying for the boards. I
4  had to take the ECFMG and FLEX exams.
5  Q.  I think you're going to have to
6  spell --
7  A.  ECFMG. Those are -- It's a
8  mnemonic for Educational Council for
9  Foreign Medical Graduates, and the Federal
10 Licensing Exams. There are a set of five
11 exams that I had to take.
12 Q.  And during the period, you were --
13 7/93 to 6/98 when you were a resident at
14 BU.
15 A.  Yes.
16 Q.  So that was about a five-year
17 residency.
18 A.  Yes.
19 Q.  Was there some reason that you had
20 to do a five-year residency like that?
21 A.  The anatomic and pathology
22 residency is for five years.
23 Q.  Okay. So you didn't get any credit
24 for the work you had already done in

## Page 254

1  India?
2  A.  No.
3  Q.  Were you qualified as a forensic
4  pathologist in India?
5  A.  Yes.
6  Q.  Doctor, in your answers to
7  interrogatories you've mentioned your
8  primary care physician, Jerome Sobieraj.
9  A.  Correct.
10 Q.  Sobieraj, S-O-B-I-E-R-A-J. Is he
11 the only doctor that you have seen on
12 account of any anxiety or depression that
13 you suffered as a result of any conduct of
14 the Commonwealth in this case?
15 A.  Yes.
16    MS. KELLEY: I have no
17 further questions.
18    MR. SHARP: Nothing here.
19    (Original exhibits retained
20 by Ms. Kelley).
21    (Deposition of ABRAHAM
22 PHILIP, M.D. concluded at 4:18 p.m.)
23 .
24 .

## Page 255

1    CAPTION
2    The Deposition of ABRAHAM PHILIP, M.D.
3  taken in the matter, on the date, and at the
4  time and place set out on the title page
5  hereof.
6    It was requested that the deposition
7  be taken by the Reporter and that same be
8  reduced to typewritten form.
9    It was agreed by and between counsel
10 and the parties that the Deponent will read
11 and sign the transcript of said deposition.
12 .
13 .
14 .
15 .
16 .
17 .
18 .
19 .
20 .
21 .
22 .
23 .
24 .

## Page 256

1    C E R T I F I C A T E
2  I, ABRAHAM PHILIP, M.D., hereby
3  certify under the pains and penalties of
4  perjury that I have read the foregoing
5  transcript of my testimony and further
6  certify that said transcript is a true and
7  accurate record of my testimony (with the
8  exception of the corrections, additions and/or
9  deletions noted below).
10 PAGE LINE CORRECTIONS, ADDITIONS AND/OR DELETIONS
11 ___ ___ _____
12 ___ ___ _____
13 ___ ___ _____
14 ___ ___ _____
15 ___ ___ _____
16 ___ ___ _____
17 ___ ___ _____
18 ___ ___ _____
19 ___ ___ _____
20    Signed under the pains and penalties
21 of perjury this ___ day of _____.
22 2005.
23 _____
24    ABRAHAM PHILIP, M.D.



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE       141 Portland Street . Boston, MA 02114       EXPERIENCE YOU CAN TRUST
                               www.jackdanielreporting.com
617.557.0039                   888.922.JACK                               FAX 617.557.0040

Page 257

1        CERTIFICATE
2        COMMONWEALTH OF MASSACHUSETTS
3              SUFFOLK SS.
4        I, SUSAN A. ROMANO, Certified Shorthand
5    Reporter No. 119393, Registered Merit Reporter
6    and Notary Public in and for the Commonwealth
7    of Massachusetts, do hereby certify that the
8    witness whose deposition is hereinbefore set
9    forth, was duly sworn and that such
10   deposition is a true record of the testimony
11   given by the witness.
12    I further certify that I am neither
13   related to or employed by any of the parties
14   in or counsel to this action, nor am I
15   financially interested in the outcome of this
16   action.
17    In witness whereof, I have hereunto set
18   my hand and seal this 1st day of August,
19   2005.
20   .
21   .
22   _____
23        Susan A. Romano, Notary Public
24        My commission expires April 21, 2006



**Jack Daniel**
Court Reporting & Video Services

TECHNOLOGIES YOU CAN USE        141 Portland Street . Boston, MA 02114        EXPERIENCE YOU CAN TRUST
                                www.jackdanielreporting.com
        617.557.0039                   888.922.JACK                        FAX 617.557.0040