# WHITFIELD SHARP & SHARP
### Attorneys and Counselors at Law
### 196 Atlantic Avenue
### Marblehead, MA 01945

| Elaine Whitfield Sharp, Esq. | Tel: 781-639-1862 | Daniel S. Sharp, Esq. |
| elainesharp@sharplaw.biz | Fax: 781-639-1771 | dansharp@sharplaw.biz |

## FACSIMILE TRANSMITTAL SHEET

**TO:** John Cronin

**COMPANY:** OCME

**FAX NUMBER:** 617-266-6763

**PHONE NUMBER:**

**RE:** Abraham T. Philip, M.D.

**FROM:** Elaine Whitfield Sharp, Esq.

**DATE:** March 1, 2004

**TOTAL NO. OF PAGES (INC. COVER):** 6

**SENDER'S REFERENCE NUMBER:**

**YOUR REFERENCE NUMBER:**

Re: Problems at the Office of Chief Medical Examiner



If you do not receive any part of this fax, please call 781-639-1862.

AGO-0002

Abraham T. Philip, M.D.
Assistant Medical Examiner
Office of the Chief Medical Examiner
720 Albany Street
Boston, MA 02118

March 1, 2004

The Honorable Mitt Romney
State House
Office of the Governor
Room 360
Boston, MA 02133

Re. Problems at the Office of Chief Medical Examiner

Dear Governor Romney:

I write to alert you to serious deficiencies in the Office of Chief Medical Examiner (OCME) where I am currently employed. I am compelled to share this information with you because it relates to matters of serious public health and concern. I have headlined these issues of important political and public concern.

**Getting Away with Murder?**

Because of the deficiencies in the OCME, people may be getting away with murder in this state. For example, toxicology is frequently not performed on elderly people who die suddenly in nursing homes. For all we know we could have one or more "Dr. Shipmans" in our midst.

As I am sure you are aware, with the advent of an increasing aging population, those who work in the criminal justice system have an increased sensitivity and concern about issues of elder abuse. Yet, there is an extreme reluctance in dealing with cases of nursing home deaths, deaths of the elderly and the infirm. Indeed, the approach taken in these cases by the agency is to search for reasons to decline jurisdiction rather than to actively investigate to rule out neglect or abuse.

With an aging population, and the turmoil in the elder care industry, it is a gross dereliction of duty to remain unmindful by lack of investigation into nursing home deaths. We owe our elders more respect than this, and we owe it to the public to

1

ensure that those who are alleged to have unlawfully taken the life of an elder shall be subject to prosecution. If we do not investigate, how will there be any accountability?

**Risk of DNA Contamination**

Due to sloppy practices and a complete lack of proper protocols controlling the entry of non-essential staff into autopsy rooms during autopsies, the collection of DNA in cases where the victims may have been raped is subject to the risk of cross-contamination. This sort of situation does not serve the criminal justice system well and, indeed, could result in a guilty person going free, perhaps to rape and murder other victims.

**The OCME's Lack of Independence**

The agency has lost its ability to independently investigate the cases it is supposed to investigate and hands over important decision making authority to the police, district attorneys and the politicians that it serves. Countless are the times that at morning conferences decisions on whether to do or not do an autopsy are deferred to what the police want. Decisions about cause and manner of death are deferred to what the district attorney wants.

**Hospital "Therapy" Deaths Not Investigated**

The agency will not delve into the cases of therapy-related deaths, denying the people of Massachusetts the right to an independent autopsy in cases dying in hospitals. This leads to the tragic situation of the hospitals left to police themselves, cover up on their own vested interests and widespread client dissatisfaction. The fact that the newspaper stories about investigations into the obesity surgery-related deaths has completely bypassed the medical examiner's office is a shameful chronicle of the irrelevance and powerlessness of the agency in deaths occurring in hospitals.

**Misreporting of Deaths Creates Faulty Public Health Statistics**

The agency is taking too cavalier an attitude to the cases where the deceased is above the age of 50 years, relying on opinions of superficial presumptive diagnosis and not scientific investigations. This results in extremely erroneous classification of the cause and manner of death, with downstream effects of faulty health statistics, improper allocation of health care funds, and gross discrepancy in insurance settlements.

**Sloppy Crime Scene Investigation Due to Lack of Specialized CSI Personnel**

The agency still persists with an outdated model of death investigation left to police personnel, who operate with the imperative of closing cases, leading to botched investigations. There is an urgent need to replace the current death investigation procedures with a specially trained, and sub-specialty trained cadre of crime scene investigators, as is the model followed in the rest of the country. Modern medical examiner offices have specialized death investigators who visit the scene of the incident, and in collaboration with the police, do a comprehensive investigation. In addition, they are backed up by specialized teams who, for example, evaluate child abuse cases, SIDS cases and what are becoming increasingly-important bio-terrorism cases.

**Lack of Photo Documentation and Retention: Acquittals and/or Civil Suits**

The procedures for photo documentation of autopsy work as done now are extremely inefficient. Autopsy photos constitute evidence for the State and the criminal defense, and for personal injury counsel for the plaintiff and defense in civil cases.

Despite the fact the autopsy photos are evidence for use in court, there is no cadre of photographers fully documenting autopsies and staying in the autopsy rooms as long as the doctors need them to be present. Further, there is no control of the photos with unified command structures, and photographers requested from different agencies are sometimes present. Police photographers remain poorly motivated to remain for the entire duration of the autopsy, are unavailable when cases are re-evaluated the next day and/or when specialized examinations, such as those of the heart or brain, are conducted.

Frequently, it is left to the individual assistant medical examiners to retain pictures. This situation, coupled with poor record-keeping procedures, ensures ready unavailability, lost and, sometimes, missing photographs when cases come to trial. In other words, due to lack of photography personnel and sloppy procedures, the chain of custody for what is often critical evidence is compromised. This may result in the suppression of evidence for the defense, which may result in the guilty going free.

**Division of Labor and Assignment of Administrative Tasks**

The current division of labor does not work. The OCME needs cadres for body transportation, evidence transport and autopsy assistance. Similarly, the office staff should have separate transcriptionists, secretaries and records clerks. Leaving multiple tasks to be carried out by the same clerical assistants leads to loss of productivity. The dire need of a records clerk leaves the filing of charts, x-rays slides and other evidence in total shambles that, in turn, leads to the extraordinary expenditure of man-hours searching for the records or material.

### Inadequate Toxicology Panels Create Missed Homicide Cases

The current quality of toxicological testing is abysmal. It takes extraordinarily long to do and is very limited in scope. The OCME needs adequate financing and manpower to ensure that there is both a widened array of toxicological analyses that will enable us to search for a larger 'panel' of substances in more tissues and organs, including routine vitreous chemistry. In effect, by performing toxicology tests for only a limited number of substances, we may be blind to dangerous contraband drugs of abuse that are circulating "on the street" and, in such cases, we will be unable to issue warnings to the public about these hazards. This may result in the loss of life, particularly among our young people who have succumbed to using contraband drugs. We owe it the parents of this state – many of whom are your constituents – to do a better job on forensic toxicology.

### The OCME Cannot Continue and Evolve and Improve Without Quality Control

It is a popular idea today to make government agencies as efficient and responsive to the 'consumer' public as are private corporations. Despite years of berating the senior administrators, the agency is still to develop a comprehensive and continuous quality improvement initiative monitoring not just areas of complaints, but also the turn around times, standardization of reports, development of protocols and procedures, with index criteria and strategies for improving services. It is imperative to have a senior manager, a statistician and a computer programmer be dedicated to the task of monitoring and outlining strategies for quality improvement.

### Bad Morale Creates Bad Service

Morale at the OCME is abysmal at all levels. The agency has failed to adequately establish a core of educational programs for visiting residents, adequate training of forensic pathology fellows, inter-agency and other medical-specialty interactions, continuing medical education programs for the staff pathologists, has failed to encourage or allocate time for its professional staff to work on publications and board certification. Further, there is no video conferencing with outside hospitals. These are just a few examples of the failure of the spirit, initiative and drive within the agency.

### No More Money Means No More Change

Nothing of course can be achieved without the eradication of budget constraints, recruitment of additional staff and pathologists, a reorganized hierarchy and workload distribution. Or put another way, barring the possibility of outsourcing the autopsies and the shipping of bodies and the investigating police officers to some third world country for autopsy, there is no way that a modern medical

examiners system can be put in place for Massachusetts without raising the budget of the agency by five to eight times the current levels.

**Some Closing Thoughts**

I am willing to share many specific examples of these and many other problems. I believe that, with some hard work in planning and management, appropriate funding, team spirit and diligence by OCME employees, and with the assistance of your administration, we can build a modern medical examiner system which will serve well the criminal justice system and, ultimately the people to whom we are responsible.

In sum, the OCME has completely lost sight of its primary goal as an agency with a charter to investigate sudden and unexpected deaths so that threats to public safety and public health can be identified and appropriately handled. As interpreted by many in the office, the charter necessitates that the office be informed about all sudden and expected deaths, but says nothing about the investigation of such deaths. Moreover, almost all have lost sight of the latter goal of identifying threats to the public's safety and health. We need specific policies and procedures to ensure high quality public service.

I stand ready to be at your service in helping to make the OCME a top-flight agency for the public and to do whatever is my part in helping improve the current situation. Thank you for hearing my views on these extremely important political issues.

Yours Sincerely,

*/s/ Abraham T. Philip, MD*

Abraham T. Philip, M.D.

cc. John Cronin
Chief Administrative Officer
Office of the Chief Medical Examiner
720 Albany Street
Boston, MA 02118