UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION: 04-CV-11069-JLT

_____
                                )
ABRAHAM PHILIP, MD              )
                                )
Plaintiff,                      )
                                )
vs.                             )
                                )
JOHN CRONIN, in his personal    )
capacity.                       )
                                )
Defendant.                      )
_____)

PLAINTIFF'S OPPOSITION TO
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

The plaintiff opposes the defendant's motion for summary judgment.

This opposition states an abbreviated history of the facts of the case.  This opposition then "tracks" the arguments of the Defendant, *seriatum*.

<u>ABBREVIATED STATEMENT OF THE CASE</u>

Dr. Philip was employed under a one-year contract with the Office of the Chief Medical Examiner (OCME) beginning during September of 2003.  He had previously been employed three times on a contract basis. (Exhibit 1; Dr. Philip's Affidavit.)

Dr. Philip contends that, from the beginning of his employment and leading to his termination on March 4, 2004, he was faced with escalating hostility from his administrative

superior, Defendant-Cronin. (Exhibit 1; Dr. Philip's Affidavit.)

Dr. Philip contends that, during and also before the period of October 2, 2003 to March 3, 2004, Dr. Philip pointed out to his administrative superior, John Cronin, numerous ways in which the operations of the OCME violated state regulations, violated state law, or created dangers to public health and safety. (Exhibit 1; Dr. Philip's Affidavit.)

On or about February 20th, Defendant-Cronin sent a messenger to the autopsy room to demand that Dr. Philip sign a death certificate for a funeral home. (See, Defendant's statement of undisputed facts, para. 1 – 3.) Dr. Philip was in the middle of a homicide autopsy. He interrupted the autopsy to respond to the immature and rash demands of Defendant-Cronin. In so doing, he may have accidentally got some blood on the death certificate. (Exhibit 1; Dr. Philip's Affidavit.) Dr. Philip was subsequently reprimanded for the accident, even though it was caused by the Defendant's own ineptitude. (See, Defendant's statement of undisputed facts, para. 7.)

On March 1, 2004, Dr. Philip wrote a letter to the Governor of the Commonwealth of Massachusetts in which Dr. Philip expressed his opinions about problems in the OCME and outlined some ideas for improvements. (Exhibit 2; 3/1/2004 OCME General Letter.) It is important to note that Dr. Philip's letter was not about his own complaints or problems at the OCME. The letter was about matters of public concern.

A copy of Dr. Philip's letter to the Governor was provided to John Cronin and to OCME's Chief, Dr. Evans. (Exhibit 3; "Further Answers of Defendant Dr. Richard Evans MD to Plaintiff's Interrogatories; Interrogatory and Answer #9.)

Dr. Philip also wrote a second letter to the Governor of the Commonwealth and to other medical examiners at the OCME pertaining to a case in which body parts had been harvested from an auto accident victim before the victim was brain dead. (Exhibit 4; "Organ Bank Letter.")

Dr. Philip had been requested to approve the harvesting procedure on or about January 30, 2004, but had declined to do so for medical and ethical reasons. (Exhibit 4; "Organ Bank Letter.")

Dr. Philip's second letter suggested that the removal of the body parts described above was not a good or appropriate procedure, and suggested a conference among appropriate personnel to discuss how such cases might be handled in the future.  It concluded with, "I hope this Memo prompts a wider discussion between the NEOB [(New England Organ Bank)], Medical Examiners, District Attorneys, etc., so that everybody is comfortable with the decisions taken." (Exhibit 4; Organ Bank Letter.)

A copy of Dr. Philip's second letter to the Governor was provided to John Cronin and to OCME's Chief, Dr. Evans. (Exhibit 3; "Further Answers of Defendant Dr. Richard Evans MD to Plaintiff's Interrogatories; Interrogatory and Answer #10.)

On March 3, 2004, John Cronin told the Defendant that he would no longer be permitted to conduct "cremation certification duty", a duty to which all other medical examiners were still assigned. (Exhibit 1; Dr. Philip's Affidavit.)

On March 4, 2004, Defendant-OCME fired the plaintiff by terminating his employment contract with the Office of Chief Medical Examiner. (Exhibit 5; letter of termination.)

The letter terminating Dr. Philip expressly referred to the plaintiff's communications with members of the OCME and the district attorney's office as a reason for the Plaintiff's termination. (Exhibit 5; letter of termination.)

It is the plaintiff's contention that his employment was terminated, at least in part, in retaliation for his speech in the letters described above. (See, Complaint, paras. 40-44.) (See, Exhibit 1; Dr. Philip Affidavit.)

### I. THE PLAINTIFF'S STATEMENTS WERE UPON MATTERS OF PUBLIC CONCEN

The plaintiff has previously filed a motion for partial summary judgment on the issue of whether his statements were statements upon a matter of public concern.  The Defendant has filed opposition documents.  The "public concern" issue has been adequately briefed.

At the very least, there is a question of fact whether Dr. Philip's statements were statements upon matters which are, or might be, of concern to the public.

## II. THE PLAINTIFF HAS ESTABLISHED
## A CAUSAL LINK BETWEEN HIS
## <u>TERMINATION AND HIS SPEECH</u>

The First Circuit has held that the proximity in time between (1) an adverse employment action and (2) protected speech is evidence in an of itself that the adverse action was motivated by the speech.  In <u>Guilloty Perez v. Pierluisi</u>, 339 F.3d 43, 57 (1st Cir. 2003), the court held that, "The proximity in time between the protected activity and the alleged retaliation is circumstantial evidence of motive."  The adverse action was Dr. Philip's termination.  That took place on March 3, 2004. (Exhibit 5; termination letter.)  The protected activity – writing to the Governor regarding matters of public concern – took place one or two days earlier. (Exhibits 2 and 4.)

The defendant argues that a temporal link is not, standing alone, sufficient to support a First Amendment retaliation claim. (<u>See</u>, Defendant's brief, pg. 4.)  The defendant relies upon <u>Storlazzi v. Bakey</u>, 894 F. Supp. 494 (1995) for this proposition.

Even if one accepts <u>Storlazzi</u> as precedent, a problem remains with the defendant's argument.  That problem is that, in this case, there is evidence that the plaintiff's termination was causally linked to his speech.

The causal link between the speech and the termination is suggested by the Defendant's own letter.  That letter refers to "[y]our conduct on March 1st and March 2nd." (Exhibit 5, para. 2.)  The only significant conduct in which the plaintiff engaged on

March 1st and March 2nd was his communication with the Governor.  A
jury could very reasonably infer that "conduct" refers to the
letters to the Governor.  If so, the Defendant's March 3rd letter
is a virtual admission that Dr. Philip was fired because he wrote
to the Governor.

Mr. Cronin concedes that he received a copy of the letters
to the Governor on or about March 1st.  This is confirmed by the
interrogatory answer of Dr. Richard Evans, the former Chief
Medical Examiner.  (Exhibit 3, Further Answer #1. "On March 1,
2004, Attorney Elaine Whitfield Sharp sent a copy of a letter
addressed to Governor Mitt Romney to John Cronin via facsimile.")
It is also conceded by the Defendant.  In supplemental
interrogatory answers, Dr. Evans states that Defendant-Cronin
received "a second letter addressed to Governor Mitt Romney" on
March 3rd, the very date on which Dr. Philip was fired. (Exhibit
3; "Further Answer #9.)  A jury could easily conclude that Mr.
Cronin's reaction to the plaintiff's protected speech was swift,
immediate, and unconstitutional retribution.

Further, Defendant-Cronin admits that Dr. Philip's
communications with the Governor were discussed in a meeting
about Dr. Philip's employment.  This took place before he was
terminated. (Exhibit 6; Cronin Deposition, pp. 34, 35 and pg.
65.)

The defendant will argue that Dr. Philip engaged in other
bad conduct on the dates in question and that those *other* bad

acts are the reason for his termination.  But it is a question of fact whether Dr. Philip engaged in any bad acts on March 1st, or March 2nd, or at any other time.  Dr. Philip denies that he did so.

Even if there were "bad acts" other than speech, the trier of fact would still have to decide whether the protected speech was a substantial or motivating factor in Dr. Philip's termination.  The excuse offered for firing Dr. Philip appears to consist of:

> (1)  having used the words "urinated" and "farted" in an e-mail (See, Statement of Undisputed Facts, para. 8 with Exhibit B);
>
> 2.  having exchanged mildly contentious[1] e-mail with the OCME's general counsel (See, Statement of Undisputed Facts, para. 9 with Exhibit C); and
>
> 3.  having an argument over an autopsy with his non-medical, unqualified, and high-strung supervisor. (See, Statement of Undisputed Facts, para. 10.)

A jury might conclude that these things never occurred, that they have been exaggerated to "cover" for the retaliatory firing, or that no one would have fired Dr. Philip (given his excellent reputation and work) for these things absent the protected speech.  Dr. Philip alleges that these events are all exaggerated and overblown. (Exhibit 1; Dr. Philip Affidavit.)

Given the facts and the reasonable inferences that a jury might draw from them, summary judgment for the defendant should

---

[1] It is questionable (a question of fact) whether these exchanges even rise to the level of being mildly contentious.

not be allowed.

### III. THE DEFENDANT HAS NOT ESTABLISHED THAT THE DECISION TO TERMINATE THE PLAINTIFF WOULD HAVE BEEN THE SAME, REGARDLESS OF HIS PROTECTED SPEECH

The defendant's position in this portion of the brief is merely the other side of the coin it presses in Section II.  It should fare no better.

There is an issue of fact whether the events alleged by the defendant ever occurred, or occurred as he claims.  The exposure of the staff person to blood was more the result of Cronin's impatience than Dr. Philip's negligence. (Exhibit 1; Dr. Philip's Affidavit.)  The defendant's suggestion that an Assistant District Attorney would somehow be so upset by the words "urinated" and "farted" in an e-mail that a homicide case might be compromised is "a stretch" at best.  If homicide investigations are that fragile, one might ask why Mr. Cronin insisted upon Dr. Philip stopping a homicide autopsy so a death certificate could be signed.

The defendant's argument for summary judgment should be rejected.

### IV. A JURY COULD INFER MALICE

This was not the first time Dr. Philip had worked for the OCME.  He was hired in July of 2001.  His contract was extended, twice, before June of 2002.  After a stint in the New York, New York medical examiner's office, Dr. Philip was hired by the OCME for a fourth time in September of 2003. (Exhibit 1; Dr. Philip's

Affidavit.)  This is strong evidence that Dr. Philip had
historically performed well for the OCME.

Dr. Philip was, in fact, among the most productive of the
OCME's assistant medical examiners. (Exhibit 1; Dr. Philip's
Affidavit.)

If the defendant fired one of the most productive assistant
medical examiners on the staff for puffed up or false reasons,
then he would not truly have been "acting on his employer's
behalf [and] such proof [is] sufficient to overcome the qualified
privilege." Zimmerman v. Direct Federal Credit Union, 262 F.3d
70, 76 (1st Cir. 2001).

The "malice" equation is further informed by the fact that,
at the time Dr. Philip's contract was terminated, the OCME was
already woefully understaffed in the number of pathologists
available to accomplish the OCME's statutory mission.  There were
only five full-time pathologists and three contract pathologists.
Full staffing required ten to twelve under the then-existing
budget.  (Exhibit 1; Dr. Philip's Affidavit.)

If Defendant-Cronin was "acting on his employer's behalf"
and determined nevertheless that Dr. Philip had to leave, Cronin
would have attempted to replace Dr. Philip before he was
terminated.  Instead, he acted in a hasty and retaliatory
fashion.  A jury could reasonably make such a finding and, from
that finding, infer malice.

Further, it cannot truly advance the interests of the OCME

to expose the agency and its chief administrator to litigation
and liability for an unconstitutional act.  Litigation provoked
by such action has wasted the time and resources of various
agency personnel, including its chief administrator.  An
experienced chief administrator would have realized this outcome
in advance of his retaliatory firing.

The inferences that may be drawn from this entire fact
pattern amounts to "an affirmative showing that the actions taken
by [Cronin] were not derived from a desire to advance the
employer's legitimate business interests." <u>Boothby v. Texon,
Inc.</u>, 414 Mass. 468 (1993).

A jury should be permitted to determine the issues of fact
presented by this case.

V. THE INTENTIAL INFLICTION
<u>CLAIM SHOULD GO FORWARD</u>

Arguing for dismissal of the "intentional infliction" claim,
the defendant continues it harangue that "the Plaintiff is unable
even to establish that he was 'fired' on account of his speech."
(Defendant's Brief, last page.)  The Defendant argues as if
denying for a sufficient number of times what a jury may find to
be the truth, summary judgment may be allowed.  This is not, of
course, what the rules or the cases allow.

"Massachusetts courts are fairly liberal about allowing
emotional distress claims to go to the jury [and such] claims
should go to the jury if reasonable people could differ on
whether the conduct is extreme and outrageous.'" <u>Orwat v.</u>

10
10

Maloney, 360 F. Supp. 2d 146, 165-166 (D. Mass. 2005, citing
Columbus v. Biggio, 76 F. Supp. 2d 43 (D. Mass 1999) (quoting
Boyle v. Wenk, 378 Mass. 592, 595-597 (1979)).

Although he was not extensively examined on the claim at his
deposition, Dr. Philip did testify that his distress was
sufficient to create physical manifestations. (Exhibit 7; Dr.
Philip Deposition, pg. 242.) ("I suffered from symptoms of
anxiety, and some time I had raising of pulse and shortness of
breath.")

Under the facts of this case, and where a First Amendment
violation is concerned, the defendant's conduct could be
considered sufficiently egregious to support a claim for the
intentional infliction of emotional distress.

<u>RELIEF REQUESTED</u>

For the reasons of law set forth in this brief, its
supporting documents, and the plaintiff's motion for partial
summary judgment, the plaintiff requests that the court:

(1)  Deny the defendant's motion; and

(2)  Allow the plaintiff's cross-motion.


Respectfully Submitted,

/s/ Daniel S. Sharp
_____
WHITFIELD SHARP & SHARP
Daniel S. Sharp (BBO 565524)
Attorney for
48 Locust Street
Marblehead, MA  01945
781-639-1862


11
11

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that he/she caused a true copy of the document above to served by first class mail, postage paid, on all counsel of record an and properly addressedd upon all parties appearing *pro se* on October 31, 2005.

/s/ Daniel S. Sharp

_____