UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION: 04-CV-11069-JLT

ABRAHAM PHILIP, MD            )
                              )
Plaintiff,                    )
                              )
vs.                           )
                              )
JOHN CRONIN, in his personal  )
capacity.                     )
                              )
Defendant.                    )

## AFFIDAVIT OF DR. ABRAHAM PHILIP

I, Dr. Abraham Philip, state the following facts on the basis of personal knowledge. If called as a witness, I could testify that:

1. At one point, I prepared for Mr. Cronin a chart of the performance of the various pathologist personnel. I was at or near the top of the chart in terms of productivity. During my entire time at the OCME, I was at or near the top of the chart in terms of productivity.

2. I was employed under a one-year contract with the Office of the Chief Medical Examiner (OCME) commencing during September of 2003. I had previously been employed on a contract basis by the OCME.

1
1

PLAINTIFF'S EXHIBIT 1

3. From the beginning of my employment and leading to my termination on March 4, 2004, I faced escalating hostility from my administrative superior, Defendant-Cronin.

4. During, and also before the period of October 2, 2003 to March 3, 2004, I pointed out to Mr. Cronin numerous ways in which the operations of the OCME violated state regulations, violated state law, or created dangers to public health and safety.

5. On or about February 20th, as I recall, Defendant-Cronin sent a messenger to the autopsy room to demand that I sign a death certificate for a funeral home. At the time, I was in the middle of a homicide autopsy. I had to interrupt the homicide autopsy to respond to the demands of Defendant-Cronin.

6. In responding to Mr. Cronin's demands, I accidentally may have gotten some blood on the death certificate.

7. I was subsequently reprimanded for an accident, if any, that Mr. Cronin had precipitated by his unreasonable demands. The exposure of the staff person to blood, if any, was more the result of Mr. Cronin's impatience than anything else.

8. On March 1, 2004, I wrote a letter to the Governor of the Commonwealth of Massachusetts in which I expressed my opinions about problems in the OCME and outlined some ideas for improvements. My letter was not about my own complaints. It was a letter about matters of public concerns.

9. I wrote a second letter to the Governor of the

Commonwealth and to other medical examiners at the OCME pertaining to a case in which body parts had been harvested from an auto accident victim before the victim was brain dead.

10. I had been requested to approve the harvesting procedure on or about January 30, 2004, but had declined to do so for medical and ethical reasons.

11. On March 3, 2004, John Cronin told me that I would no longer be permitted to conduct "cremation certification duty", a duty to which all other medical examiners were still assigned.

12. Based upon all the facts of this case, I am certain that my employment was terminated, at least in part, in retaliation for my speech in the letters to the Governor.

13. I am aware of the allegations of misconduct that have been made against me as the result of this litigation. Those allegations are contained in the Defendant's motion for summary judgment and are described in the Opposition that my attorney has prepared. (See, subparagraphs 1, 2, and 3 appearing on page 6.) Those events are all exaggerated and overblown.

14. The contract underlying this litigation is not the first time I worked for the OCME. I was hired by OCME in July of 2001. My contract was extended, twice, before June of 2002. After a stint in the New York, New York medical examiner's office, I was hired by the OCME for a fourth time in September of 2003.

15. At the time I was fired, there were only five full-time

pathologists and three contract pathologists. Full staffing required ten to twelve under the then-existing budget.

16. I suffered extreme emotional distress as the result of Mr. Cronin's actions, including physical manifestations of that emotional distress.

17. I do not believe there was ever anything "inappropriate" about my communications to a District Attorney or to the OCME's attorney, as alleged in the Defendant's statement of so-called "undisputed facts."
nications.

18. I never "screamed" at Defendant-Cronin.

19. My termination was related to speech.

20. This concludes my affidavit.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY.


October 31, 2005                    _____
                                    Dr. Abraham Philip, MD

16. I suffered extreme emotional distress as the result of Mr. Cronin's actions, including physical manifestations of that emotional distress.

17. I do not believe there was ever anything "inappropriate" about my communications to a District Attorney or to the OCME's attorney, as alleged in the Defendant's statement of so-called "undisputed facts."
nications.

18. I never "screamed" at Defendant-Cronin.

19. My termination was related to speech.

20. This concludes my affidavit.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY.

October 31, 2005            _____
                             Dr. Abraham Philip, MD