"FILED IN OPEN COURT"
3/7/07

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION: 04-CV-11069-JLT

|  |  |
|---|---|
| ABRAHAM PHILIP, MD | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| JOHN CRONIN, in his personal | ) |
| capacity. | ) |
| | ) |
| Defendant. | ) |
| | ) |

## JOINT PRE-TRIAL MEMO

### I. Concise Summary of the Evidence

#### Plaintiff's Statement

Plaintiff-Dr. Philip was employed by contract with the Office of the Chief
Medical Examiner of Massachusetts (OCME) during September of 2003. He had
previously been employed on a contract basis by the OCME. In fact, he had been hired
or had his contract extended on four different occasions. At his deposition, the Medical
Examiner, himself, admitted that Dr. Philip was a good medical examiner.

From the beginning of his employment and leading to his termination on March 4,
2004, he was faced with escalating hostility from Defendant-Cronin. Cronin, a non-
physician, was Dr. Philip's administrative superior at the OCME. This hostility was the

result of repeated suggestions for improvements at the woefully inadequate and badly mismanaged OCME made by Dr. Philip. These suggestions, sometimes critical of the OCME, were made during and also before the period of October 2, 2003 to March 3, 2004.

Many of Dr. Philips' concerns pointed out how the OCME violated state regulations, violated state law, or created dangers to public health and safety. In the plaintiff's view, these were clearly "matters of public concern."

On March 1, 2004, Dr. Philip wrote a letter to the Governor of the Commonwealth of Massachusetts in which Dr. Philip expressed his opinions about problems in the OCME and outlined some ideas for improvements. A copy of Dr. Philip's letter to the Governor was provided to John Cronin and to OCME's Chief, Dr. Evans.

Dr. Philip also wrote a second letter to the Governor of the Commonwealth and to other medical examiners at the OCME pertaining to a case in which body parts had been harvested from an auto accident victim before the victim was brain dead.

Dr. Philip had been requested to approve the harvesting procedure on or about January 30, 2004, but had declined to do so for medical and ethical reasons.

Dr. Philip's second letter suggested that the removal of the body parts described above was not a good or appropriate procedure, and suggested a conference among appropriate personnel to discuss how such cases might be handled in the future. It concluded with, "I hope this Memo prompts a wider discussion between the NEOB [(New England Organ Bank)], Medical Examiners, District Attorneys, etc., so that everybody is comfortable with the decisions taken." A copy of Dr. Philip's second letter

2

to the Governor was provided to John Cronin and to OCME's Chief, Dr. Evans.

On March 3, 2004, John Cronin told the Defendant that he would no longer be permitted to conduct "cremation certification duty", a duty to which all other medical examiners were still assigned. Cronin's excuse for this disciplinary (or retaliatory) act was that Dr. Philip got some blood on a death certificate about two weeks earlier. But the "blood spatter" incident was generated by Cronin. Cronin had demanded that Dr. Philip sign a death certificate while Philip was in the middle of a homicide autopsy, an inherently bloody procedure.

The letters by Dr. Philips touched upon matters of great public concern, triggering protection under the First Amendment. (The letters also point to violations of public health and safety, triggering protection under the Commonwealth's "Whistleblower Statute." A separate, state action has been instituted for this in Suffolk County.)

Among the matters complained of to the Governor and public officials was OCME's failure to conduct adequate toxicological studies of newly-deceased hospital and nursing home patients who presented to OCME with high levels of morphine in their body. Such studies would (or could) protect the elderly and infirm from possible negligence or murder.

Another topic addressed by Dr. Philip was OCME's failure to conduct adequate toxicological studies of deceased persons for illicit drugs such as Ecstasy, PCP, Fentanyl, Ketamine, or abuse of prescription drugs. These toxicological studies would, or could, help the police in the interdiction of such substances.

Dr. Philip discussed in his letters the OCME's failure to conduct timely microbiological studies of deceased persons to detect infectious diseases. These studies

3

would, or could, help OCME and other public officials notify the public about outbreaks of Hepatitis, Influenza, Severe Acute Respiratory Syndrome, and West Nile virus.

On March 4, 2004, Defendant-OCME fired the plaintiff by terminating his employment contract with the Office of Chief Medical Examiner. The letter terminating Dr. Philip implicitly referred to the plaintiff's communications with members of the OCME, the Governor, and the district attorney's office as a reason for the Plaintiff's termination.

It is the plaintiff's contention that his employment was terminated, at least in part, in retaliation for his speech in the letters described above.

As for damages, Dr. Philip lost approximately six months of contract employment at $114,000 per year. He attempted to mitigate his damages and found employment at the medical examiner's office in Syracuse, New York. He must now commute from Essex, Massachusetts to Syracuse every week. He has no choice in this because his wife, who is a tenured faculty member at Gordon College, cannot move.

Dr. Philip's salary has been reduced compared to current OCME salaries. His living expenses have increased. The financial and emotional strain on Dr. Philip and his family and his marital relationship have been severe.

### Defendant's Statement

Defendants expect that the evidence in this case will show as follows:

In 2004, Dr. Philip was working under a one-year employment contract with the Office of the Chief Medical Examiner ("OCME"). As part of that contract, Dr. Philip was expected to adhere to the highest ethical standards and serve as a role model for other OCME personnel.

On February 13, 2004, OCME staff requested that Dr. Philip sign a Death Certificate on behalf of a funeral home. After an initial refusal, Dr. Philip signed the Death Certificate and handed it back to Autopsy Room Supervisor Kathleen Taylor, covered in blood, thereby exposing her to potentially dangerous blood products. As a result of this incident, by letter dated February 25, 2004, OCME Chief Administrative Officer John Cronin issued to Dr. Philip a one-day suspension, to be served on March 4, 2004. As soon as he received that letter, by his own admission, Dr. Philip considered that he was probably going to be fired in the near future.

On March 1, 2004, CAO Cronin became aware of another incident involving Dr. Philip. In connection with a case on which he was working, he had communicated with an attorney from the District Attorney's office in an inappropriate and unprofessional manner. Among other things, Dr. Philip requested in an e-mail to the Assistant District Attorney that the attorney insist that a witness be present when Dr. Philip worked on the file, "to prevent weird charges of having urinated on the chart or farted while working on the chart being leveled against me by the head honcho who runs this agency."

Over the course of the next day, CAO Cronin learned that Dr. Philip had had further inappropriate communications with OCME General Counsel Jackie Faherty regarding the homicide file. On March 2 he learned that the General Counsel had left a file on Dr. Philip's chair for completion. Dr. Philip responded to the General Counsel, via e-mails, that he wanted a witness present while he worked on the file and completed his report. Mr. Cronin considered the e-mails inappropriate and was concerned that the work would not be completed. He then took the file to Dr. Philip's office and placed it on his desk. Dr. Philip screamed at Mr. Cronin about the circumstances under which he

would work on the case. Mr. Cronin told him to finish the case, that it was his job.

In connection with all of the conduct of Dr. Philip on March 1 and 2, John Cronin met with a number of people including Chief Medical Examiner Dr. Richard Evans, the General Counsel, the Chief of Staff of the Executive Office of Public Safety, the HR director for the OCME, the HR director for the Executive Office of Public Safety and Undersecretary Robert Haas. They discussed their concerns regarding Dr. Philip's conduct on March 1 and 2, 2004; as well as their concerns regarding the events that had resulted in Dr. Philip's suspension.

Based upon the discussions described above, it was agreed that Dr. Philip's service contract would be terminated. That termination was by letter dated March 4, 2004.

Meanwhile, believing that he was likely to be fired after the Bloody Death Certificate incident, Dr. Philip had contacted the law firm of Whitfield Sharp & Sharp on February 25, 2004, the same day he received his letter of suspension. On March 1, 2004, Plaintiff sent two letters to Governor Mitt Romney. The first, relating to "Problems at the OCME" catalogued a number of "concerns" regarding the running of the OCME. The evidence will show that virtually all of these so-called "concerns" had been raised in a Report entitled, "Needs Assessment of Forensic Services in the Commonwealth of Massachusetts" which had been commissioned by the Commonwealth to assess what needed to be done at the OCME. Plaintiff had himself been interviewed during the investigation for the Report, and had received a copy of the final version of the Report in Spring, 2002. In addition, CME Dr. Evans had written to the Assistant Secretary of the Executive Office of Public Safety on January 4, 2002, outlining the need for additional

6

funding at the OCME to permit the hiring of additional staff and to address many of the "concerns" raised by Dr. Philip.

The second letter to Governor Romney is entitled "Organ Procurement: Procedures of Concern." The evidence will show that the case raised in that letter involved a young man whose family had decided to withdraw treatment and who had subsequently consented to organ donation; the ventilator was removed; the patient's heart stopped beating; and the patient was declared dead in accordance with the law prior to the recovery of any organs.

Plaintiff's attorneys, Whitield Sharp & Sharp, sent copies of the first letter to John Cronin, both by fax and by Certified Mail, on March 1, 2004. They sent copies of the second letter to John Cronin, both by fax and by Certified Mail, on March 3, 2004. In light of Plaintiff's belief that he was about to be fired, it is reasonable to infer that the purpose of sending those letters was to set the stage for the current lawsuit.

## II.    Agreed Facts

1.    Dr. Philip was employed under a one-year contract with the Office of the Chief Medical Examiner commencing 9/2/03.

2.    On February 25, 2004, the OCME issued a one-day suspension of Dr. Philip.

3.    By letter dated March 4, 2004, the OCME terminated Dr. Philip's contract of employment.

## III.    Contested Issues of Fact

**Plaintiff's Statement of Contested Issues of Fact:**

7

1.     Whether Dr. Philip was discharged purely for misconduct or, at least in part, for his speech.

2.     Whether Dr. Philip engaged in any misconduct.

3.     Whether it was Cronin or Philip that caused the blood spatter incident.

4.     Whether Dr. Philip spoke out merely to protect his job, or to protect the public.

5.     Whether Dr. Philip's speech was a matter of public concern. (Mixed law and fact.)


**Defendant's Statement of Contested Issues of Fact:**

1.     Whether Plaintiff's speech was a substantial or motivating factor in the Defendant's decision to terminate Plaintiff's employment contract.

2.     Whether Plaintiff engaged in inappropriate professional behavior leading to Defendant's decision to terminate Plaintiff's employment contract.

3.     The circumstances under which blood from an autopsy being performed by Plaintiff was transferred onto a death certificate while being signed by Plaintiff on February 13, 2004, prompting the decision to suspend Plaintiff for one day and issuing him a warning on February 25, 2004.

4.     Whether Plaintiff's speech was designed merely to protect his job, or to protect the public.

5.     Whether Plaintiff's speech was a matter of public concern.

8

## IV.    Jurisdictional Questions

None.


## V.    Questions Raised by Pending Motions

None.


## VI.    Issues of Law, Including Evidentiary Questions

Plaintiff moved for partial summary judgment on the question of whether

Plaintiff's speech was a matter of public concern. Defendant moved for summary

judgment on all counts. The Court denied both motions. All the legal issues raised by

those motions remain.

The parties do not believe there are any evidentiary questions other than the

normal objections to foundation, hearsay, etc.


### Plaintiff's Statement of Issues of Law


### Defendant's Statement of Issues of Law

### 1.    No Causal Link Between Alleged Protected Speech And Termination

Plaintiff claims that his employment contract with the Commonwealth of

Massachusetts was terminated in retaliation for Plaintiff's exercise of his First

Amendment right to petition the Governor and other state officials. However, as set out

in Plaintiff's Amended Complaint and Plaintiff's Statement of Undisputed Facts, Plaintiff

does nothing more than make conclusory allegations that he wrote two letters to the

9

Governor and that he was subsequently terminated. As a matter of law, this does not

constitute evidence "from which a jury reasonably may infer that plaintiff's

constitutionally protected conduct ... was a 'substantial' or 'motivating' factor behind [his]

dismissal." See Acevedo-Diaz v. Aponte, 1 F.3d 62, 66-67 (1st Cir.1993); Storlazzi v.

Bakey, 894 F. Supp. 494, 503 (1995).

## 2. Decision to Terminate Would Have Been Same Regardless Of Plaintiff's Alleged Protected Speech

In addition to the Plaintiff's failure to establish a causal link between the

expression of his allegedly protected speech and the termination of his employment

contract, the Defendant has provided a legitimate justification for the termination of that

contract. See Mt. Healthy City School Dist. Bd. Of Educ. V. Doyle, 429 U.S. 274, 287,

97 S.Ct. at 568 (1977). As the First Circuit stated in Acevedo-Diaz:

> T]he defendant-employer's *Mt. Healthy* defense, ensures that a plaintiff-employee
> who would have been dismissed in any event on legitimate grounds is not placed
> in a better position merely by virtue of the exercise of a constitutional right
> irrelevant to the adverse employment action. 1 F.3d at 66 (internal quotations
> omitted). (cited in Storlazzi, supra, at 503.)

Here, Defendant was justified in terminating Plaintiff's employment contract,

based upon Plaintiff's inappropriate, unprofessional conduct relating to two separate

incidents: first, the incident in which he, at the least, permitted a staff person at the

OCME to be exposed to potentially dangerous blood products; and, second, the series of

incidents involving his unprofessional comments to an Assistant District Attorney in the

context of an ongoing homicide investigation, as well as his unprofessional handling of

the file in that matter. The decision to terminate Dr. Philip's contract would have been

10

made, whether or not he communicated with the Governor. He should not be put in a better position because of those communications than he otherwise would have been.

### 3.    Plaintiff's Alleged Speech Was Not A Matter Of Public Concern

As set out in Defendant's Supplemental Opposition to Plaintiff's Motion for Partial Summary Judgment, Plaintiff's alleged speech did not involve a matter of public concern and, therefore, cannot serve as a foundation for a claim under the First Amendment. See Connick v. Myers, 461 U.S. 138 (1983); Pickering v. Board of Education, 391 U.S. 563 (1968); Smith v. Comm'r of Mental Retardation, 409 Mass. 545, 552 (1991). Courts may inquire into the employee's motivation for the speech Mullin v. Town of Fairhaven, 284 F.3d 31,38 (1st Cir. 2002), citing Alinovi v. Worcester Sch. Comm., 777 F.2d 776, 787 (1st Cir. 1985). They may also inquire into the extent to which a Plaintiff has intended that his speech contribute to the public discourse. O'Connor v. Steeves, 994 F.2d 905, 914 (1st Cir. 1993). Here, Plaintiff concedes that he had an expectation that he would be fired before he sent either of his letters to the Governor, thereby casting doubt upon his motivation. In addition, Plaintiff contends he sought to generate public debate; however, each of Plaintiff's concerns had previously been raised by outside consultants in reports that were widely and publicly disseminated. Plaintiff was not contributing to public discourse, but merely repeating what already existed in the public commentary. Public debate on the matter existed prior to Plaintiff's letters and in no way was augmented or furthered by Plaintiff's communications to the Governor.

Further, Plaintiff's questionable motivation may be inferred from the falsity of the information contained in his letter to the Governor regarding organ donation. Plaintiff

11

essentially contends that the publication of his refusal to approve the removal of organs
from a patient not yet dead is one of the reasons that his contract with the OCME was
terminated. As set out in the previously produced Affidavit of Kevin J. O'Connor,
Plaintiff's description of events in connection with the patient in question is blatently
false. As discussed above, motivation may be considered in the analysis of whether a
matter is "of public concern;" and the falsity of Plaintiff's statements may be considered
in determining Plaintiff's motivation.[1]

### 4. Plaintiff's Claim For Intentional Interference With Contractual Relations Fails Because Defendant Was Acting As Agent For The Commonwealth And Plaintiff Cannot Demonstrate Actual Malice On The Part Of Defendant

Plaintiff brings Count II in Intentional Interference with Contractual Relations
Under State Law, alleging that Defendant Cronin intentionally interfered with Plaintiff's
contract of employment with the Commonwealth. It is axiomatic that under
Massachusetts law "a defendant-supervisor is entitled to a qualified privilege in an
employment-based tortious interference case (and, thus, will not be liable for
employment decisions that are within the scope of his supervisory duties)." Zimmerman
v. Direct Federal Credit Union et al., 262 F.3d 70, 76 (1st Cir. 2001), citing Gram v.
Liberty Mut. Ins. Co., 384 Mass. 659, 429 N.E.2d 21, 24 (1981). However, as noted by
the Zimmerman court, "[T]he privilege is not sacrosanct. Massachusetts treats proof of
actual malice as a proxy for proof that a supervisor was not acting on the employer's
behalf, and deems such proof sufficient to overcome the qualified privilege." Id. at 76.

---

[1] In addition, false statements may not constitute speech which is afforded First Amendment protection.
See Wulf v. City of Wichita, 883 F.2d 842, 858, citing Pickering v.Bd. of Ed., 391 U.S. 563 at 574 (1968);
see also, Moore v. City of Wynnewood, 57 F.3d 924, 932 (1995). The issue of the truth or falsity of the
statements at issue is relevant, not only to the ultimate balancing required under Pickering, supra, but also
to the threshold analysis of whether the matter is "of public concern" Wulf, supra, at 858, FN. 24.

12

The court then chronicles the limitations and restrictions which must be overcome in

order for a plaintiff in an employment case to establish the element of malice sufficient to

withstand dismissal:

> Proof of actual malice requires more than a showing of mere hostility. See King v.
> Driscoll, 418 Mass. 576, 638 N.E.2d 488, 495 (1994) (explaining that "personal
> dislike will not warrant an inference of the requisite ill will"). For one thing, the
> plaintiff must prove that malice was the controlling factor in the supervisor's
> interference. Alba v. Sampson, 427 Mass. 1104, 44 Mass.App.Ct. 311, 690
> N.E.2d 1240, 1243 (1998). For another thing, "[a]ny reasonable inference of
> malice must ... be based on probabilities rather than possibilities." Gram, 429
> N.E.2d at 24-25 (citation omitted). Finally, such an inference requires an
> affirmative showing that the actions taken by the supervisor were not derived
> from a desire to advance the employer's legitimate business interests. Boothby v.
> Texon, Inc., 414 Mass. 468, 608 N.E.2d 1028, 1040 (1993); Alba, 690 N.E.2d at
> 1243.

Defendant submits that, based upon the facts set forth in Defendant's Statement of

Undisputed Facts, and upon the arguments set out above, Plaintiff cannot demonstrate

malice on the part of the Defendant Cronin such as would permit Plaintiff to recover for

Intentional Interference with Contractual Relations.

### 5.    The Facts Alleged By Plaintiff Do Not Support A Claim For Intentional Infliction of Emotion Distress

In order to recover for intentional infliction of emotional distress in

Massachusetts, a plaintiff must establish four elements of that tort:

> It must be shown (1) that the actor intended to inflict emotional distress or
> that he knew or should have known that emotional distress was the likely
> result of his conduct, Restatement (Second) of Torts s 46, comment i
> (1965); Savage v. Boies, 77 Ariz. 355, 272 P.2d 349 (1954); Samms v.
> Eccles, 11 Utah 2d 289, 293, 358 P.2d 344 (1961); (2) that the conduct
> was 'extreme and outrageous,' was 'beyond all possible bounds of decency'
> and was 'utterly intolerable in a civilized community,' Restatement
> (Second) of Torts s 46, comment d (1965); George v. Jordan Marsh Co.,
> 359 Mass. 244, 254--255, 268 N.E.2d 915 (1971); (3) that the actions of
> the defendant were the cause of the plaintiff's distress, Spackman v. Good,

13

> 245 Cal.App.2d 518, 54 Cal.Rptr. 78 (1966); Womack v. Eldridge, 215
> Va. 338, 341, 210 S.E.2d 145 (1974); and (4) that the emotional distress
> sustained by the plaintiff was 'severe' and of a nature 'that no reasonable
> man could be expected to endure it.' Restatement (Second) of Torts s 46,
> comment j (1965); Womack v. Eldridge, supra. Agis v. Howard Johnson
> Co., 371 Mass. 140, 144-145, 355 N.E.2d 315 (1976).

Defendant submits that Plaintiff is unable even to establish that he was "fired" on account of his speech. However, even assuming that he were able to meet that burden, it is unquestionable that the alleged conduct does not in any way rise to the level of the conduct deemed in Agis to be "extreme and outrageous," "beyond all possible bounds of decency," and "utterly intolerable in a civilized community."

### 6.    Plaintiff's claim for Intentional Infliction of Emotion Distress is barred by M.G.L. c. 152 § 24.

In addition, Plaintiff's claim of intentional infliction of emotional distress must fail because § 24 of the Workers' Compensation Act, G.L. c. 152, bars an employee from bringing an action for an intentional tort against a fellow employee, unless the fellow employee was in no way acting within the scope of his employment furthering the interests of the employer when he committed the acts alleged as a tort. Anzalone v. Massachusetts Bay Transportation Auth., 403 Mass. 119, 124-25, 526 N.E.2d 249. Plaintiff cannot demonstrate that Defendant's actions were outside the scope of his employment furthering the interests of OCME.

### VII.    Requested Amendments to Pleadings

None.

14

## VIII. Additional Matters

As Defendant has submitted previously, Plaintiff has filed a complaint in the Suffolk County Superior Court on the same set of facts and circumstances as the present case. That case, *Philip v. Evans, et al.*; Suffolk Superior Court Civil Action No. SUCV2004-02264, is currently pending. Defendant respectfully submits to the Court the suggestion that this proceeding be removed to state court and joined with the state court litigation on the basis of abstention.

Such action would be especially appropriate based upon Plaintiff's characterization of the anticipated evidence in this matter. Plaintiff claims that he was faced with "escalating hostility" from the defendant, John Cronin. Plaintiff alternatively alleges in the state court action that he faced escalating hostility from his "superiors" at the OCME. Here, Plaintiff has attempted to single out one individual supervisor and paint him as being motivated by a singular vendetta against the Plaintiff. The Plaintiff should be required to prove his allegations in the context of a single forum in which all of the alleged participants to the alleged hostility are present.

## IX. Estimated Length of Trial

Plaintiff estimates 6 half-days; Defendant estimates that the trial will last four (4) to five (5) half-days.

## X. Witnesses

### Plaintiff's Witnesses

1. Plaintiff

2. Plaintiff's spouse

15

3. Peter Burke.

4. Melissa Christie

5. Timothy Manning

6. Joseph Bryson

7. Alexander Chirkov

8. Gerald Feigen, MD

9. Stanton Kessler

10. Mildred Anglin

11. Deidre Ward

12. Kathleen Taylor

13. Dr. Flomenhaft, MD (OCME)

14. Edith Platt (OCME)

15. Anne Marie Mires, Ph,D. (OCME)

16. Witnesses needed for authentication

17. Rebuttal witnesses

18. Any witness listed by the defendants

19. Plaintiff reserves the list to supplement this list.


**Defendants' Witnesses**

**Defendants' Experts**

Defendants may call as an expert:

1. Kevin J. O'Connor, Director of Donation Services for the New England

Organ Bank, One Gateway Center, Suite 202, Newton, MA 02458 for the past 15 years.

16

B.S. in Health Science; M.S. in Administration; Physician Assistant with more than three years of experience in cardiothoracic surgery; more than 20 years of experience in organ donation. Attached hereto as Defendant's Exhibit A are Mr. O'Connor's Supplemental Affidavit, with attached current C.V. and also a copy of his Affidavit in this matter, the original of which was provided to the court as Exhibit 2 in support of Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment, filed with this court on 6/23/05.

It is expected that Mr. O'Connor may testify, in whole or in part, with respect to the facts and opinions set forth in the Affidavit annexed hereto. The grounds for those opinions are his background, education and training, as well as personal, first-hand knowledge of the events occurring on 1/30/04 relating to organ donation of a young man that was the basis of a Memorandum authored by the Plaintiff Dr. Philip, and which is at issue in the current lawsuit.

As noted above, Mr. O'Connor's report in the form of an affidavit was provided to the court as Exhibit 2 in support of Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment, filed with this court on 6/23/05. Further, full information regarding this potential witness has been provided to Plaintiff in the companion case currently pending in state court, in the context of the Supplemental Answers to Interrogatories, a copy of which is annexed hereto as Defendant's Exhibit B, and which was served upon Plaintiff's counsel on 12/28/05:

**Other Witnesses of the Defendant:**

2.  John Cronin, OCME

3.  Dr. Richard Evans, OCME

17

4.    Jackie Faherty, Esq., OCME

5.    Dr. Frank Evangelista, OCME

6.    Dr. Faryl Sanders, OCME

7.    Kathleen Taylor, OCME

8.    Leslie Ward, OCME

9.    Deirdre Ward, OCME

10.    Sgt. Paul J. L'Italien, Mass. State Police, Crime Scene Services Section,

       Sudbury, MA

11.    Lewis Armistead, Asst. District Attorney

12.    Authentication witnesses

13.    Any witness called by the Plaintiff

## XI.    Proposed Exhibits

1.    Original bloody Death Certificate (AGO-0001)

2.    Statement of Sgt. Paul L'Italien, Massachusetts State Police, Crime Scene
      Services Section  (AGO-0031)

3.    Statement of Kathleen Taylor, OCME (AGO-0032)

4.    Statement of Leslie Ward, OCME (AGO-0033)

5.    Statement of Deirdre Ward, OCME (AGO-0034)

6.    Handwritten memo dated March 3, 2004 of Plaintiff to "Dear Friends and
      Technicians" (AGO-0042)

7.    Handwritten list of cases worked by M.E.'s, 2003 (AGO-0044 - AGO-
      0045)

8.  Email from ADA Armistead to Plaintiff, dated January 26, 2004 (AGO-0082 - AGO-0083)

9.  Email from Plaintiff to ADA Armistead, dated January 29, 2004 (AGO-0055)

10. Emails between Plaintiff and Defendant, dated January 8, 2004 to January 15, 2004 (AGO-0113 - AGO-0114)

11. Email from Plaintiff to Defendant, dated January 9, 2004 (AGO-0120)

12. Emails between Plaintiff and Defendant, dated December 24, 2003 to January 4, 2004 (AGO-0130 - AGO-0133)

13. Emails between Plaintiff and Defendant, dated January 2, 2004 to January 5, 2004 (AGO-0152 - AGO-0153)

14. Email from Plaintiff to Defendant, et al, dated January 4, 2004 (AGO-0168)

15. Contract & Job Posting (AGO-0177 - AGO-0180)

16. Letter from Plaintiff to Defendant, dated August 6, 2003 (AGO-0188 - AGO- 0189)

17. Audit Report by National Association of Medical Examiners, dated November 10, 2000 (AGO-0204 - AGO-0239)

18. Management Consultation Services Report by Dallas Associates, dated March 15, 2001 (AGO-0240 - AGO-0348)

19. Needs Assessment of Forensic Services in the Commonwealth of Massachusetts Report, dated April 4, 2002 (AGO-0349 - AGO-0442)

20. Office of the Chief Medical Examiner Policies and Procedures manual, 2003 (AGO-0476 - AGO-0690)

21. Emails between Plaintiff and ADA Lewis Armistead, dated February 29, 2004 to March 1, 2004 (AGO-0691)

22. Emails between Plantiff and OCME counsel Jackie Faherty, dated February 25, 2004 to March 2, 2004 (AGO-0692)

23. Email from Plaintiff to ADA Lewis Armistead, dated March 3, 2004 (AGO-0693)

19

24.  Memorandum of Defendant regarding February 20, 2004 meeting with Plaintiff (AGO-0710)

25.  Letter from Chief Medical Examiner Richard J. Evans to Michael O'Toole, Exec. Office of Public Safety, dated January 4, 2002 (AGO-0716 - AGO-0719)

26.  Proposal Regarding Lt. Edith Platt (AGO-0746 - AGO-0749)

27.  January, 2004 e-mails from Dr. Philip to John Cronin--Philip Deposition Exhibit No. 5 (P-0187 - P-0193)

28.  Dr. Philip Meeting Agendas--Philip Deposition Exhibit No. 6 (P-0194 - P-0197)

29.  January 7, 2004 e-mail from Dr. Philip to John Cronin -- Philip Deposition Exhibit No. 9 (AGO-0128)

30.  Dr. Philip Memo--Philip Deposition Exhibit No. 21 (P-0528)

31.  Letter from Plaintiff to Governor Romney, dated March 1, 2004 (AGO-0002 - AGO-0007) (copy faxed to Defendant from Plaintiff's counsel on March 1, 2004)

32.  Letter from Plaintiff to Governor Romney, dated March 1, 2004 (AGO-0014 - AGO-0018) (copy faxed to Defendant from Plaintiff's counsel on March 3, 2004)

**Plaintiff's Proposed Exhibits**

1)  Daily report of who was doing what work at the OCME on February 13, 2004

2)  Photographs of OCME facilities

   a)  dryer locker and bags on tables
   b)  specimen from 2/17/04 still lying in main autopsy room
   c)  main autopsy room
   d)  photos with emergency eye wash station
   e)  burn victims clothing and evidence bucket mixed up with cleaning material
   f)  main autopsy rooms
   g)  unsecured storage racks, evidence material not bagged, drying cupboard
   h)  evidence buckets

33.) Fax from Sharp's office to Cronin (AGO-0002-7)
34.) Fax from Sharp's office to Cronin (AGO-0014-18)

20

      i)      organ buckets on shelf
      j)      specimen jar marked "Salem Chicken"

3)      Proposal to start a forensic institute by Dr. Philip

4)      1/10/2002 memo to all medical examiners co-signed by Evans and Philip

5)      2/27/04 report from Philip re Insubordination by Trooper Wesley Wanagel

6)      "Data Management Tools" memo co-authored by Cronin and Philip.

7)      Proposal to Perpetuate Legacy of Lt. Edith Platt, MSP

8)      Agenda for 1/16/04 meeting with Cronin

9)      Taxes 2004

10)      Taxes 2003

11)      Taxes 2002

12)      Taxes 2001

13)      2/13/04 Critique of New Toxicology Forms

14)      2-page e-mail string re 12-point program (12/24/03)

15)      Workload Distribution chart and report

16)      1/9/04 e-mail re 12-point program

17)      6-page e-mail string re 12-point program

18)      Agenda for 1/30/2004

19)      Greetings and Happy New Year memo to Vallaro, Cronin, and Habell

20)      New Organizational Chart

21)      July 12, 2001 Agenda, by e-mail, for meeting with Cronin

22)      11-page e-mail string re testifying in court and other matters

23)      e-mails numbered pages 1 – 163 in plaintiff's disclosures

24)      4-page letter and examples of "missed cases" to Rachel from Philip

25) Grouped death certificates for elderly deaths not investigated by OCME (16 pages)

26) Postmortem Examination Report re 55-year-old victim by Evangelist and Philip

27) e-mail to Vallaro re "visit to Wooster"

28) Memo to Edith Platt re Failure of Proper Handling of Microbiology Specimens

29) Memo re "Strange Death of Joshua"

30) Photocopy of a glove recommended by Dr. Philip for proper attire during autopsies.

31) January 9, 2004 "Abraham & Marcel" memo.

32) November 10, 2000 NAME letter to Evans (65 pages)

33) OCME Needs Assessment, 4 April 2002 (94 pages)

34) Case reports where jurisdiction was declined by OCME (produced at tab #24 of plaintiff's production of documents.)

35) Daily case rosters (plaintiff's production #24 and #25)

36) OCME Daily Case Roster for February 13, 2004

37) 2003 Job posting OCME from internet

38) 11/30/01 employment contract

39) September 2003 contract

40) Draft of "Problems in OCME" letter (2/28/2004)

41) 1/16/04 memo to "Jay" regarding new case numbering system

42) OCME organizational charts supplied by defendant

43) New OCME organizational chart

44) three-page memo regarding wasting time on grand juries (re: 10/21/03)

45)  Newspapers articles slamming OCME before Philip was fired

46)  schematic drawing of autopsy room where bloody death certificate
incident took place

47)  Fax of March 4, 2004 from Faherty to Sharp

48)  e-mail from Dr. Flomenhaft to Philip, 7/6/2004

49)  Letters from John C. Kane of Ropes & Gray threatening Dr. Philip and
Attorney Sharp with litigation and attorney sanctions

50)  Letters, e-mails, and correspondence from Ropes & Gray to OCME
pertaining to Dr. Phlip.

51)  March 1, 2004 letter to Cronin from Sharp

52)  September 8, 2003 letter from Cronin re controlling media

53)  9 August 2002 e-mail from Philip to Sharp

54)  September 19, 2001 Report to Governor: The Status of Forensic Services
in the Commonwealth of Massachusetts

55)  Office of the OCME Policy and Procedures Manual

56)  Governor's Commission on Criminal Justice Innovation Final Report

57)  3/26/2004 Memo from Evans to ME's assigning lockers

58+)  All documents from Philip deposition

Respectfully Submitted,
ABRAHAM PHILIP, M.D.,
By his Attorneys,

Daniel S. Sharp, Esq. BBO #565524
WHITFIELD, SHARP & SHARP
196 Atlantic Avenue
Marblehead, MA 01945
781-639-1862

DR. RICHARD EVANS MD, EDWARD
FLYNN
and COMMONWEALTH OF
MASSACHUSETTS
By their Attorneys,
THOMAS F. REILLY
ATTORNEY GENERAL

Jean M. Kelley, BBO #265540
Assistant Attorney General
One Ashburton Place, Room 1813
Boston, MA 02108-1598
(617) 727-2200 ext.3327