COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                          SUPERIOR COURT
                                                     DOCKET No. SUCV2004-02264

ABRAHAM PHILIP, M.D. )
    Plaintiff, )
)
v. )
)
RICHARD EVANS M.D., )
    Defendant. )

## SUPPLEMENTAL ANSWER OF DEFENDANT RICHARD EVANS M.D. TO PLAINTIFF'S INTERROGATORY NO. 1

### INTERROGATORY # 1

Please state the identity of each person expected to be called as an expert witness at the trial of this matter, and for each such person provide the following information:

(a) the expert's address and phone number;
(b) a summary of the expert's qualifications, including educational background;
(c) the opinion or opinions the expert will give in consultation or at the time of trial;
(d) in detail, the specific facts and grounds upon which the expert bases his/her opinion or opinions;
(e) each and every document, exhibit or visual aid that the defendant intends to use in conjunction with or offer into evidence through the expert witness;
(f) a comprehensive list of any and all cases, whether in trial or by deposition, at which the expert has testified in the preceding 48 months, including any and all names of counsel, docket numbers, and the respective courts in which the testimony was given;
(g) please provide each experts' curriculum vitae or set forth its contents word-for-word.

### ANSWER #1

No expert witness has been chosen at this time. Defendant will supplement this answer when an expert is chosen.

## SUPPLEMENTAL ANSWER # 1

a) Kevin J. O'Connor, New England Organ Bank, One Gateway Center, Suite 202, Newton, MA 02458;

(b) See attached Curriculum Vitae;

(c) Mr. O'Connor may testify, in whole or in part, as to the following opinions: that the law in every state recognizes that death may be declared when there is either irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the entire brain, including brain stem; that the vast majority of people who die are declared dead on the basis of permanent cessation of circulatory and respiratory functions, rather than by brain death criteria; that when cessation of circulatory and respiratory function is only delayed by means of artificial ventilation, removal of that support at the direction of the Patient or the family is proper and appropriate; that Donation after Cardiac Death (DCD) is an accepted donation practice, endorsed by the National Institute of Medicine, the Advisory Council on Organ Transplantation to Secretary Thompson, the Society for Critical Care Medicine, UNOS, and numerous other professional associations; that in instances where a patient has suffered a non-survivable injury, and for whom there is no hope for recovery, and where the family has decided to withdraw treatment, the family may further request or agree to the donation of the patient's organs; that donation in such cases is in accordance with established DCD protocols and entails taking the

2

patient off the ventilator; that after the patient's heart stops beating, the physician declares the patient dead in accordance with clinical practice and the law; that the organ recovery process begins only after death has been declared; and that NEOB has never recovered organs from patients who remain in a persistent vegetative state or are otherwise not legally dead.

Further, the witness may testify in whole or in part, as to his personal knowledge of the events occurring in the case referred to by Plaintiff in the Complaint: that the patient at issue was declared dead in accordance with DCD protocols and the law; and that the facts as alleged by Plaintiff are inconsistent with irrefutably established medical and legal principles. The witness' potential testimony is more fully set out in the Affidavit attached hereto.

(d)  With respect to the opinions set out in the first paragraph of 1(c), the witness relies upon his education, background, training and experience. With respect to the opinions set out in the second paragraph of 1(c), the witness relies upon his personal knowledge and involvement in the case, his review of the patient's medical records, and his knowledge of DCD protocol at the hospital where the donation occurred.

(e)  At this time Defendant is not aware of any documents or visual aids to be used in conjunction with the witness' testimony, other than Plaintiff's letter to the Governor and attachment setting out Plaintiff's allegations with respect to the organ donation here at issue.

(f)  Defendant objects to Interrogatory 1 (f) in that it calls for information not within the purview of the Massachusetts Rules of Civil Procedure. Notwithstanding nor waiving this objection,

3

Defendant states that the witness has not testified as an expert at trial or by deposition within the past 4 years.

(g) See attached.

Signed under the penalties of perjury this 16 day of Dec., 2005.

_____
Dr. Richard Evans


AS TO OBJECTIONS:

_____
Jean M. Kelley, BBO #265540
Assistant Attorney General
Government Bureau/Trial Division
One Ashburton Place, Rm. 1813
Boston, Massachusetts 02108
Tel. (617) 727-2200 x.3327

## AFFIDAVIT OF KEVIN J. O'CONNOR

I, Kevin J. O'Connor, have been the Director of Donation Services for the New England Organ Bank, Inc. (NEOB) for over 15 years, with responsibility for all NEOB organ donation activities. NEOB is a federally designated organ procurement organization responsible for coordinating organ donations for transplant in all of the New England states. I hold a B.S. in Health Science, an M.S. in Administration, and I am a Physician Assistant with over three years of experience in cardiothoracic surgery, and over 20 years experience in organ donation.

Specific to the issues present in this case, I have worked with 12 major New England hospitals to develop Donation after Cardiac Death (DCD) policies consistent with applicable state regulations and national standards of practice developed by the Institute of Medicine. I have been physically present and participated in all aspects of numerous DCD donations that NEOB has coordinated over the past ten years. I have served on the United Network for Organ Sharing (UNOS) Donation after Cardiac Death Clinical Pathway Development Committee, and I currently serve as a national DCD mentor under the auspices of UNOS. I have served as Co-Chair of the Association for Organ Procurement Organizations (AOPO) Technical Assistance Program where I developed a specialized program to help other organ banks develop DCD programs.

In 2003, I was appointed to serve as a faculty member and designated as a national DCD expert for the Dept. of Health and Human Services (DHHS) Organ Donation Breakthrough Collaborative. More recently, I was appointed to serve as Co-Director of the Organ Transplantation Breakthrough Collaborative, a DHHS funded program, with a specific charge from the federal government to increase the rate of DCD donation nationwide from its current level of 5% to over 10%. I have co-authored over 20 papers and on organ donation, including DCD, published in peer reviewed journals, including the New England Journal of Medicine and the Journal of the American Medical Association. I have been an invited speaker on DCD and other organ donation related topics to over 10 national medical conferences in the past three years. In May of 2005, I was awarded a DHHS Medal of Honor for my work on the national level as a faculty member for the Organ Donation Breakthrough Collaborative, with a special focus on DCD.

The organ donation case at issue in the matter referred to in Paragraph 6 of Plaintiff's Statement of Undisputed Facts involved Donation after Cardiac Death. DCD is an accepted donation practice, endorsed by the National Institute of Medicine as well as the Advisory Counsel on Organ Transplantation to Secretary Thompson, the Society for Critical Care Medicine, UNOS and numerous other professional associations. DCD is vital to the transplant community in the United States. Last year alone, 38 DCD donors in the New England area resulted in 75 organ transplants. Nationally, in 2004 there were 389 DCD donors resulting in over 700 potentially life-saving organ transplants.

One clear and undisputable fact is that DCD involves recovery of organs from individuals <u>after</u> they have been declared dead in accordance with the law. More specifically, DCD refers to the circumstance when a person becomes a donor after dying from permanent cessation of cardiac and pulmonary function; the heart stops beating. The law in every state recognizes that death may be declared when there is either (1) irreversible cessation of circulatory and respiratory functions or (2) irreversible cessation of all functions of the entire brain, including brain stem.

Organ donation is not as common after death from permanent cessation of cardiac and pulmonary function because organs rapidly become unsuitable for transplantation. However, this is where organ donation began 40 years ago, before the legal acceptance of declaring death by brain criteria. The vast majority of people who die are declared dead on the basis of permanent cessation of cardiac and pulmonary function rather than by brain death criteria. Moreover, the law is clear that when cessation of circulatory and respiratory function is only delayed by means of artificial ventilation, removal of that support (either at the patient's or the family's direction) is never viewed as a criminal act or the least bit improper.

In instances when a patient suffers a non-survivable injury and for whom there is no hope of recovery, families sometimes decide to withdraw treatment. Once the decision to withdraw futile treatment has been made, the option of donating organs after the patient dies from permanent cessation of cardiac and pulmonary function may be given to or requested by these families. Donation in such cases is in accordance with established DCD clinical protocols and entails taking the patient off the ventilator, typically in the operating room. After the patient's heart stops beating, the physician declares the patient dead in accordance with clinical practice and the law. Only after death is declared does the organ recovery process begin. NEOB has <u>never</u> recovered organs from patients who remain in a persistent vegetative state or are otherwise not legally dead.

In all DCD cases under the jurisdiction of the Massachusetts Medical Examiner's Office, the Medical Examiner's decision with respect to restriction of a donation must be communicated prior to the pronouncement of death because there is a critically short period of time to coordinate recovery of viable organs. For this reason, NEOB informs the Medical Examiner's Office of a potential DCD in advance of death.

I also have personal, first hand knowledge of the events that occurred on 1/30/04 related to organ donation of a young man that took place at a Boston area hospital that is the subject of a Memorandum authored by Dr. Abraham T. Philip. As part of my personal involvement in this case, I had opportunity to review the medical records of the donor and am aware of the DCD protocol at the hospital where the donation at question occurred. This particular organ donor case was a standard DCD case: the family decided to withdraw treatment and subsequently consented to organ donation; the ventilator was removed; the patient's heart stopped beating; and the patient was declared dead in accordance with the law prior to the recovery of any organs as documented in the patient's medical record. In summary, the donation occurred in compliance with established protocol.

To the best of my personal knowledge of this donation case, I absolutely dispute the statements made in Paragraph 6 and 9 of the Plaintiff's Statement of Undisputed Facts that the case was one in which "body parts had been harvested . . . before the victim was brain dead" or involved a request that Dr. Philip approve "the removal of body parts from a person who was not yet dead." Nor was this patient in a "persistent vegetative state" – as is most obvious from the fact that the patient's heart stopped beating after ventilator support was withdraw. By medical definition, if the patient had been in a persistent vegetative state, his heart would not have stopped beating after withdrawal of the ventilator.

The statements about the donation being presented in Plaintiff's Statement of Undisputed Facts, lack any evidentiary support and fly in the face of the irrefutably established medical and legal principles.

I, Kevin O'Connor, sign this document and swear to its veracity under the pains and penalties of perjury as of this 23 day of June, 2005.

_____
Kevin J. O'Connor, PA, MS, CPTC

## Curriculum Vitae

Kevin J. O'Connor MS, PA, CPTC
251 Brookline Street
Needham, MA 02492

Work phone        617-244-8000
Home phone            781-449-3581
E-mail                kocon@neob.org

## Professional Experience:

### New England Organ Bank (NEOB), Newton, MA

1/89 to present:    Director, Donation Services

Responsible for day-to-day clinical and operational oversight of one of the largest organ procurement organizations in the US, serving 11 million people and over 30 organ transplant programs at 12 academic medical centers located throughout the New England region. Responsibilities include management of staff members responsible for ICU patient management, donor evaluation, hospital development, consent, organ recovery surgery, and organ allocation. Also responsible for strategic planning, budgeting, and serving as key liaison with transplant surgeons, physicians, and transplant programs affiliated with New England Organ Bank. Represent NEOB on regional and national level by active participation in numerous committees and consortia. Active in research, protocol development, and writing.

10/86 to 12/88:    NEOB Assistant Technical Director
9/85 to 9/86: NEOB Manager, Recovery Services
8/83 to 8/85:    NEOB Organ Procurement Specialist

### New England Medical Center, Boston, MA

8/81 - 8/83    Physician Assistant, Cardiothoracic Surgery

Responsible for pre-operative, intra-operative, and post-operative care of cardiac and thoracic surgical patients. Duties included post-op ICU patient management, surgical assisting including saphenous vein harvesting, emergency room coverage, intra-aortic balloon pump management, and medical student education. Also served as Instructor for Advanced Cardiac Life Support course.

## Education:

1

| | |
|---|---|
| 9/96 – 5/99 | Boston College, Boston, MA<br>Master of Science, Administrative Studies |
| 7/79 - 6/81: | Northeastern University, Boston, MA<br>Physician Assistant Program<br>Bachelor of Science, Health Science, Summa Cum Laude |
| 8/73 - 5/75:<br>1/77 - 5/78: | State University College at Buffalo, Buffalo, NY<br>Undergraduate studies; biology major |

**Certification:**

1982              National Commission on Certification of Physician Assistants
                  Certificate #820862 (not currently active)

1990              Certified Procurement Transplant Coordinator, Certificate #403,
American Board of Transplant Coordinators

**Other Training**

12/99             Managing the Difficult Business Conversation [2 day program]
                  Harvard Law School – Program on Negotiation


**Committees:**

United Network for Organ Sharing (UNOS)

Kidney Allocation Review Subcommittee, member 2004 -present

Operations Committee; 2003 – present

Organ Procurement Organization Committee, Region 1 representative; 2000 – 2001

Organ Procurement Organization Committee, at large member; 2002 – 2003

Organ Procurement Organization Committee, at large member; 1998 – 1999

Ad Hoc Pediatric Advisory Committee; 2002 – 2003

Pediatric Donor Critical Pathway Workgroup; 2002

Technology User Advisory Committee (AOPO representative); 1998 – 1999

Information Technology Advisory Group; 2000 – 2003

Transportation Committee, Region 1 representative; 1986 - 1987

Ad Hoc Foreign Relations Committee, at large member; 1995 -1997

Association of Organ Procurement Organizations (AOPO)

Procurement Directors Council, Co-Chair; 1998 – 1999

Procurement Directors Council, Chair; 1999 – 2000

Procurement Directors Council, Region 1 representative; 1995 - present

Technical Assistance Program (TAP) Co-Chair 2003 – present

Medical Examiner Committee;1993 - 1995

Ad Hoc Special Projects Committee; 1992 - 1994

Ad Hoc Planning Committee; 1992 – 1993

Other

MedScape Transplantation Editorial Board Member; 1999 – 2001

TransMedics Scientific Advisory Board Member; 2000 – 2001

**Awards:**

2004 Distinguished Service Award - U.S. Department of Health and Human Services; Health Resources and Services Administration

2005 DHHS Medal of Honor - U.S. Department of Health and Human Services; Health Resources and Services Administration

2005 – AOPO/AIG Excellence in Leadership Award – AOPO 2005 Annual Meeting

**Grants:**

<u>Increasing Organ Donation by Enhancing End of Life Care: A Family-Centered, Quality Improvement Program;</u> Co-Investigator, HRSA Grant No. 1 H39 OT 00016; $960,000 (three years); awarded June 1999

<u>The Impact of an Expedited Allocation System and Pulsatile Preservation upon the Transplantation of Kidneys from Expanded Criteria Donors;</u> Co-Investigator, HRSA Grant No. 1 H39 OT 00123; $1,370,000 (three years); awarded September 2002

**Appointments:**

U.S. Department of Health and Human Services; Health Resources and Services Administration; <u>Faculty Member</u> Organ Donation Breakthrough Collaborative_ 2003 – 2005

U.S. Department of Health and Human Services; Health Resources and Services Administration; <u>Co-Director</u> Organ Transplantation Breakthrough Collaborative_ 2005 - present

**Selected Presentations (Invited):**

"Challenges in Allocation of Expanded / Marginal Donor Organs" North American Transplant Coordinator's Organization Transplant Institute, Miami Beach, FL, January, 2005

"Overview of HRSA Organ Donation Breakthrough Collaborative"   American Transplant Congress, Boston, MA, May, 2004 Sunrise Symposium AOPO 2004

"The Use of Organs From Poisoned Donors" North American Transplant Coordinator's Organization Transplant Institute, Reno, NV, March 2004

"The New England Organ Bank Donor Management Experience, 1997 – 2003", Canadian Transplant Association, Medical Management to Optimize Donor Organ Potential Consensus Conference, Mont Tremblant, Quebec, February 2004

"The Use of Organs From Poisoned Donors" South-Eastern Organ Procurement Foundation, Expanded Criteria Donor Course, Orlando, FL, June, 2003

"Expedited (or Aggressive) Organ Placement" UNOS Region 2 Spring Meeting, Newark, NJ, May 2003

"Review of AOPO Survey on Pancreas Donation in the U.S." South-Eastern Organ Procurement Foundation, Tissue & Cell Technology Workshop, Atlanta, GA, March, 2003

4

**Selected Publications:**

Ojo A; Pietroski R; O'Connor K; McGowan J; Dickenson D Quantifying Organ Donation Rates by Donation Service Area. Amer J Transplantation 2005 (5) (part 2) 958-966

Shafer T; Schkade L; Evans R; O'Connor K; Reitsma W Vital Role of Medical Examiners and Coroners in Organ Transplantation. Amer J Transplantation 2004 (4) 160-168

S. Feng; J. Buell; W. Cherikh; M. Deng; D. Hanto; M. Kauffman; A. Leichtman; M. Lorber; R. Maters; M. McBride; R. Metzger; F. Nolte; K. O'Connor; D.Roth; N. Terrault; M. Henry Organ donors with positive viral serology or malignancy: risk of disease transmission by transplantation Transplantation 74(12): 1657-1663; Dec 2002

Hauptman PJ and O'Connor KJ: Medical Progress: Procurement and Allocation of Solid Organs for Transplantation. New England Journal of Medicine 336: 422-431 Feb 6, 1997.

O'Connor KJ and Delmonico FL; Donor Selection and Management; chapter in textbook Transplantation; edited by Leo C. Ginns, A. Benedict Cosimi, and Peter J. Morris, Blackwell Science,1999

O'Connor KJ and Delmonico FL; Organ Donation and Transplantation from Poisoned Donors; Transplantation Reviews; Vol. 13, No. 1, January,1999, pp. 52-54

Hauptman PJ, O'Connor KJ, Wolf RE, McNeil BJ; Angiography of potential cardiac donors. J Am Coll Cardiol (2001 Apr) 37(5):1252-8

Freeman RB, Rohrer RJ, Katz E, Lewis WD, Jenkins R, Cosimi AB, Delmonico FL, Freidman A, Lorber M, O'Connor KJ, Bradley J: Preliminary Results of A Liver Allocation Plan Using a Continuous Medical Severity Score That De-emphasizes Waiting Time; Liver Transplantation (2001 Mar) 7(3):173-8

Gandhi N, Goldman D, Kahan D, Supran S, Saloman R, Delmonico F, O'Connor K Rohrer R, Freeman R Donor cytokine gene polymorphisms are associated with increased graft loss and dysfunction after transplant. Transplant Proc (2001 Feb-Mar) 33(1-2):827-8

Freeman RB, Giatras I, Falagas ME, Supran S, O'Connor KJ, Bradley J, Snydman DR, Delmonico FL; Outcome of transplantation of organs procured from bacteremic donors; Transplantation (1999 Oct 27) 68(8):1107-11

5

Luskin RS, Buckley CA, Bradley JW, O'Connor KJ, Delmonico FL; <u>An Alternative Approach to Evaluating Organ Procurement Organization Performance;</u> Transplant Proc (1999 Feb-Mar) 31(1-2):353-5

Shafer T, Schkade L, Warner H, et al: <u>Impact of Medical Examiner / Coroner Practices on Organ Recovery in The United States</u>. Journal of The American Medical Association, November 1994, Vol. 272, No. 20.

Bradley JW, McCabe JL, O'Connor KJ, and Cho SI: <u>Multi-Organ Donors: A Limited Resource</u>. Transplant Proceedings 20: 846, 1988.

O'Connor KJ, Bradley JW, Cho SI: <u>Extreme Donor Age in Kidney Transplantation.</u> Transplant Proceedings 20: 770, 1988. (also presented at International Transplantation Society Meeting in Barcelona, Spain; Dec. 1987)

O'Connor KJ: <u>Organ Procurement</u>. Physician Assistant Vol. 10, No 9, 1986

O'Connor KJ, Franklin C, Bradley JW, and Cho SI: <u>The Effect of Increased Donor Age on Kidney Transplant Outcome</u>. Transplant Proceedings 18: 480, 1986.

## CERTIFICATE OF SERVICE

I, Jean M. Kelley, Assistant Attorney General, hereby certify that I have this day, December 28, 2005, served the foregoing **Supplemental Answer of Defendant Richard Evans M.D. to Plaintiff's Interrogatory No. 1 with attached Affidavit of Kevin J. O'Connor, Curriculum Vitae, and Certificate of Service** upon all counsel of record by mailing, first class, postage prepaid, to:

Daniel S. Sharp, Esquire
WHITFIELD, SHARP & SHARP
196 Atlantic Avenue
Marblehead, MA 01945

_____
Jean M. Kelley
Assistant Attorney General
Trial Division