UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION: 04-CV-11069-JLT

|  |  |
|---|---|
| ABRAHAM PHILIP, MD | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| JOHN CRONIN, in his personal capacity. | ) |
| | ) |
|     Defendant. | ) |

MOTION IN LIMINE FOR FINDING AND
INSTRUCTION THAT THE PLAINTIFF'S SPEECH
WAS "SPEECH OF PUBLIC CONCERN"

On 6/15/2005, pursuant to F.R.Civ.P. 56(a) and (d), the plaintiff moved for partial summary judgment on one of the pivotal issues in this case. That issue is whether Plaintiff-Dr. Philip engaged in speech related to "matters of public concern" before he was terminated from his employment with the Office of the Chief Medical Examiner (OCME).

**The First Circuit has decided four cases (three in calendar year 2005) not cited in the original briefing of the motion that strongly support the plaintiff's position.** (See, *infra*.)

The plaintiff's motion was denied without prejudice to raising the issue at trial. The plaintiff is raising the issue again through this motion in limine. Efficiency in the trial of this case and helping to ensure a just result would be promoted by deciding the issue at this time.

1

## ABBREVIATED STATEMENT OF THE CASE

Dr. Philip was employed by contract with the Office of the Chief Medical Examiner (OCME) during September of 2003. He had previously been employed on a contract basis by the OCME. (Exhibit 1; Plaintiff's Affidavit.)

Dr. Philip contends that, from the beginning of his employment and leading to his termination on March 4, 2004, he was faced with escalating hostility from OCME Chief Administrator John Cronin. Dr. Philip contends that, during and also before the period of October 2, 2003 to March 3, 2004, Dr. Philip pointed out to Defendant-Cronin, numerous ways in which the operations of the OCME violated state regulations, violated state law, or created dangers to public health and safety. (Exhibit 1; Plaintiff's Affidavit.)

On March 1, 2004, Dr. Philip wrote a letter to the Governor of the Commonwealth of Massachusetts in which Dr. Philip expressed his opinions about problems in the OCME and outlined some ideas for improvements. (Exhibit 2; 3/1/2004 letter.)

A copy of Dr. Philip's letter to the Governor was provided to John Cronin and to OCME's Chief, Dr. Evans. (Exhibit 3; "Further Answers of Defendant Dr. Richard Evans MD to Plaintiff's Interrogatories; Interrogatory and Answer #9.)

Dr. Philip wrote a second letter to the Governor of the Commonwealth and to other medical examiners at the OCME pertaining to a case in which human organs had been harvested from an auto accident victim before the victim was brain dead. (Exhibit 4; "Organ Bank Letter.")

Dr. Philip's second letter questioned the procedure by which a young man's organs were removed for donation. He suggested a meeting among appropriate personnel to discuss how such cases might be handled in the future. It concluded with, "I hope this Memo prompts a

wider discussion between the NEOB [(New England Organ Bank)], Medical Examiners, District Attorneys, etc., so that everybody is comfortable with the decisions taken." (Exhibit 4; Organ Bank Letter.)

A copy of Dr. Philip's second letter to the Governor was provided to John Cronin and to OCME's Chief, Dr. Evans. (Exhibit 3; "Further Answers of Defendant Dr. Richard Evans MD to Plaintiff's Interrogatories; Interrogatory and Answer #10.)

Two days after receiving the letters, John Cronin told Dr. Philip that he would no longer be permitted to conduct "cremation certification duty", a duty to which all other medical examiners were still assigned. (Exhibit 1; Plaintiff's Affidavit.)

Three days after receiving the letters, Defendant-Cronin terminated Dr. Philip's employment. (Exhibit 5; letter of termination.)

Defendant-Cronin admits that the letters were received *and were discussed* at a meeting where Dr. Philip's termination of employment was decided. (Exhibit 6; Cronin Deposition, pp. 65-66.)

The letter terminating Dr. Philip referred to the plaintiff's communications with members of the OCME and the district attorney's office as a reason for the Plaintiff's termination. (Exhibit 5; letter of termination.)

It is the plaintiff's contention that his employment was terminated, at least in part, in retaliation for his speech in the letters described above. (See, Complaint, paras. 40-44.)

## THE COURT MAY NOW RULE THAT DR. PHILIP'S STATEMENTS WERE SPEECH UPON MATTERS OF PUBLIC CONCERN

The plaintiff submits that the court may, and should, now rule that Dr. Philip's statements

3

were speech upon matters of public concern. Such a decision would streamline the trial, would

eliminate possible jury confusion, and would follow First Circuit precedent.

The general rule is that, "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-148 (1983.)

In this case, however, the fact that the statements were upon matters of public concern can be decided without examining the Connick elements. The First Circuit has now held on five different occasions that:

> It is not always necessary, however, to examine the form and context of the expression…. Where a public employee speaks out on a topic which is clearly a legitimate matter of inherent concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the "form and context" of the expression.
>
> Tripp v. Cole, 425 F.3d 5, 12-13 (1st Cir. September 2005); Baron v. Suffolk County Sheriff, 402 F.3d 225 (1st Cir. March 29, 2005); Mihos v. Swift, 358 F.3d 91, 102-103 (1st Cir. 2004), all quoting O'Connor v. Steeves, 994 F.2d 905, 913-914 (1st Cir. 1993). (Internal quotations omitted.) Jordan v. Carter, 428 F.3d 67, 73 (1st Cir. November 4, 2005). ("In some instances, the subject matter of the speech, alone, may resolve the public concern question.")

Dr. Philip's speech was made to public officials including the Governor. Among the matters complained of to the Governor and public officials was OCME's failing to conduct adequate toxicological studies of newly-deceased hospital and nursing home patients to determine whether they presented to OCME with high levels of morphine in their body. (Exhibit 2.) Such studies would (or could) protect the elderly and infirm from possible negligence or murder.

Another topic addressed by Dr. Philip was OCME's lack of independence from police agencies, district attorneys, and politicians. (Exhibit 2.)

Dr. Philip criticized OCME procedures for the manner in which autopsy photographs were being taken. These photographs were used by prosecutors and criminal defense attorneys, and by civil attorneys in wrongful death litigation. (Exhibit 2.) Dr. Philip's letter linked "sloppy procedures," "poor record-keeping," and a lack of motivation on the part of police photographers to evidence suppression that "may result in the guilty going free." This is plainly a matter of public concern.

Dr. Philip pointed out the inadequacy of toxicology studies being completed by the OCME. (Exhibit 2.) He linked this issue to "missed homicide cases" and the possible "loss of life, particularly among our young people who have succumbed to using contraband drugs." No one could seriously question whether these are matters of public concern.

In his March 1 letter concerning organ harvesting, Dr. Philip questioned the procedure used in a case in which the OCME permitted the removal of organs from a hospital patient who had not been declared brain dead before the procedure resulting in the removal of the organs began. (Exhibit 4.)

It is beyond fair dispute that the operations of the OCME, particularly those operations identified and objected to, or questioned by, Dr. Philip were matters of public concern.

EVEN UNDER THE *CONNICK* STANDARDS,
<u>THE SPEECH WAS OF PUBLIC CONCERN</u>

Even if the court were to decide that it must analyze Dr. Philip's speech under the Connick standards, a finding that Dr. Philip was engaged in speech of public concern would be appropriate at this time. The Baron Court explained the Connick analysis as follows:

> To prevail on a § 1983 claim based on a violation of his First Amendment rights, a public employee like Baron must show that "(1) his expression involved matters

>of public concern; (2) his interest in commenting upon those matters outweighed the [government employer's] interests in the efficient performance of its public services; and (3) his protected speech was a substantial or motivating factor in the . . . adverse employment actions." Lewis v. City of Boston, 321 F.3d 207, 218 (1st Cir. 2003). This appeal focuses on the first prong, the threshold question of whether Baron was speaking "not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest." Connick v. Myers, 461 U.S. 138, 147, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983).  In answering this question of law, the Supreme Court has instructed courts to consider "the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48.
>
>Baron, at 402 F.3d 233.

The first two Connick elements have been proven.  First, as argued above, Dr. Philip's letters to the Governor (as well his internal speech) were upon matters of public concern.

Second, OCME's then-Chief Medical Examiner Evans has conceded the second element; i.e. that Dr. Philip's "interest in commenting upon those matters outweighed the [government employer's] interests in the efficient performance of its public services." Lewis, at 321 F.3d 218.  Then-Chief Medical Examiner Dr. Evans testified that:

>Q. Did Dr. Philip's suggestions for improvements in the operation of the OCME cause any difficulties?
>
>A. Well, [non-responsive answer that does not cite any difficulties.]
>
>Q. My question was, Dr. Philip's criticisms and suggestions for improvements did not cause any troubles in the office of the OCME, did they?
>
>A. No, I don't think so. (Exhibit ***; Evans MD Deposition, 12/19/05, pp. 71-73.)

The only question remaining under the Connick analysis is, therefore, whether Dr. Philip's "protected speech was a substantial or motivating factor in the . . . adverse employment actions." Baron, at 402 F.3d 233, quoting Lewis v. City of Boston, 321 F.3d 207, 218 (1st Cir.

2003).    *This is the only question that the jury should have to consider in this case.*


1. Even Internal Complaints Were Public Speech

The defendant may try to avoid the thrust of this motion by arguing that Dr. Philip only complained of internal problems at the OCME. Even if this were true, which it is not, that would not assist the defendant.

In Baron, *supra*, the First Circuit held:

> The district court determined at summary judgment that "the internal workings of the Sheriff's Department" were a matter of inherent public concern, and thus found that Baron's speech was protected without engaging in an extended analysis of its form and context. The Department takes issue with this conclusion, arguing that the content of Baron's expression was not a matter of inherent public concern because it dealt exclusively with internal working conditions at the House of Correction. We disagree.

> Baron, at 402 F.3d 233-234.

The First Circuit recognized that the plaintiff's allegations in Baron were matters of public concern. The First Circuit pointed to certain facts, also present in *this* case, that proved that the internal workings of the Sheriff's Department were matters of public concern. It held:

> The court also emphasized that "the community has in fact manifested a legitimate concern in the internal workings of the Sheriff's Department." As evidence of that concern, the court cited a series of 2001 Boston Globe newspaper articles chronicling abuse and mismanagement at the House of Correction, and the Stern Report, commissioned by Governor Jane Swift in 2001 in response to mounting allegations of mismanagement of the Suffolk County Sheriff's Department, which recommended a number of sweeping changes to the Department, including an aggressive attack on the code of silence

> Baron, at 402 F.3d 234-235.

Here, the facts are the same. To paraphrase Baron, "the community has in fact manifested a legitimate concern in the internal workings of the [OCME.] As evidence of that

concern, the court [will see] a series of [] Boston Globe newspaper articles (Exhibit 7) chronicling abuse and mismanagement at the [OCME], and the [Governor's Commission on Criminal Justice Innovation], commissioned by Governor [Romney]" recommended sweeping changes at the OCME. (See, Exhibit 8.)  The First Circuit's later decision in Tripp v. Cole cited and approved this analysis. Tripp, at 425 F.3d 12.

Thus, even under a Connick analysis of *internal* speech, Dr. Philip's speech was a matter of public concern.

Following well-established First Circuit precedent, this court should "eschew further inquiry into the employee's motives as revealed by the 'form and context' of the expression" (Tripp, *supra*, Baron) and hold, in limine, that Dr. Philip's speech was on a matter of public concern.

## RELIEF REQUESTED

For the reasons of fact and law set forth in this brief, the plaintiff requests that the court:

(1)  find that Dr. Philip's speech was speech on a matter of public concern;

(2)  rule that the issue of speech on a matter of public concern is established for trial;

(3)  so instruct the jury before the commencement of the trial;

(4)  preclude contrary evidence on the issue; and

(5) grant such other relief as is just and equitable under the circumstances.

Respectfully Submitted,

/s/ Daniel S. Sharp

_____

Daniel S. Sharp
Elaine Whitfield Sharp
Attorneys for Plaintiff
(BBO 565524)
196 Atlantic Avenue
Marblehead, MA  01945
781-639-1862

Certificate of Service

Daniel S. Sharp certifies that a copy of the document above was served by ECF on March 10, 2006 and in hand on counsel for all opposing parties on March 13, 2006 to:

Attorney Jean M. Kelly
Assistant Attorney General
One Ashburton Place
Boston, MA  02108-1598

/s/ Daniel S. Sharp

_____