```
 1      mentioned a moment ago, all aware of
 2      the content of your letter before it
 3      was sent?
 4  A.  Yes, sir.
 5  Q.  So, the people who knew of the content
 6      of your letter before it was mailed
 7      included general counsel for the OCME,
 8      is that right?
 9  A.  Yes, sir.
10  Q.  And it included the human resources
11      director for the OCME?
12  A.  Yes, sir.
13  Q.  And it included another human resources
14      director?
15  A.  Yes, sir.
16  Q.  And who was that?
17  A.  The executive office of public safety.
18  Q.  Who specifically was that?
19  A.  Irma Gutierrez.
20  Q.  Now, did this collaboration include
21      face-to-face meetings, or was it all
22      over the phone or by e-mail?  How did
23      the collaboration come about?
24  A.  Both.
```

```
 1   Q.   Just talking about face-to-face meetings
 2        right now, do you remember how many
 3        there were relating to terminating
 4        Dr. Philip?
 5   A.   I believe there was one meeting, sir.
 6   Q.   And who do you recall was in that
 7        meeting?
 8   A.   The chief of staff for the executive
 9        office of public safety, the
10        undersecretary to which this agency
11        reported, the human resources directors
12        for the CME, and the executive office
13        of public safety.  Dr. Richard Evans, I
14        believe, was there, the general counsel
15        for our agent.
16   Q.   That's Miss Faherty?
17   A.   That's right.  I believe that's it, sir,
18        that I recall.
19   Q.   During that meeting was there any
20        discussion of any letters that Dr. Philip
21        had sent to Governor Romney?
22   A.   Yes, sir.
23   Q.   What was that discussion?
24   A.   As I recall, folks were notified that
```

```
 1         correspondence had been sent both to
 2         our agency as well as apparently mailed
 3         to Governor Romney.  There was some
 4         discussion as to what the content was
 5         of those two letters.  But other than
 6         that, it was just general information.
 7   Q.    Did anyone discuss whether there might
 8         be some first amendment issues if Dr.
 9         Philip was terminated after sending
10         those letters to Governor Romney?
11              MS. KELLEY:  Objection to form,
12         but you may answer..
13   A.    No, sir.
14   Q.    So, no one among the people that you have
15         named, or the positions that you have
16         named expressed any first amendment
17         concerns?
18              MS. KELLEY:  Objection to
19         form.  You may answer..
20   A.    No, sir.
21   Q.    In your view, what were the reasons for
22         the termination of Dr. Philip's contract?
23   A.    Dr. Philip's contract, I believe, had
24         mentioned in the job duties that he was
```

1  to be a role model for other medical
2  examiners, employees of the chief medical
3  examiner's office. As a result of his
4  actions with the correspondence with
5  the district attorney on that case that
6  I mentioned, it was determined that he
7  had violated that term of his contract.
8  Q. So, was this correspondence with the
9  district attorney the sole act that
10 led to the termination of his contract?
11         MS. KELLEY: Objection to form,
12 but you may answer.
13 A. No, sir.
14 Q. What else, what other acts on the part
15 of Dr. Philip contributed to the
16 termination of his contract?
17 A. The collaboration amongst the folks that
18 we discussed this issue with involved the
19 consideration of his actions. Prior to
20 this event involving his signature on
21 a death certificate where he allegedly,
22 or somehow put blood on the death
23 certificate, and handed it to a member
24 of our administrative staff. As a

| | | |
|---|---|---|
| 1 | | result of his actions in that case, he |
| 2 | | was disciplined. |
| 3 | Q. | So, you've mentioned so far |
| 4 | | correspondence with the district |
| 5 | | attorney, and the signature -- the bloody |
| 6 | | signature, we'll say for lack of a better |
| 7 | | phrase. Were there any other actions |
| 8 | | by Dr. Philip that contributed to the |
| 9 | | termination of his contract? |
| 10 | A. | No, sir. |
| 11 | Q. | Can you describe, as best you recall it, |
| 12 | | this correspondence with the district |
| 13 | | attorney? |
| 14 | A. | It was an e-mail regarding, I believe, a |
| 15 | | juvenile or child case that Dr. Philip |
| 16 | | was working on. It was correspondence |
| 17 | | between himself and a district attorney |
| 18 | | covering that case. Dr. Philip, as I |
| 19 | | recall, in his e-mail responded back to |
| 20 | | the district attorney that he did not |
| 21 | | want his actions involved in this case |
| 22 | | to be misconstrued or misinterpreted by |
| 23 | | anyone lest he be accused of farting |
| 24 | | or urinating on the case folder. That's |